700 A.2d 306

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT AND
CROSS–APPELLANT, v. DAVID COOPER, DEFENDANT–
APPELLANT AND CROSS–RESPONDENT.

Argued December 3, 1996—Decided August 20, 1997.

332

&#8986;798(.5)

*Stephen W. Kirsch,* and *Linda Mehling,* Assistant Deputy Public Defenders, argued the cause for appellant and cross-respondent (*Susan L. Reisner,* Public Defender, attorney).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for respondent and cross-appellant (*Peter Verniero,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

COLEMAN, J.

In May 1995, a Monmouth County jury convicted defendant, David Cooper, of the kidnapping, aggravated sexual assault, felony murder, and purposeful-or-knowing murder of L.G., a six-year-old girl, by his own conduct. The same jury sentenced him to death. This is defendant's direct appeal from his conviction for capital murder and sentence of death. *R.* 2:2–1(a)(3). We affirm both the conviction and the sentence of death.

I

*Procedural and Factual History*

A Monmouth County Grand Jury indicted defendant on the following charges: purposeful-or-knowing murder by his own conduct, contrary to *N.J.S.A.* 2C:11–3a(1) or (2) (count one); felony murder, contrary to *N.J.S.A.* 2C:11–3a(3) (count two); first-degree kidnapping, contrary to *N.J.S.A.* 2C:13–1b (count three); and two counts of first-degree aggravated sexual assault, contrary to *N.J.S.A.* 2C:14–2a(1) and 2C:14–2a(3) (counts four and five alleging rape and sodomy).

The State's theory at trial was that defendant kidnapped the victim and took her underneath a porch where he raped her and then strangled her to escape detection or apprehension. An alternative theory was that defendant murdered the victim in the course of an aggravated sexual assault or kidnapping.

At trial, the defense conceded defendant's guilt of felony murder, kidnapping, and aggravated sexual assault. The defense contested, however, that the murder was purposeful or knowing. Instead, defendant contended that the killing had occurred accidentally during the course of an aggravated sexual assault. Thus, he claimed that there had been no intent to strangle the child but rather that death had been caused by unintentionally placing pressure on her carotid artery for about thirty seconds.

-A-

*Guilt Phase*

On July 18, 1993, the six-year-old victim, L.G., her mother, R.G., and the victim's two sisters were at the home of R.G.'s sister-in-law, M.W., in Asbury Park. While M.W. was at the supermarket, R.G. sat on the front porch of the house with her youngest daughter. The victim and her other sister were with M.W.'s daughter playing in the frontyard. After playing in the frontyard for some time, the children moved into a fenced-in backyard.

While they were playing in the backyard, defendant lured the victim away from the other children and eventually picked her up, lifted her over the fence, and walked away with her. The other children went to the frontyard and told R.G. what had occurred. R.G., joined by M.W., who had just returned from the supermarket, began to search for and to call out to L.G., but they could not locate her. Soon after, neighbors joined in the search.

The Asbury Park Police Department was contacted shortly after L.G.'s disappearance, and police officers also joined the search. Within a few hours after the victim had disappeared, her body was found under a porch of an abandoned house. Defendant lived under that porch. L.G. was found lying on her back on a mattress with her shirt pulled up, her panties at her ankles, a pair of men's boxer shorts over her face, and her vaginal area exposed and bloodstained.

The police found clothing and a bloodstained paper towel at arms's length from L.G.'s body. The police also found a gym bag

that contained a wallet. Inside the wallet was defendant's social-security card. Defendant's latent fingerprints were found on a paper bag and on a malt-liquor bottle in the porch area. Several letters, photographs, and other documents in defendant's name were also found in the area.

That night, the police interviewed witnesses to the abduction, and defendant became a suspect almost immediately. Defendant was located the next day and was taken to police headquarters for questioning. The State concedes that defendant was in custody at that time. He was read his *Miranda* rights, and he signed a form waiving his rights to remain silent and to counsel. At that time, defendant denied any involvement in the child's death.

Soon thereafter, Detective John Musiello confronted defendant with the evidence that the police had against him and told him that they would seek a court order to obtain forensic evidence from his person. No law-enforcement officer, however, informed defendant that he was facing a potential death sentence. Instead, they told him that the perpetrator was facing a term of life imprisonment with thirty years of parole ineligibility.

Defendant then confessed to causing L.G.'s death. According to slightly varying police testimony, he dropped his head and stated either: (1) "It was an accident. I did it. I was drunk;" or (2) "It's an accident. I was drunk. I strangled her." Defendant explained that he had seen children playing at M.W.'s house on his way to the porch of the abandoned house and that he had told L.G. to come to him. He lifted her over the fence and led her underneath the porch of the abandoned house. Defendant then stated, "Then we had sex, and I strangled her" and that he had left her body underneath the porch. After further questioning, defendant admitted that he had ejaculated and that he had worn a condom which he later had discarded in a nearby field.

Defendant subsequently signed a formal written statement, in which he described the sexual penetration of L.G. as vaginal and stated that she had bled from her vagina during the penetration,

causing blood to get on defendant's clothes. He also told the police that he had been on top of L.G. during the penetration and that his hands had been on her neck.

An autopsy of L.G.'s body revealed dried blood on the skin of her lower abdomen and external genitalia. Numerous internal injuries were found in her vaginal canal and cervix. Her hymen was not intact. Her anal canal also showed signs of injury. The autopsy revealed swelling in L.G.'s trachea and lungs, petechial hemorrhages on the outer surface of the thymus, and swelling in her brain.

The medical examiner concluded that the injuries on and around L.G.'s neck, the edema in her lungs, and the swelling in her brain were consistent with asphyxia caused by manual strangulation. He also concluded that pressure probably had been applied for approximately four to six minutes because, for edema to form in the lungs, pressure would have had to have been applied for three to six minutes, and for irreversible brain damage to occur from lack of oxygen, pressure would have had to have been applied for four to six minutes.

The police obtained seven discarded condoms from a field, close to the abandoned house, to which defendant had led them, and obtained from defendant samples of his hair, saliva, and blood. None of the condoms tested positive for semen, although one had blood on it. Blood was found on the paper towel discovered under the porch, on the cushion on which L.G. had been found, on two pairs of sneakers found under the porch, and on defendant's jeans, t-shirt, and boxer shorts. No semen was found on L.G.'s clothes or person. Four pubic hairs found on L.G. were consistent with defendant's pubic hair, although they could not be linked to him conclusively.

-B-

*Penalty Phase*

The penalty phase was conducted before the same jury. The State relied on three aggravating factors: (1) that the murder was

outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind, *N.J.S.A.* 2C:11–3c(4)(c); (2) that the murder occurred during the commission of an aggravated sexual assault or kidnapping, *N.J.S.A.* 2C:11–3c(4)(g); and (3) that the purpose of the murder was to escape detection or apprehension, *N.J.S.A.* 2C:11–3c(4)(f). Defendant's mitigating evidence was limited to his life up to the age of seventeen. The defense, under the "catch-all" mitigating factor, *N.J.S.A.* 2C:11–3c(5)(h), submitted eighteen mitigating circumstances related to defendant's life.

The defense presented an enormous amount of mitigating evidence about defendant's tragic childhood, which was replete with numerous foster care placements, abuse, neglect, and exposure to violence, drugs, and alcohol. Several experts testified that the lack of stability in defendant's life, his exposure to violence, and his lack of a relationship with his mother had affected him in numerous ways, such as making him aggressive and unable to empathize with others, as well as by reducing his ability to understand cause and effect. The defense also presented expert testimony that, as a result of defendant's upbringing, he was extremely emotionally disturbed and that he had not developed normally.

The State's strategy during the penalty phase was to emphasize the good aspects of defendant's childhood. The prosecutor thus elicited testimony from defendant's relatives about the positive aspects of his familial and foster-care relationships, which the prosecutor argued in summation.

The State rebutted defendant's expert mitigating evidence by presenting testimony that defendant's personality disorder was not treatable. The State's expert also testified that defendant's childhood would not prevent him from knowing the difference between right and wrong and would not make him unable to control his actions.

The jury unanimously found that the State had proven that defendant had committed the murder to escape detection, *N.J.S.A.* 2C:11–3c(4)(f), and that he had done so in the course of commit-

ting aggravated sexual assault and kidnapping, *N.J.S.A.* 2C:11–3c(4)(g). The jury, however, unanimously found that the State had failed to prove the existence of the c(4)(c) aggravating factor, namely, that the murder had involved depravity, *N.J.S.A.* 2C:11–3c(4)(c). Some or all of the jurors found the following mitigating factors: (1) that defendant had been denied nurturing as an infant (6 jurors); (2) that he had been born to drug and alcohol-dependent parents (12 jurors); (3) that drinking by his mother during pregnancy had contributed to defendant's physical and developmental disabilities (2 jurors); (4) that his father had abused members of the family when defendant was an infant, thereby exposing him to violent and abusive behavior (8 jurors); (5) that his mother had abandoned him with relatives throughout his youth (3 jurors); (6) that his mother had neglected and abused him because of her own upbringing and dependence on alcohol (10 jurors); (7) that throughout his childhood, he had been exposed to excessive amounts of domestic violence and substance abuse (10 jurors); (8) that he had suffered through multiple placements and periodically had attended 11 different schools (10 jurors); (9) that he had been denied consistent treatment throughout childhood despite identification of emotional and psychological problems (3 jurors); (10) that his background had increased significantly his risk of engaging in substance abuse and antisocial behavior (8 jurors); (11) that he had been allowed to abuse drugs and alcohol at an early age (6 jurors); (12) that he had begun acting out during his childhood because of unresolved and untreated emotional disturbances (6 jurors); (13) that during his childhood, he had been exposed periodically to an unstable father (6 jurors); (14) that he had been deprived of a stable nurturing home throughout his childhood (5 jurors); (15) that he had not been provided with recommended and necessary therapy (4 jurors); and (16) that the sudden death of his mother had left him with unresolved grief issues that were not addressed through therapy (6 jurors). The jury unanimously rejected the following two factors: (1) that defendant had been denied exposure to proper role models during

his childhood; and (2) the "any other reasons not mentioned" factor.

However, the jury unanimously found that the two aggravating factors together outweighed the mitigating factors beyond a reasonable doubt. Defendant was accordingly sentenced to death.

After the jury was discharged, the parties discovered that a graphic photo of wounds on the victim's genitalia accidentally had been submitted to the jury during the penalty phase. The trial court subsequently denied defendant's motion for a non-death verdict or, in the alternative, a new penalty-phase trial, concluding that the accidental submission of the photo had not prejudiced defendant because it had been admitted into evidence during the guilt phase.

That same day, the trial court sentenced defendant on the noncapital counts. The court merged the felony-murder conviction into the purposeful-or-knowing-murder conviction and sentenced defendant to thirty years to life. The two counts of aggravated sexual assault were merged with each other. The court then sentenced defendant on the kidnapping conviction to fifty years of imprisonment with a twenty-five-year parole-ineligibility bar and on the aggravated-sexual-assault conviction to a consecutive twenty-year term with a ten-year parole bar.

II

*Jury Selection*

Defendant asserts that he was denied an impartial jury because of juror Maria Hollenback's alleged intent, formed during the trial, to seek employment at the Monmouth County Prosecutor's Office. Defendant also contends that he was prejudiced by her omission during *voir dire* of the fact that her cousin was an inmate in a federal prison. For those reasons, defendant maintains that he is entitled to a new trial. Following an evidentiary hearing, the trial court found that Hollenback had not intended to seek employment at the Prosecutor's Office until after the trial and that her

obtaining employment there was "happenstance." The court also concluded that her failure to reveal her cousin's status as an inmate had been neither deliberate nor prejudicial.

-A-

*Employment at Prosecutor's Office*

Defendant contends that, given the incredibly short time span between the verdict and Hollenback's application and the numerous instances of her alleged perjury at the evidentiary hearing, the trial court clearly abused its discretion in concluding that she had never contemplated, during the trial, seeking employment at the Prosecutor's Office and that she had no ulterior motive in convicting and sentencing defendant.

We reject defendant's contention that the trial court erred in making factual findings that undermine his claim. The scope of our appellate review of those findings is limited to a determination of whether they are supported by credible evidence in the record. *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964). The trial court heard the testimony and saw the witnesses, thereby placing it in a much better position than this Court to judge credibility. The trial court recognized the inconsistencies in Hollenback's testimony, but nevertheless found her to be candid. Implicit in that finding was the inability of the defense to offer any direct evidence that she had contemplated employment during the pendency of the trial.

We reject defendant's assertion that Hollenback would have had an incentive to ingratiate herself with the Prosecutor's Office by convicting and returning a death sentence. Absent supporting evidence, that possibility is pure speculation and assumes that Hollenback disregarded her oath for personal gain. The presumption that she followed her oath has not been rebutted. *See State v. LaFera,* 42 *N.J.* 97, 110, 199 *A.*2d 630 (1964).

-B-

## Omission During Voir Dire

 Defendant also seeks reversal of his conviction based on Hollenback's omission, during *voir dire,* that she had a cousin in federal prison. When a juror incorrectly omits information during *voir dire,* the omission is presumed to have been prejudicial if it had the potential to be prejudicial. *In re Kozlov,* 79 *N.J.* 232, 239, 398 *A.*2d 882 (1979); *Wright v. Bernstein,* 23 *N.J.* 284, 293–96, 129 *A.*2d 19 (1957); *State v. Scher,* 278 *N.J.Super.* 249, 262–68, 650 *A.*2d 1012 (App.Div.1994), *certif. denied,* 140 *N.J.* 276, 658 *A.*2d 299 (1995). As the Court stated in *In re Kozlov, supra:*

> Where a juror on *voir dire* fails to disclose potentially prejudicial material, such as that involved in this case, a party may be regarded as having been denied [a] fair trial. This is not necessarily because of any actual or provable prejudice to his case attributable to such juror, but rather because of his loss, by reason of that failure of disclosure, of the opportunity to have excused the juror by appropriate challenge, thus assuring with maximum possible certainty that he be judged fairly by an impartial jury.
>
> [79 *N.J.* at 239, 398 *A.*2d 882.]

 In its application, however, that rule is not as all-encompassing as it appears at first glance. Although the rule does not require a litigant to demonstrate prejudice by showing that an improperly empaneled juror did not decide the case fairly, *Wright, supra,* 23 *N.J.* at 295, 129 *A.*2d 19, it does require a litigant to demonstrate that, had he or she known of the omitted information, he or she would have exercised a peremptory challenge to exclude the juror. *Id.* at 294, 129 *A.*2d 19. That is so because

> [o]nce the jury is sworn, ... the law presumes that every juror in a case is indifferent and above legal exception, or otherwise he would have been challenged for cause. *This presumption puts a duty on a party to show that they were or would have been dissatisfied with the jury as finally impaneled, and that they would have exercised the right of additional peremptory challenges given them by statute if they were aware of the true situation.*
>
> [*Ibid.* (emphasis added).]

 In *Wright, supra,* the Court concluded that it had "no doubt had the prospective juror answered the inquiry truthfully, he would have been peremptorily challenged," thus causing it to

sustain the claim of prejudice. 23 *N.J.* at 294, 129 *A.*2d 19. Absent an affirmative showing that a litigant would have exercised a peremptory challenge to exclude a juror, the *voir dire* omission is harmless. *See Scher, supra,* 278 *N.J.Super.* at 266–68, 650 *A.*2d 1012. Such a rule makes sense because if a litigant would not have challenged the juror, the litigant could not have been prejudiced.

In the present case, it is highly unlikely that defendant would have exercised a peremptory challenge to excuse Hollenback had she disclosed her cousin's imprisonment. Her answers during *voir dire* indicated that she could be receptive to psychiatric testimony and to mitigating evidence about defendant. For example, at one point, defense counsel asked her about her impression of the effects of a child's upbringing on his or her future behavior:

Q: ... You also mentioned that—an interesting observation. Everybody has the potential to do wrong thinks [sic] but some people, they get a better chance at not doing the wrong thing or better opportunities to—

A: Yes.

Q: Could you explain—

A: *My observation—in my observation—*

Q: Yeah. Sure that's what we want.

A: Children, for example, whose parents bring them up, what we say is denominational of the Lord, we bring them up knowing right from wrong. In my *observation, limited observation, those children, myself included, tend to,* you know, have a narrow perimeter of behavior, you know.

Q: Of right and wrong? You're more ... aware of it, is that what you're saying?

A: I guess if you are polished more. I don't know why it is. I know there are things that in my observation children are brought up with that, within those perimeters and [t]hey're better behaved just altogether, yeah.

. . .

Q: Now, as I explained that process, do you think that you could possibly consider the background of Mr. Cooper or perhaps when he was a child, when he was first being raised, could you consider that in the weighing process and determine whether he should live or die?

A: Sure.

Q: You say that with quite certainty. Can you explain that more to me.

A: Yes.

Q: Why do you say it so certain?

A: Because as I said to you before, I think how a child is brought up is relevant as he behaves as an adult or even as a child, sure.

Thus, during *voir dire*, Hollenback did not appear to be in any way a "bad" defense juror.

The question then becomes whether the additional information would have changed defense counsel's acceptance of Hollenback. We are satisfied that it would not. First, she testified at the remand hearing that she was not close to her cousin, having neither seen him nor spoken to him since 1950. Second, as for her attitude toward those sent to prison, she stated that she occasionally sent Christmas cards to her cousin.

This information did not make Hollenback a less desirable juror from a defense perspective. Perhaps it is for that reason that defendant does not elaborate even in the most hypothetical way on the prejudice that he suffered vis-a-vis the omission and does not even assert that he would have struck Hollenback from the jury, simply stating that the omission "deprived [him] ... of information necessary to make intelligent use of his peremptory challenges." That, however, simply is not the test under our law.

We conclude that the events surrounding Hollenback's employment with the Monmouth County Prosecutor's Office do not constitute reversible error. We also conclude that her *voir dire* omission was harmless.

## III

### *Alleged Death Qualification of Juror*

The essence of defendant's argument is that the trial court erred by granting the prosecutor's motion to dismiss juror Fred Rummel for cause because of his relatively uncommitted views on capital punishment. Defendant stresses that a capital juror may not be removed for cause simply because the State does not like his views on the death penalty and that, in order to be removed for cause, the juror's qualms about capital punishment must prevent him from following the law. Defendant relies on *Gray v.*

*Mississippi,* 481 *U.S.* 648, 664–65, 107 *S.Ct.* 2045, 2054–55, 95 *L.Ed.*2d 622, 637 (1987), and asserts that an erroneous exclusion in this context can never be harmless.

A capital juror may only be excused for cause based on his or her views on the death penalty if such views would substantially impair his or her ability to follow the law during the trial. *Adams v. Texas,* 448 *U.S.* 38, 45, 100 *S.Ct.* 2521, 2526, 65 *L.Ed.*2d 581, 589 (1980); *State v. Martini,* 131 *N.J.* 176, 210, 619 *A.*2d 1208 (1993) (*Martini I*), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995); *State v. Ramseur,* 106 *N.J.* 123, 255–56, 524 *A.*2d 188 (1987). Here, Rummel clearly stated that, although he was sympathetic to the possibility of rehabilitation, he believed in the death penalty and could impose it. He was thus not death-excludable.

A review of the record, however, reveals that Rummel was not excused because of his views on capital punishment. The prosecutor based her motion to excuse Rummel for cause on numerous responses that he gave, including his ambiguous views on the death penalty, his inconsistent responses, and his failure to disclose his political activities. She never argued that he was death-excludable. Moreover, contrary to defendant's assertion, the trial court did not "adopt[ ] the State's reasoning" regarding the death penalty. Indeed, the court never even mentioned Rummel's views on the death penalty in granting the prosecutor's motion. Instead, it stressed the other irregularities in his testimony and answers on the juror questionnaire.

Apart from the lack of evidence of death-qualification, defendant cannot plausibly claim that he was prejudiced by Rummel's dismissal. First, Rummel expressed no qualms about capital punishment. Second, although he later disavowed it, he stated in his questionnaire that he could not consider child abuse as mitigating evidence, which was the core of defendant's penalty-phase defense. Third, he stated on his questionnaire that, given the brutal circumstances of the case, he would not be able to judge the case impartially, although he later abandoned that view in court.

Fourth, he had served as a juror in a prior murder case in which the jury had returned a guilty verdict. Finally, he stated that he knew a police officer involved in the case. In sum, many defense attorneys would have characterized Rummel as anti-defense and would have considered him to be a liability were he to be selected to serve on a jury. Hence, we find defendant's claim to be without merit.

## IV

### Admission of Defendant's Statements

Defendant contends that his confession statement to the Asbury Police Department was involuntary because it was induced by a police officer's material misrepresentation that he would face only a prison term, rather than a possible death sentence, for the murder. Defendant maintains that the admission of the statement at trial violated his rights under the Fifth and Fourteenth Amendments to the Federal Constitution, and Article I, paragraph 10, of the New Jersey Constitution.

On the night of his arrest, defendant provided the police with oral and written statements, in which he made numerous incriminating remarks regarding the kidnapping, rape, and murder of L.G. He moved to suppress the statements, arguing that they had been involuntarily obtained. The trial court held a hearing on July 8, 1994, during which Officer Valerie Williams, Detective John Musiello, and defendant testified. On August 4, 1994, the court held that defendant had voluntarily made the statements, and that they were admissible.

At issue during the hearing, among other things, was Detective Musiello's statement to defendant, after defendant had denied any involvement in killing L.G. and immediately before defendant confessed. Detective Musiello stated that

the person that did this would be charged with murder and would be facing life imprisonment with a minimum of thirty years parole. I told him the person that did this, we had witnesses and we had forensic evidence and, again, we would be

looking for Court orders to get exemplars and have the witnesses review photographs or persons in person.

Detective Musiello admitted that he had not informed defendant that the death penalty was a potential punishment for the murder. Defendant testified that

Detective Fazio ... drew a diagram ... [w]ith a seven on one side of a line and fifty on the other side of the line. And he told me if I confess to the crime, he would say that all I would get is a manslaughter charge which would be seven years. He said if I do not work with them, he would say I would get fifty or more years. He says, we, meaning him and the other detectives, were being nice to you, but you keep fucking us around we're going to send the other detectives in here, and they're not going to be as nice as we have been to you.

Defendant stated that, in addition to believing that he would get a reduced charge if he confessed, he believed that the officers would hit him if he did not confess. Detective Musiello denied having said anything about a reduced charge.

In denying defendant's suppression motion, the trial court found that Detective Musiello had told defendant that he was facing thirty years in prison without parole. However, the court did not find the statement to be threatening, instead the court characterized it as "kind of factual." The court also found that the detectives had not promised defendant a reduced sentence; they simply had informed him "what the facts were." The court concluded that the statement was voluntary and that defendant was intelligent and strong enough not to be intimidated by the officers.

Defendant's claim raises a mixed factual-legal issue: whether Detective Musiello's statement about thirty years of imprisonment being the punishment for murder rendered defendant's waiver involuntary or unknowing. Defendant has not raised on appeal any other grounds for suppression despite his testimony at the suppression hearing that he had feared physical abuse during the interrogation.

A custodial confession is admissible only if there has been a knowing, intelligent, and voluntary waiver of *Miranda* rights. *Miranda v. Arizona*, 384 *U.S.* 436, 444, 86 *S.Ct.* 1602,

1612, 16 *L.Ed.*2d 694, 707 (1966). To determine voluntariness, courts examine the totality of the circumstances. *State v. Galloway,* 133 *N.J.* 631, 654, 628 *A.*2d 735 (1993). Although misrepresentations by police officers to the subject of an interrogation are relevant in analyzing the totality of the circumstances, *People v. McClary,* 20 *Cal.*3d 218, 142 *Cal.Rptr.* 163, 169, 571 *P.*2d 620, 626 (1977) (holding that confession was involuntary based on various circumstances of interrogation, including misrepresentation about defendant's death-eligibility), misrepresentations alone are usually insufficient to justify a determination of involuntariness or lack of knowledge. *Frazier v. Cupp,* 394 *U.S.* 731, 739, 89 *S.Ct.* 1420, 1425, 22 *L.Ed.*2d 684, 693 (1969); *Galloway, supra,* 133 *N.J.* at 653–57, 628 *A.*2d 735; *State v. Miller,* 76 *N.J.* 392, 402–05, 388 *A.*2d 218 (1978); *State v. Lapointe,* 237 *Conn.* 694, 678 *A.*2d 942, 960–61, *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 484, 136 *L.Ed.*2d 378 (1996); *State v. Register,* 476 *S.E.*2d 153, 158–59 (S.C.1996), *cert. denied,* —— U.S. ——, 117 *S.Ct.* 988, 136 *L.Ed.*2d 870 (1997). Moreover, a misrepresentation by police does not render a confession or waiver involuntary unless the misrepresentation actually induced the confession. *People v. Benson,* 52 *Cal.*3d 754, 276 *Cal.Rptr.* 827, 841–43, 802 *P.*2d 330, 344–45 (1990) (holding that comment by officer that case was not death-eligible did not render confession involuntary because comment did not cause defendant to confess).

The statement by Detective Musiello is not entirely inaccurate. As the State emphasizes, the ordinary sentence for murder is life imprisonment with thirty years of parole ineligibility. *N.J.S.A.* 2C:11–3b. The death penalty only comes into play when the prosecutor, not police officers, charges a death-eligible form of murder under *N.J.S.A.* 2C:11–3c, and submits notice of at least one aggravating factor. *N.J.S.A.* 2C:11–3c(2)(e); *R.* 3:13–4(a). Although a police officer may suspect that the murder will be death-eligible, the officer has no way of knowing for sure.

The totality of the circumstances involved more than a statement about potential sentences. Detective Musiello also informed

defendant about the investigatory steps that were being taken to tie him to the murder. Considered as a whole, the statement that induced defendant to confess was not a promise of "mere" life imprisonment, but rather an attempt to convey to defendant the seriousness of the offense, the seriousness of the sentence that he was facing, and the strong case that the police officers were building against him. Although the statements by the police might have included some puffery, they were, as the trial court described them, "factual."

Given the totality of the circumstances, the atmosphere during defendant's interrogation and confession was not coercive. The trial court found that defendant's confession was given after a knowing and voluntary waiver of his *Miranda* rights. That conclusion is supported by the record. *Johnson, supra,* 42 *N.J.* at 162, 199 *A.*2d 809. We thus affirm that finding.

V

### *Jury Instruction, Guilt Phase*

Defendant has raised several claims based on his assertions that the jury instructions failed to make the jury aware of the legal effect of its findings. He maintains that the jury should have been instructed under a "unified-murder charge," where the sole issue before the jury would be defendant's state of mind during the murder. He also complains that the sequential presentation of the murder charge deprived him of an opportunity for the jury to convict him of noncapital felony murder. Finally, he contends that it was reversible error not to give an ultimate-outcome charge during the guilt phase regarding the sentence for felony murder.

-A-

### *Unified–Murder Charge*

During the guilt phase, defendant requested that the trial court charge the jury that it could find him guilty of the general crime of murder without being unanimous about the type of murder he

had committed, namely, purposeful-or-knowing murder or felony murder. Because felony murder is not death-eligible, a verdict split between purposeful-or-knowing murder and felony murder would be a non-death-eligible murder conviction.

Defendant argued that this Court's holding in *State v. Brown*, 138 *N.J.* 481, 509–14, 651 *A.*2d 19 (1994) (requiring instruction on possibility of nonunanimity in determination of principal-liability murder versus accomplice-liability murder), compelled a similar instruction on nonunanimity in the context of felony murder versus purposeful-or-knowing murder. Defendant also relied on *State v. Mejia*, 141 *N.J.* 475, 486–87, 662 *A.*2d 308 (1995) (requiring instruction on possibility of nonunanimity in determination of intent to kill versus intent to cause serious bodily injury). The trial court denied the defense request, concluding that the concept of one unified crime of murder was not the law in New Jersey. The court thus severed the jury's consideration of purposeful-or-knowing murder from its consideration of felony murder.

Defendant contends that, given the structure of the murder statute, there is one crime of murder in New Jersey, as opposed to distinct crimes of capital and noncapital murder. He argues that under New Jersey's murder statute, *N.J.S.A.* 2C:11–3, three mental states give rise to murder: (1) purpose (to kill or to cause serious bodily injury), *N.J.S.A.* 2C:11–3a(1); (2) knowledge (that death will occur or that serious bodily injury will occur), *N.J.S.A.* 2C:11–3a(2); and (3) the mental state necessary for a predicate felony to felony murder, *N.J.S.A.* 2C:11–3a(3). He argues that that structure indicates that, in New Jersey, there is one crime of murder with various theories to support a murder conviction; some of those theories—purpose to cause death or knowledge that death will occur—trigger death-eligibility, *N.J.S.A.* 2C:11–3(c), while the other theories—purpose to cause serious bodily injury (prior to the 1992 amendment to Article I, paragraph 12 of the New Jersey Constitution), knowledge that serious bodily injury will occur (prior to the 1992 amendment), and felony murder—do not. Defendant asserts that, despite the fact that different theo-

ries may or may not trigger death-eligibility, the fact remains that there is one crime of murder and no such thing as distinct crimes of capital and noncapital murder.

The State responds by arguing that felony murder is entirely distinct from other types of murder because it has different elements than purposeful-or-knowing murder and is a lesser crime, as evidenced by its non-death-eligible status. The crux of the State's argument is that felony murder is not the moral equivalent of purposeful-or-knowing murder (be it intent-to-kill or intent-to-inflict-serious-bodily-injury murder) because felony murder, unlike the others, requires only an intent to commit an underlying felony as opposed to an intent to kill or an intent to cause serious bodily injury that results in death. The State also points to several of this Court's decisions that have implicitly recognized the distinct nature of felony murder by holding that trial courts may charge sequentially on the various theories, *State v. Perry*, 124 *N.J.* 128, 164–65, 590 *A.*2d 624 (1991) (approving of sequential charge for non-felony-murder offenses), and that a purposeful-or-knowing-murder conviction may be vacated without vacating a felony-murder conviction. *State v. Pennington*, 119 *N.J.* 547, 556, 575 *A.*2d 816 (1990) (reversing purposeful-or-knowing-murder conviction without setting aside felony-murder conviction).

A determination of how felony murder fits into the capital-murder context must begin with an examination of the structure of the murder statute, *N.J.S.A.* 2C:11–3, and the Death Penalty Act, *N.J.S.A.* 2C:11–3c to –3i. The murder statute was part of the New Jersey Code of Criminal Justice ("the Code"), *L.* 1978, *c.* 95, that became effective September 1, 1979. *N.J.S.A.* 2C:98–4. The Code defines murder as follows:

a. Except as provided in N.J.S.2C:11–4 criminal homicide constitutes murder when:

(1) The actor purposely causes death or serious bodily injury resulting in death; or

(2) The actor knowingly causes death or serious bodily injury resulting in death; or

(3) It is committed when the actor [commits felony murder].

[*N.J.S.A.* 2C:11–3a.]

Thus, the Code defines three forms of murder: purposeful murder (with intent to kill or to inflict serious bodily injury), knowing murder (with knowledge/awareness that death or serious bodily injury will occur), and felony murder. *N.J.S.A.* 2C:11–3a.

Although the death penalty had been proposed at the time the Code was enacted, the Death Penalty Act did not become law until August 6, 1982. *L.* 1982, *c.* 111, §§ 1, 3. To implement the death penalty, the Legislature changed the penalty section of the murder statute, *N.J.S.A.* 2C:11–3b, to add "except as provided in subsection c. of this section." *L.* 1982, *c.* 111, § 1. Subsection "c" limits capital murders to purposeful-or-knowing murderers "who commit[ ] the homicidal act by [their] own conduct; or who as an accomplice procure[ ] the commission of the offense by payment or promise of payment of anything of pecuniary value; or who, as . . . leader[s] of . . . narcotics trafficking network[s]" as defined in *N.J.S.A.* 2C:35–3, command the killing. *N.J.S.A.* 2C:11–3c.

Unlike some jurisdictions, the New Jersey Legislature has not made felony murder death-eligible. Some jurisdictions that have made felony murder death-eligible have adopted the unified-murder concept. *E.g., State v. Encinas,* 132 *Ariz.* 493, 647 *P.*2d 624, 627–28 (1982); *People v. Milan,* 9 *Cal.*3d 185, 107 *Cal.Rptr.* 68, 73–74, 507 *P.*2d 956, 961–62 (1973); *Brown v. State,* 473 *So.*2d 1260, 1265 (Fla.1985); *People v. Travis,* 170 *Ill.App.*3d 873, 121 *Ill.Dec.* 830, 840–41, 525 *N.E.*2d 1137, 1147–48 (1988); *State v. Nissen,* 252 *Neb.* 51, 560 *N.W.*2d 157, 165 (1997); *Crawford v. State,* 840 *P.*2d 627, 640 (Okla.Crim.App.1992).[1]

---

[1] The Kansas Supreme Court in *State v. Hartfield,* 245 *Kan.* 431, 781 *P.*2d 1050 (1989), and the Washington Supreme Court in *State v. Fortune,* 128 *Wash.*2d 464, 909 *P.*2d 930 (1996), also adopted the unified-murder concept. *Hartfield, supra,* 781 *P.*2d at 1062; *Fortune, supra,* 909 *P.*2d at 931–35. In Kansas and Washington, felony murder is not death-eligible. *See Kan.Stat.Ann.* § 21–3439 (1995); *Wash. Rev.Code Ann.* §§ 10.95.020, 10.95.030 (West 1996). It is important to note, however, that *Hartfield* and *Fortune* involved noncapital offenses.

 Although under our prior death-penalty statute, *N.J.S.A.* 2A:113–4 (repealed 1978), felony murder made a defendant death-eligible, *N.J.S.A.* 2A:113–2, –4 (repealed 1978), the Legislature elected not to continue that practice under our current Death Penalty Act. Therefore, New Jersey, unlike jurisdictions that have a unified-murder concept based on felony murder being a death-eligible offense, has intentionally rejected the predicate for a unified-murder charge. The fact that the Legislature has established the identical sentence for noncapital purposeful-or-knowing murder as it has for felony murder should not be determinative of whether to require a unified-murder charge. It is the culpable mental state plus the aggravating circumstances that determine death-eligibility and that also distinguish capital murder from felony murder.

 The mental states required to convict for purposeful murder and knowing murder are "equivalent expressions of moral culpability." *State v. Bey,* 129 *N.J.* 557, 582, 610 *A.*2d 814 (1992) (*Bey III* ). Unlike purposeful-or-knowing murder, felony murder is an absolute liability crime because a defendant need not have contemplated or *intended* the victim's death. *State v. Martin,* 119 *N.J.* 2, 20, 573 *A.*2d 1359 (1990); *State v. McClain,* 263 *N.J.Super.* 488, 491, 623 *A.*2d 280 (App.Div.), *certif. denied,* 134 *N.J.* 477, 634 *A.*2d 524 (1993); *State v. Darby,* 200 *N.J.Super.* 327, 331, 491 *A.*2d 733 (App.Div.1984), *certif. denied,* 101 *N.J.* 226, 501 *A.*2d 905 (1985). The only mental state required for felony murder is the specific mental culpability required to commit one of the particular underlying felonies specified in *N.J.S.A.* 2C:11–3(a)(3). Because the *mens rea* for purposeful-or-knowing murder is different from that required for felony murder, we do not believe that the Legislature intended to create a unified crime of murder. This Court has acknowledged in a capital case that the "elements are different" in felony murder than they are in purposeful-or-knowing murder. *State v. Purnell,* 126 *N.J.* 518, 531, 601 *A.*2d 175 (1992).

■ We conclude that felony murder is not the moral equivalent of purposeful-or-knowing murder. We believe the Legislature intended that death-eligibility be viewed as the touchstone of moral equivalence. Defendant's reliance on *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988); *Purnell, supra,* 126 *N.J.* 518, 601 *A.*2d 175; *Brown, supra,* 138 *N.J.* 481, 651 *A.*2d 19; and *Mejia, supra,* 141 *N.J.* 475, 662 *A.*2d 308, to support his claim of entitlement to a unified-murder charge is misplaced.

*Gerald, supra,* held that the imposition of the death penalty for serious-bodily-injury murder violated the New Jersey Constitution's ban on cruel and unusual punishment. 113 *N.J.* at 89, 549 *A.*2d 792. The Constitution was amended, effective December 3, 1992, *see Acts of the First Annual Session of the Two Hundred and Fifth Legislature of the State of New Jersey and Thirty–Fifth Under the New Constitution: Chapters 76–215,* at 1429 (1992) ("Acts"), to overturn *Gerald. See* Assembly Judiciary, Law and Public Safety Committee, *Statement to Assembly Bill No. 2113— L.1993, c. 111 ("Statement ").* To ensure that the amendment would be given full effect, the Legislature amended the Death Penalty Act to make murderers who intend to commit serious bodily injuries death-eligible. *Ibid.; L.* 1993, *c.* 111 (approved May 5, 1993).

*Purnell, supra,* requires that in a capital-murder case, "all forms of homicide rationally supported by the evidence ... should be placed before the jury." 126 *N.J.* at 530, 601 *A.*2d 175. *Purnell* does not contemplate a unified-murder charge. Rather, it requires that felony murder be submitted to the jury in capital cases if rationally supported by the evidence even if it is not technically a lesser-included offense of capital murder. *Id.* at 530– 34, 601 *A.*2d 175. In *Purnell,* the rational basis was the State's reliance on death occurring in the course of a felony as an aggravating factor even though felony murder was not charged in the indictment. *Id.* at 523–24, 601 *A.*2d 175.

*Brown, supra,* involved a death-eligible murder with a factual scenario that required the jury to decide whether the defendant

acted as a non-death-eligible accomplice or as a death-eligible principal. 138 *N.J.* at 509, 651 *A.*2d 19. Similarly, a nonunanimity possibility was submitted to the jury in *Mejia, supra,* a 1991 capital case in which the jury had to decide whether the defendant was death-eligible based on an intent to kill, or non-death-eligible based on an intent to cause serious bodily injuries. 141 *N.J.* at 479, 482–83, 662 *A.*2d 308. The constitutional amendment that overturned *Gerald* was not yet in effect when the *Mejia* murder occurred.

Because the Legislature has decreed that felony murder is not a death-eligible offense and our capital jurisprudence, stressing the importance of providing a jury with every opportunity to spare a defendant's life, has been limited to purposeful-or-knowing-murder cases in which the jury had to resolve a factual dispute determinative of whether that murder was death-eligible, we decline to extend that jurisprudence to noncapital murder. Those cases have been restricted to capital murder as defined in *N.J.S.A.* 2C:11–3c for which notice of aggravating factors has been given. *N.J.S.A.* 2C:11–3c(2)(e).

Moreover, to permit a jury to return a nonunanimous verdict on a charge of felony murder contradicts "[o]ne of the nearly-universal hallmarks of trial by jury [which] is the requirement of a unanimous verdict in criminal cases. The roots of the search for jury unanimity are traced in 3 William Blackstone, Commentaries *375–76." *Brown, supra,* 138 *N.J.* at 594, 651 *A.*2d 19 (O'Hern, J., dissenting in part). The public's right "to see that a criminal prosecution proceeds to a verdict either of acquittal or conviction is predicated on 'the public's interest in fair trials designed to end in just judgments.'" *Id.* at 597, 651 *A.*2d 19 (quoting *Wade v. Hunter,* 336 *U.S.* 684, 689, 69 *S.Ct.* 834, 837, 93 *L.Ed.* 974, 978 (1949)). The Legislature never contemplated such a draconian change in the handling of murder cases.

Aside from the absence of any legislative intent to create a unified crime of murder, the intermingling of death-eligible murder with non-death-eligible murder would create utter

chaos when instructing a jury. This Court consistently has emphasized the need for clear and correct jury instructions. *Martini I, supra,* 131 *N.J.* at 271, 619 *A.*2d 1208; *State v. Collier,* 90 *N.J.* 117, 122, 447 *A.*2d 168 (1982). Jury instructions are supposed to serve as "a road map to guide the jury." *Martin, supra,* 119 *N.J.* at 15, 573 *A.*2d 1359. Rather than guiding a jury, a unified-murder charge in a case in which felony murder is not a death-eligible offense would lead a jury "down the wrong path ... to a verdict not permitted under our law." *State v. Grey,* 147 *N.J.* 4, 14, 17, 685 *A.*2d 923 (1996). It would cause extraordinary confusion, ultimately requiring reversal of *any* murder or felony-murder conviction. Given the absence of any legislative intent to create a unified crime of murder and the confusion such a charge would create, we conclude that the trial court properly rejected the request to give a unified-murder charge.

-B-

*Sequential Presentation of Purposeful–or–Knowing–Murder Charge and Felony–Murder Charge*

Defendant contends that the trial court's refusal to instruct the jury to consider purposeful-or-knowing murder and felony murder simultaneously, contravened this Court's jurisprudence on sequential presentation of charges. Defendant maintains that in a capital case, sequential presentation of felony murder as an alternative to, or as a lesser-included offense of, capital murder creates a risk that the jury will convict of the capital murder without considering felony murder as an alternative.

The State responds by arguing that a sequential charge is not inherently prohibited and that, except in a small number of instances, sequential deliberations provide the jury with a good framework in which to work. The State contends that the only danger of sequential deliberations is stratification of jury thought, which can be avoided by clear instructions and a clear verdict sheet. The State further asserts that, in this case, instructing first on purposeful-or-knowing murder did nothing to preclude

jury consideration of felony murder and that if the jury had had any reasonable doubt about the purposeful-or-knowing nature of the killing, it would have acquitted defendant.

Unlike *Purnell, supra,* 126 *N.J.* 518, 601 *A.*2d 175, and some other capital cases, defendant also was indicted for felony murder based on the homicide occurring during the commission of an aggravated sexual assault and a kidnapping. In *Purnell,* and the present case, the State relied on the c(4)(g) aggravating factor, that a homicide occurred during the course of a felony. *Id.* at 529, 601 *A.*2d 175. The defense theory relating to the felony-murder charge in the present case was based on the assertion that defendant had accidentally compressed L.G.'s carotid artery for about thirty seconds while raping her. On the basis of that contention and evidence presented, the trial court in the present case found a rational basis in the evidence to charge felony murder. The trial court in *Purnell,* however, did not submit felony murder to the jury, notwithstanding the State's evidence that the homicide had occurred during the commission of a felony. *Ibid.*

*Purnell* held that in a capital case,

all forms of homicide rationally supported by the evidence, whether they be lesser-included or alternative offenses, should be placed before the jury. To truncate the definitions of the murder statute and thus deny a jury the mechanism to decide which of the forms of murder has been proven is unacceptable. *State v. Long,* 119 *N.J.* 439, 462, 575 *A.*2d 435 (1990). In that respect, defendant's claim of entitlement to a felony-murder charge is similar to a request for a lesser-included offense charge. We have regularly held that a defendant is entitled to such a charge if there is any evidence "that would have afforded the jury a rational basis for convicting" the defendant of the lesser-included offense. *State v. Moore,* 113 *N.J.* 239, 290, 550 *A.*2d 117 (1988). In *State v. Ramseur, supra,* 106 *N.J.* 123, 524 *A.*2d 188, we held that a trial court must charge the jury regarding "all of the possible offenses that might reasonably be found from such facts." *Id.* at 271 n. 62 [524 *A.*2d 188], [113 *N.J.* 239] 550 *A.*2d 117. Although strictly speaking felony murder is not a lesser-included offense of murder in the sense that its elements are different, the statutory definition of lesser-included offenses, as we noted in *State v. Sloane,* 111 *N.J.* 293, 300, 544 *A.*2d 826 (1988), is not "all-encompassing," nor are the statutory categories "water-tight compartments." As Justice Stein has noted, *Sloane* suggests that in certain circumstances, subject to the requirements of fair notice, an offense, if supported by the evidence, should be charged to the jury even though it does not meet the Code's definition of lesser-included offense. *State v.*

*Mancine,* 124 *N.J.* 232, 265, 590 *A.*2d 1107 (1991) (Stein, J., concurring). That principle "comports with our general view that subject to fair notice the jury should resolve the degree of an actor's guilt on the basis of the evidence presented to the jury." *Sloane, supra,* 111 *N.J.* at 300, 544 *A.*2d 826.

[*Purnell, supra,* 126 *N.J.* at 530–31, 601 *A.*2d 175.]

The "alternative offense" in *Purnell* was felony murder and the jury should have been charged as if it were a lesser-included offense. *Id.* at 531, 601 A.2d 175. *Purnell* does not remotely suggest that the noncapital offense of felony murder be charged simultaneously with a capital offense.

One of the problems addressed in *State v. Long,* 119 *N.J.* 439, 575 A.2d 435 (1990), was the trial court's failure to give a *Gerald* charge. *Id.* at 460–65, 575 A.2d 435. In *Long,* neither the indictment, the jury charge, nor the verdict sheet informed the jury that intent to cause death triggered death-eligibility, but an intent to cause serious bodily injury did not. *Id.* at 461–62, 575 A.2d 435. Although both forms of intent constituted purposeful-or-knowing murder, the two forms were not explained to the jury in terms of death-eligibility. *Ibid.* Intent-to-kill murder makes a defendant death-eligible, *N.J.S.A.* 2C:11–3c; intent-to-cause-serious-bodily-injury murder, at the time the case was decided, did not trigger death-eligibility. *Gerald, supra,* 113 *N.J.* at 89, 549 A.2d 792. Thus, under *Long,* the alternative offense that must be submitted to the jury as an option is the *Gerald* and *Mejia* noncapital serious-bodily-injury offense.

In addition, *Purnell* mandates that in a capital case in which the murder was committed in the course of one of the felonies specified in *N.J.S.A.* 2C:11–3a(3), the death penalty may not be imposed unless the felony-murder option has been submitted to the jury, provided that a rational basis exists in the evidence. *Purnell, supra,* 126 *N.J.* at 530–34, 601 A.2d 175. The *Purnell* Court acknowledged that although the elements of felony murder may differ from those of a capital murder, and therefore that it may not be a traditional lesser-included offense, it nonetheless should be treated as a lesser-included offense when deciding what offenses must be submitted to the jury. *Id.* at 531, 601 A.2d

175. Here, the felony murder was submitted to the jury pursuant to *Purnell* and Count Two of the indictment based on the allegation that the homicide occurred during the course of a kidnapping and rape. Analytically, therefore, we regard felony murder as a lesser-included offense of capital murder for purposes of deciding the appropriateness of sequential jury instructions.

 Ordinarily, juries may not consider lesser-included offenses until they have acquitted of the greater offense. *State v. Harris*, 141 *N.J.* 525, 552–53, 662 *A.2d* 333 (1995); *State v. Coyle*, 119 *N.J.* 194, 223, 574 *A.2d* 951 (1990). The rationale behind the sequential ordering of greater- and lesser-included offenses is that the jury must convict of the crime supported by the evidence, as opposed to compromising between jurors who want the greater charge and jurors who want to acquit. *See Harris, supra,* 141 *N.J.* at 553, 662 *A.2d* 333 ("[I]t is the duty of the jury not to reach compromise verdicts based on sympathy for the defendant or to appease holdouts, but to render a just verdict by applying the facts it finds to the law it is charged.") (internal quotations omitted). Thus, if jurors are split between the greater charge and acquittal, the result is a hung jury.

The trial court used the following verdict sheet in the present case regarding the murder charges:

*COUNT I*

*PURPOSEFUL OR KNOWING MURDER*

Did the defendant, David Cooper, purposely or knowingly cause the death of [L.G.]?

NOT GUILTY _____

GUILTY _____

If, and only if you find the defendant guilty answer the following:

1. We unanimously find the defendant committed the murder by his own conduct.

_____

2. We unanimously find the defendant did not commit the murder by his own conduct.

_____

3. We do not unanimously agree that the defendant committed the murder by his own conduct.

(Only if your verdict is guilty of murder for purposely or knowingly causing death by his own conduct, will the trial proceed to the death penalty phase.)

## COUNT II

*Felony Murder*

Did the defendant, David Cooper, cause the death of [L.G.] while in the course of, or in flight after committing the crime of kidnapping and/or sexual assault?

NOT GUILTY _____

GUILTY _____

(If your verdict is not guilty of purposeful or knowing murder and guilty of felony murder there will be no death penalty phase.)

If and only if you find defendant, David Cooper, *Guilty* of Purposeful or Knowing Murder go to *Count 3.*

If and only if you find the defendant, David Cooper, *Not Guilty* of Purposeful or Knowing Murder, you must answer the following:

*Aggravated Manslaughter*

Did the defendant, David Cooper, under circumstances manifesting extreme indifference to the value of human life recklessly cause the death of [L.G.]?

NOT GUILTY _____

GUILTY _____

If, and only if your answer is *Not Guilty* answer the following:

*Manslaughter*

Did the defendant, David Cooper, recklessly cause the death of [L.G.]?

NOT GUILTY _____

GUILTY _____

The trial court employed the verdict sheet and asked the jury to deliberate first on purposeful-and-knowing murder, then on felony murder, and finally on aggravated and reckless manslaughter. After charging purposeful-or-knowing murder, the court stated:

> Before you may conclude defendant committed the murder by his own conduct you must be convinced of this fact beyond a reasonable doubt. If you have a reasonable doubt as to whether the killing was by his own conduct or if you are unable to reach a unanimous decision beyond a reasonable doubt as to whether defendant committed the murder by his own conduct, that is a permissible final verdict on this issue that would result in the imposition of a mandatory sentence for murder of at least thirty years in prison without parole.
>
> If after a consideration of all the evidence you are convinced beyond a reasonable doubt that the defendant either purposely or knowingly caused [L.G.'s] ... death then your verdict should be guilty. If, however, after a consideration of all the evidence you find the State has failed to prove each and every element of the offense beyond a reasonable doubt *your verdict must be not guilty and you go on to consider whether defendant should be convicted of the next count in the indictment which is felony murder.*

At the conclusion of the felony murder charge, the jury was instructed that "[u]nder our law a person may be found guilty of a purposeful-or-knowing murder and also can be found guilty of felony murder." At the request of defense counsel, the court clarified its instruction:

> I might have told you and I don't remember exactly, but in regard to knowing or purposeful murder the First Count. I might have said if you found him not guilty then you move onto the Second Count of felony murder. That's not so—notwithstanding your verdict under First Count knowing and purposeful murder you will move to felony murder irrespective of that verdict.... I should also tell you that in regard to the felony murder if your verdict is not guilty of purposeful or knowing murder and guilty of felony murder there will be no death penalty phase. Just so you know that.

Later in the charge, while reading from the verdict sheet, the court stated: "If your verdict is not guilty of purposeful or

knowing murder and guilty of felony murder there will be no death penalty phase."

Although *Purnell* requires that in a capital case, a felony-murder charge must be submitted to the jury if a rational basis for that charge exists, *Purnell, supra,* 126 *N.J.* at 530–34, 601 *A.*2d 175, it does not discuss the placement of the felony-murder charge. *Purnell* represents a hybrid. It is not clearly like a lesser-included offense because regardless of the verdict on the purposeful-or-knowing murder, the jury still must be instructed to consider the felony murder in a capital case if a rational basis exists. As in *Purnell,* the felony-murder charge in the present case had to be considered by the jury regardless of the jury's verdict on purposeful-or-knowing murder. Today, we have rejected the unified-murder concept, which, for charging purposes, would have made the sequential aspect of the charge similar to passion/provocation manslaughter in a purposeful-murder case. *Coyle, supra,* precludes sequential instructions in such cases and requires that the passion/provocation charge be incorporated into the purposeful-murder charge. 119 *N.J.* at 223–24, 574 *A.*2d 951.

Absent a passion/provocation case, *Coyle* states that "there is nothing inherently wrong with the [sequential] model charge for purposeful murder." *Id.* at 223, 574 *A.*2d 951. Other than in the passion/provocation context, "sequential charges usually provide a framework for orderly deliberations." *Ibid.; State v. Zola,* 112 *N.J.* 384, 405, 548 *A.*2d 1022 (1988).

The *Coyle* passion/provocation exception was created because the State could not obtain a conviction for purposeful murder without proving beyond a reasonable doubt that the purposeful killing was not the product of passion/provocation. *State v. Powell,* 84 *N.J.* 305, 314, 419 *A.*2d 406 (1980). Viewed in that context, the mental states for those two offenses were interrelated; they shaded from one into the other. In sharp contrast, there is no connection between the required mental state for purposeful-or-knowing murder and that for felony murder, the

latter being a strict-liability offense. Consequently, we hold that it is proper in a capital case to sequentially charge capital murder and felony murder.

We still adhere to the view, however, that " 'care must be taken to avoid the stratification of thought that would deter a jury from returning the proper available verdict.' " *Harris, supra,* 141 *N.J.* at 553, 662 *A.*2d 333 (quoting *Zola, supra,* 112 *N.J.* at 406, 548 *A.*2d 1022). Here, we are satisfied that the jury was not stratified in its deliberations, and the charge did not deter it from returning the proper available verdict.

The trial court followed the Model Jury Charge in all respects. The jury was instructed that, notwithstanding its verdict on purposeful-or-knowing murder, it also had to consider felony murder. By telling the jury to begin deliberating with purposeful-or-knowing murder, the court started the jury's deliberations in an orderly fashion. The jury was never told that it could not consider felony murder until after it had completed its deliberations on purposeful-or-knowing murder. Moreover, defense counsel, as a matter of trial strategy, conceded that defendant was guilty of felony murder. Given the way the case was submitted to the jury, the sequential charge did not deter the jury from returning the proper verdict.

-C-

*Lack of Ultimate–Outcome Charge in Guilt Phase*

Defendant further contends that the trial court's refusal to instruct the jury, or to allow defense counsel to inform the jury, of the legal effect of its guilt-phase decisions, including the potential sentence for the noncapital offense of felony murder, requires reversal.

At a charging conference, defense counsel requested that the jury be instructed that if it acquitted defendant of purposeful-or-knowing murder, thereby making him ineligible for the death penalty, but found him guilty of felony murder, kidnapping, and

aggravated sexual assault, he would be required to serve a minimum of fifty-five years in prison before becoming eligible for parole. The court also refused to permit defense counsel to tell the jury what the minimum alternative sentence would be. The court reasoned that it was sufficient to instruct that a felony-murder conviction without a purposeful-or-knowing-murder conviction, would preclude a penalty phase.

The court then instructed the jury that if it returned a guilty verdict on purposeful-or-knowing murder, the minimum sentence would be thirty years to life. The instruction also stated that "[o]nly if your verdict is guilty of murder purposely or knowingly causing death by his own conduct, will the trial proceed to the penalty phase. . . . If your verdict is not guilty of purposeful or knowing murder and guilty of felony murder there will be no death penalty phase." The court, in accordance with its prior ruling, did not instruct the jury regarding the sentence for felony murder.

▄▄▄▄ Generally, juries in criminal cases are not informed of the consequences of returning guilty verdicts. "It is the function of the jury to adjudge the degree of guilt and for the court to pronounce the sentence." *State v. Grillo,* 11 *N.J.* 173, 189, 93 *A.*2d 328 (1952); *State v. Bunk,* 4 *N.J.* 461, 476, 73 *A.*2d 249 (1950); *State v. Molnar,* 133 *N.J.L.* 327, 335, 44 *A.*2d 197 (E. & A.1945). That rule prevailed in capital and noncapital cases in this State prior to the Court's decisions in *Brown* in 1994 and *Mejia* in 1995.

▄▄▄▄ Defendant argues that as in *Mejia, supra,* where the Court required that the jury be informed during the guilt phase of the consequence of convicting of a non-death-eligible alternative offense (in that case, serious-bodily-injury murder), 141 *N.J.* at 486–87, 662 *A.*2d 308, the trial court here should have informed the jury of the consequences of convicting of felony murder, which is also a non-death-eligible alternative offense. Defendant reads *Mejia* and our death-penalty jurisprudence too broadly. In the process, he fails to separate the role of the jury in determining death-eligibility in the guilt phase of a capital case, from the jury's

role as sentencer in the penalty phase. Bifurcating capital trials "into a guilt-determination phase and a penalty phase tends to prevent the concerns relevant at one phase from infecting jury deliberations during the other." *Sumner v. Shuman,* 483 *U.S.* 66, 85 n. 13, 107 *S.Ct.* 2716, 2727 n. 13, 97 *L. Ed.*2d 56, 71–72 n. 13 (1987); *see also State v. Biegenwald,* 126 *N.J.* 1, 44, 594 *A.*2d 172 (1991) (*Biegenwald IV* ).

Although bifurcated guilt and penalty phases in capital cases are not required by the federal constitution, it was observed in *Gregg v. Georgia,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859 (1976), that the constitutional concerns expressed in *Furman v. Georgia,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346 (1972), "are best met by a system that provides for a bifurcated proceeding." *Gregg, supra,* 428 *U.S.* at 195, 96 *S.Ct.* at 2935, 49 *L.Ed.*2d at 887 (plurality opinion of Stewart, Powell, and Stevens, JJ.).

The capital-punishment statute involved in *Gregg* contained a bifurcated procedure that determined a defendant's guilt first and the defendant's sentence second. *Id.* at 163, 96 *S.Ct.* at 2920, 49 *L.Ed.*2d at 869. New Jersey's Death Penalty Act is modeled after Georgia's death-penalty statute, which generally follows the Model Penal Code's provisions regarding, among other things, the requirement of a bifurcated proceeding. *See State v. Marshall,* 130 *N.J.* 109, 126, 613 *A.*2d 1059 (1992) (*Marshall II* ).

The Model Penal Code's comment to the section requiring bifurcated capital proceedings, outlines the purpose of having separate proceedings:

Systems providing for jury discretion with respect to capital punishment confront an inescapable dilemma if the jury is required to impose sentence at the same time that it renders a verdict on guilt. Such information as prior criminal record of the accused may be important to choice of punishment yet highly prejudicial to determination of guilt. Either sentencing must be based on less than all the evidence relevant to that issue, or otherwise inadmissible evidence must be allowed in the trial on the ground that it contributes to an informed assessment of sentence. Contemporaneous decision of both questions forces a choice between a solution that detracts from the rationality of the sentencing decision and one that threatens the fairness of the determination of guilt. Either choice is undesirable, and the second alternative may well be unconstitutional. Trial lawyers understandably have little

confidence in the intermediate solution of admitting such evidence and trusting an instruction to limit its consideration to sentencing rather than guilt.

The obvious solution ... calls for a bifurcated proceeding with strict observance of the rules of evidence until the guilty verdict and subsequent consideration of all additional information relevant to sentence.

[*Model Penal Code and Commentaries* § 210.6 cmt. 8, at 144–45 (Official Draft and Revised Comments 1980) (footnotes omitted).]

Focusing on the sentencing role of the jury in the penalty phase, this Court has held that "[a] capital sentencing jury must be fully informed of its responsibility in determining the appropriateness of the death penalty." *State v. Loftin,* 146 *N.J.* 295, 370, 680 *A.*2d 677 (1996). As the Court emphasized in *Ramseur, supra,* "[t]o hide from the jury the full range of its sentencing options, thus permitting its decision to be based on uninformed and possibly inaccurate speculation, is to mock the goals of rationality and consistency required by modern death penalty jurisprudence." 106 *N.J.* at 311, 524 *A.*2d 188.

Thus, the Court has held that during the penalty phase, trial courts generally should inform juries of prior sentences that the defendant is serving because that information may bear on the jury's thought process in determining the adequacy of a life sentence as opposed to death. *Loftin, supra,* 146 *N.J.* at 372, 680 *A.*2d 677 (noting that court should inform jury of prior sentence if there is a "realistic likelihood" that court will impose noncapital sentence consecutively to that sentence); *Bey III, supra,* 129 *N.J.* at 603, 610 *A.*2d 814. The Court also has instructed trial courts to inform penalty-phase juries of the potential sentences for defendants' noncapital convictions. *Martini I, supra,* 131 *N.J.* at 313, 619 *A.*2d 1208. In *Martini I,* the Court stated:

[W]e hold that in the future when defense counsel or the jury requests instructions on the potential sentences a defendant will receive for convictions arising from the same trial as his capital-murder conviction, such information should be provided by the trial court. The jurors should be informed of the sentencing options available to the judge, and that the determination of sentence had not yet been made. In addition, the trial court should explain that the sentence may or may not run consecutively to that for murder, but that the determination is left to the court. Finally, the court should inform the jury that defendant's possible sentence for the

other convictions should not influence its determination regarding the appropriateness of a death sentence on the murder count. Such instructions will assist in dispelling confusion on the part of the jury and will help to safeguard against improper sentencing determinations.

[*Ibid.*]

In the present case, defendant does not deny that the trial court complied with the letter of *Martini I* in instructing the jury *during the penalty phase* that if it rejected the death penalty, defendant would be imprisoned for fifty-five years without parole.

The narrow issue becomes whether the foregoing legal principles, that have developed in view of the role of the jury as sentencer during the penalty phase, should be applied to the guilt phase. Defendant asserts that an ultimate-outcome instruction should have been given during the guilt phase. To support his claim, defendant primarily relies on *Mejia, supra,* where the Court stated:

> In the guilt phase of the present case, the court should have told the jury that its determination of defendant's mental state would predetermine whether defendant was subject to the death penalty. Specifically, the court should have instructed the jury that if it found that defendant had intended to kill the victim, he would be subject to the death penalty. *Conversely, the court should have told the jury that if it found that defendant had intended to cause serious bodily injury, he would be subject to life imprisonment with thirty-years parole ineligibility. The failure to inform the jury of the difference, which could have diluted the jury's responsibility for the imposition of the death penalty, constitutes reversible error.*
>
> [141 *N.J.* at 485–86 [662 A.2d 308] (citation omitted) (internal quotation marks omitted) (emphasis added).]

The State contends that the jury was well aware of the legal effect of its decision. In particular, it points to *voir dire,* where the court told potential jurors that defendant would face twenty-five years of parole ineligibility if convicted of kidnapping and sexual assault, and to the court's instruction that a penalty phase would occur only if the jury convicted defendant of purposeful-or-knowing murder.

The State further argues that *Mejia*'s requirement that the jury be informed of the legal effect of its guilt-phase decision was satisfied because the trial court informed the jury that a conviction

for purposeful-or-knowing murder carried a sentence of thirty
years to life.

When Mejia committed the homicide on December 8, 1991, *id.*
at 479, 662 *A.*2d 308, one who purposely or knowingly caused
serious bodily injury resulting in death was not eligible for the
death penalty. *Gerald, supra,* 113 *N.J.* at 89, 549 *A.*2d 792.
*Gerald* held that imposition of the death penalty for serious-
bodily-injury murder violated the New Jersey Constitution's ban
on cruel and unusual punishment. *Ibid.* In response to *Gerald,*
the New Jersey electorate amended Article I, paragraph 12 of the
New Jersey Constitution, effective December 3, 1992, to overturn
*Gerald. Statement, supra; Acts, supra,* at 1429. The amendment
provides in part:

> It shall not be cruel and unusual punishment to impose the death penalty on a
> person convicted of purposely or knowingly causing death or purposely or knowing-
> ly causing serious bodily injury resulting in death who committed the homicidal act
> by his own conduct or who as an accomplice procured the commission of the offense
> by payment or promise of payment of anything of pecuniary value.
>
> [*N.J. Const.* art. I, ¶ 12.]

To ensure that the constitutional amendment would be given full
effect, the Legislature amended the Death Penalty Act to state
that the term "homicidal act" means "conduct that causes death or
serious bodily injury resulting in death." *Statement, supra; L.*
1993, *c.* 111 (effective May 5, 1993 and codified at *N.J.S.A.* 2C:11–
3i). Because the *Mejia* murder occurred *before* the 1992 constitu-
tional amendment, the *Mejia* Court felt constrained to apply
*Gerald.*

The *Mejia* ultimate-outcome-instruction requirement for the
guilt phase was based on the fact that the capital murder involved
required a *Gerald* mental-state determination, namely whether
there was an intent to cause death or an intent to cause serious
bodily injury. *Mejia, supra,* 141 *N.J.* at 482, 662 *A.*2d 308. In
that limited context, the Court held that the jury should have been
informed of the consequences of the required *Gerald* findings:
that a finding of an intent to cause death would render the
defendant death-eligible, while a finding of intent to cause serious

bodily injury would subject the defendant to life imprisonment with thirty years of parole ineligibility. *Id.* at 485, 662 *A.*2d 308.

*Mejia* held that in a capital murder case, in which a defendant's mental state under *Gerald* is at issue, a court's failure to give an ultimate-outcome charge covering the alternative mental state is reversible error because such a failure would diminish a defendant's opportunity for the jury to be unanimous that the defendant has purposely or knowingly killed the victim, but not unanimous on whether the defendant intended to kill or to cause serious bodily injury. *Id.* at 485–86, 662 *A.*2d 308. In other words, if a jury is unanimous that a defendant intended either to kill or to cause serious bodily injury, but nonunanimous as to which one, a purposeful-or-knowing murder is established, but the defendant is not death-eligible.

The *Gerald* mental state issue that formed the basis for the *Mejia* ultimate-outcome instruction is not implicated in the present case. As noted earlier, defendant murdered L.G. on July 18, 1993. By that time, *Gerald* had been overturned by a constitutional amendment for more than eight months. *Acts, supra,* at 1429.

Although the 1993 amendment to the Death Penalty Act that added *N.J.S.A.* 2C:11–3i occurred before the present murder, we agree with Judge Skillman's dissent in *State v. Yothers,* 282 *N.J.Super.* 86, 98–106, 659 *A.*2d 514 (App.Div.1995) (Skillman, J., dissenting), that because *Gerald* was decided on state constitutional grounds, no implementing legislation was required to effectuate the constitutional amendment. *Id.* at 99–100, 549 A.2d 792. *Gerald* acknowledged that "[t]he death-penalty statute clearly exposes to the death penalty one who purposely or knowingly causes serious bodily injury resulting in death." *Gerald, supra,* 113 *N.J.* at 71, 549 *A.*2d 792. Although *N.J.S.A.* 2C:11–3i was not necessary to implement the constitutional amendment, it became effective May 5, 1993, *L.* 1993, *c.* 111, § 2, approximately two months before L.G. was murdered. Furthermore, the Legislature intended *N.J.S.A.* 2C:11–3i to be retroactive. The Assembly Judiciary, Law and Public Safety Committee Statement to the law states:

This bill is designed to ensure that the amendment is given full effect. Although the Supreme Court based its constitutional decision in *Gerald* on its conclusion that the "death penalty statute clearly exposes to the death penalty one who purposely or knowingly causes serious bodily injury resulting in death[,]" [*Gerald, supra,* 113 *N.J.*] at 71, 549 *A.*2d 792, the court also described its decision to exclude such persons from the reach of the statute as "comporting with the Legislature's intent in restoring the death penalty." *Id.* at 89, 549 *A.*2d 792.

Therefore, in order to clarify legislative intent and thereby avoid additional judicial construction that might narrow the scope of the law to comport with the court's view of the legislative intent, this bill would amend New Jersey's death penalty statute to clearly state that the term "homicidal act" means conduct that causes "death or serious bodily injury resulting in death." *This amendment clarifies that the Legislature's intent regarding the category of homicides eligible for the death penalty has remained consistent since the effective date of P.L.1982, c. 111 which added subsection c. and other subsections to N.J.S. 2C:11–3, the current capital punishment statute.*

[*Statement, supra* (emphasis added).]

Consequently, the 1992 constitutional amendment mooted the *Gerald* issue that formed the basis for the *Mejia* ultimate-outcome instruction. For those reasons, *Mejia* is no longer authoritative regarding the need to inform the guilt-phase jury what the defendant's numerical-sentence exposure is for noncapital offenses.

 The *Mejia* ultimate-outcome instruction was required largely because of *dicta* in *Brown, supra,* 138 *N.J.* at 517, 651 *A.*2d 19. There, the ultimate-outcome issue was whether the jury should be told in the guilt phase that it could return a nonunanimous verdict on the "by his own conduct" issue. *Id.* at 492, 517, 651 *A.*2d 19. Thus, the *dicta* in *Brown* and the holding in *Mejia* are the only cases that have suggested or required an ultimate-outcome instruction during the guilt phase. An ultimate-outcome instruction is required only during the penalty phase. *Simmons v. South Carolina,* 512 *U.S.* 154, 114 *S.Ct.* 2187, 129 *L.Ed.*2d 133 (1994); *Bey III, supra,* 129 *N.J.* at 601–04, 610 *A.*2d 814. To the extent that the *dicta* in *Brown* may be understood to require the jury to be instructed during the guilt phase what the potential sentence is for each noncapital offense, it is overruled.

We hold that a *Mejia*-type-ultimate-outcome charge during the guilt phase is not required. Were we to hold otherwise, we would

be compelled to reject the State's argument that such a require-
ment was satisfied in the present case. During the *voir dire,*
potential jurors were informed that defendant would face twenty-
five years of parole ineligibility if convicted of kidnapping and
aggravated sexual assault. During the guilt phase, the jury was
informed that the noncapital sentence for purposeful-or-knowing
murder is thirty years to life. At no time during the guilt phase
was the jury informed regarding the penalty for felony murder.
However, based on our holding that an ultimate-outcome instruc-
tion was not required in the guilt phase, no error was committed
in not informing the jury what the potential sentences would be
for offenses such as felony murder, kidnapping, and aggravated
sexual assault. For the same reason, the failure to inform the
jury what the sentence would be for a felony-murder conviction
after apprising it what the sentence would be for a noncapital-
purposeful-or-knowing murder conviction did not prejudice defen-
dant.

-D-

*Future Guilt–Phase Charge*

Although we reject the *Brown* and *Mejia* standard for
an ultimate-outcome instruction during the guilt phase, we recog-
nize that a jury must be given some sentencing information during
the guilt phase of a capital case. The jury must be informed, as
occurred in the present case, that a conviction for purposeful-or-
knowing murder makes the defendant eligible to receive a sen-
tence of death. *State v. Harris, supra,* 141 *N.J.* at 546, 662 *A.2d*
333. It is conceivable that that instruction could cause a jury to
speculate about the sentence for noncapital-homicide charges sub-
mitted for deliberations. To address that concern, the guilt-phase
jury in cases tried after the date of this decision should be
informed by the trial court that the noncapital-homicide charges
are extremely serious offenses and that although they do not
expose the defendant to the death penalty, they carry severe
prison sentences. The jury should not be informed what those

numerical terms are. The jury should also be instructed not to concern itself with the comparative severity of the sentences for various offenses submitted to it for its deliberations, and that its responsibility is solely to determine whether the prosecution has met its burden of proving beyond a reasonable doubt the defendant's guilt on the charged offenses. Finally, the jury should be told that if a penalty-phase trial is required, the jury will be informed at that time what the potential sentence is for each noncapital offense for which the defendant has been convicted in the event the death penalty is not imposed.

## VI

*Constitutionality of the Death–Penalty Statute*

Defendant filed a pretrial motion seeking to have the Death Penalty Act, *N.J.S.A.* 2C:11–3c to –3i, declared unconstitutional as violative of the Eighth and Fourteenth Amendments to the United States Constitution. The basis for that motion was "the ever-increasing number of cases that seem to fall in the category of being death-eligible." He insists that the Court has not interpreted the statute adequately to limit the class of death-eligible persons. The trial court denied the motion, citing this Court's repeated validation of the statute's constitutionality.

We repeatedly have upheld the constitutionality of the death-penalty statute. *Loftin, supra,* 146 *N.J.* at 333, 680 *A.*2d 677; *Martini I, supra,* 131 *N.J.* at 221–22, 619 *A.*2d 1208; *Ramseur, supra,* 106 *N.J.* at 182–97, 524 *A.*2d 188. Defendant has presented no persuasive reason for retreating from that view. We, therefore, reaffirm our decisions upholding the constitutionality of the Death Penalty Act.

## VII

*Failure to Instruct that Defendant's State of Mind Was Central Issue in Case*

Defendant argues that although the trial court accurately instructed the jury on purposeful-or-knowing murder and felony

murder and the differences between the two, its failure to grant his request that the jury be instructed that the central question in the case was defendant's state of mind during the killing prevented the jury from focusing on the critical issue in the case, namely, defendant's state of mind and thus his death-eligibility or lack thereof.

Defendant properly notes that the trial court has an obligation to provide accurate instructions that explain the law in the context of the facts of the case. *See State v. Concepcion*, 111 *N.J.* 373, 379–80, 545 *A.2d* 119 (1988). Two facts, however, undermine defendant's· argument. First, the trial court clearly instructed the jury on the differences between felony murder and purposeful-or-knowing murder, including the "legal effect" of the finding of one or the other or both. Moreover, both defense counsel and the prosecutor emphasized the differences in their summations. Defense counsel told the jury that

> the only question left before you, the only question I'll argue is what type of murder was it. Was it a felony murder. Was it knowing or purposeful murder. Have they proven to you knowing or purposeful murder, beyond a reasonable doubt. And I suggest to you they have not. What they have really proven is sexual assault and kidnapping and during the course of it you had a reckless killing of a child. Reckless in the sense that they have not proven to you that he knew it. That he intended to do it.

Defense counsel spent much of his summation describing the conflict between the medical examiner's theory that defendant would have had to apply pressure for at least four minutes to cause death and the defense theory that thirty seconds would have been sufficient. The prosecutor also noted the issue, stating that "[t]here is more to this case than simply sitting here and saying that defendant says okay I did the kidnapping. Okay, I committed the sexual act. It was awful but I didn't mean to kill her. Hence felony murder."

The second problem with defendant's argument is that, if the requested instruction had been given, the trial court effectively would have directed a verdict on all counts except for purposeful-or-knowing murder. Of course, defendant had the right to plead

guilty to any or all of the noncapital charges, but he elected not to do so as was his constitutional right. By invoking his right to trial by jury on all counts, he endowed the jury with the role of factfinder. The court thus was not in a position to instruct the jury about what facts to find and what conclusions to draw. *Cf. United States v. Urbana*, 412 *F*.2d 1081, 1083 (5th Cir.1969) (holding that instruction that omitted elements of crime that defense had conceded was error, although not plain error); *Merrill v. United States*, 338 *F*.2d 763, 767–68 (5th Cir.1964) (holding that, despite defense counsel's strategic concession of guilt during summation, instruction that jury could "start with this premise: that the defendant is guilty unless there has been proof of his insanity" constituted reversible error).

Thus, although defendant was entitled to concede his guilt before the jury on all of the charges except purposeful-or-knowing murder, he was not entitled to an instruction that the jury could assume his guilt on those charges. As the State correctly notes, "[w]hile unlikely, the jury in its fact-finding role could have rejected defendant's concession and acquitted him of several of the crimes." Indeed, had the court provided the requested instruction and had the jury returned the same guilty verdicts on all counts, defendant no doubt would be arguing now that the trial court had committed reversible error by "directing a verdict" and that trial counsel was ineffective for requesting the court to do so.

We find, therefore, that the trial court did not err in rejecting the requested instruction.

## VIII

*Submission of Depravity as an Aggravating Factor, N.J.S.A. 2C:11–3c(4)(c)*

Defendant contends that the trial court erred by submitting depravity as an aggravating factor, *N.J.S.A.* 2C:11–3c(4)(c) ("c(4)(c)"), to the jury, and that the error prejudiced him.

As noted earlier, one of the aggravating factors that the State relied on was the depravity factor: that the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind. In the present case, the theory underlying the factor was defendant's alleged lack of a reason for killing L.G. Defense counsel repeatedly, albeit unsuccessfully, moved to strike the factor, arguing that insufficient evidence supported it and that it was inconsistent with submission of the escape-detection aggravating factor, *N.J.S.A.* 2C:11–3(c)(4)(f). Although the State conceded that our law does not allow the two aggravating factors to coexist, it argued that the present case represented a limited exception to the general rule because defendant had no motive to commit the crime, and part of his enjoyment was getting away with the crime.

The trial court twice instructed the jury that, although both the depravity and escape-detection aggravating factors were being submitted, it could not find both of them because they were mutually exclusive, one representing a reason for the murder and one representing no reason. The jury unanimously rejected the depravity factor, while unanimously finding the escape-detection and felony-murder, *N.J.S.A.* 2C:11–3c(4)(g), aggravating factors.

In *Ramseur, supra,* the Court, expressing concern that the depravity factor was unconstitutionally vague, narrowed its scope substantially. 106 *N.J.* at 207–11, 524 *A.*2d 188. Under *Ramseur,* one of the possible meanings of "depravity" is "[w]here the murder was not the product of greed, envy, revenge, or another of those emotions ordinarily associated with murder, and served no purpose for the defendant beyond his pleasure of killing." *Id.* at 211, 524 *A.*2d 188. Under that definition, depravity in the present case exists only if the killing had no purpose.

The escape-detection factor, by contrast, connotes a definite motive, namely, murder to prevent apprehension, prosecution, or both. Given that the depravity factor requires no motive, while the escape-detection factor requires a motive, the jury

cannot rationally find that both exist. The trial court recognized that fact and charged the jury that it could not find both.

Defendant argues that by submitting the escape-detection factor, however, the State necessarily affirmed the existence of a motive, thus precluding it from also submitting the depravity factor. In *Gerald, supra,* the Court stated that

[g]iven *Ramseur*'s intention to include within the reach of the term "depravity" only those murders that are entirely without motive, we hold that where, as here, greed, anger, revenge, or other similar motive is present, the depravity aspect of Section (c)(4)(c) [*i.e.,* lack of purpose] should not be submitted to the jury.

[113 *N.J.* at 66, 549 *A.2d* 792.]

The Court since has reiterated that part of the *Gerald* holding in *Perry, supra,* 124 *N.J.* at 173–76, 590 *A.2d* 624 (holding that trial court erred in submitting depravity factor because evidence pointed to drug dispute as motive for killing), and in *State v. McDougald,* 120 *N.J.* 523, 567, 577 *A.2d* 419 (1990) (doubting propriety of submitting depravity factor because of evidence of revenge motive). However, the Court on occasion has upheld submission of the depravity factor despite other evidence of motive. *See State v. Davis,* 116 *N.J.* 341, 376, 561 *A.2d* 1082 (1989) (allowing submission of depravity factor despite some evidence of revenge motive); *Zola, supra,* 112 *N.J.* at 434, 548 *A.2d* 1022 (same). Yet, despite the Court's occasional willingness to tolerate submission of the depravity factor in the face of other evidence of motive, it has disallowed submission of the factor when the escape-detection factor also is alleged. *State v. Rose,* 112 *N.J.* 454, 531–32, 548 *A.2d* 1058 (1988).

Given the Court's clear jurisprudence in this area, the trial court's submission of both factors to the jury was error. The narrow issue then becomes whether the error was harmless. Defendant argues that he was prejudiced because the jury, having been told that it could only find one of the two factors, may have compromised by rejecting the depravity factor while accepting the escape-detection factor.

The jury's function in the penalty phase is to assess, independently of each other, the sufficiency of aggravating and mitigating factors. A rejection by the jury of one aggravating or mitigating factor does not compel or inhibit its determination that another factor existed. Therefore, it would be highly speculative to conclude that an erroneous submission of an aggravating factor to the jury, with an appropriate limiting instruction, prejudicially affected its deliberations on the remaining aggravating factor(s), the mitigating factor(s), and the weighing process. *See id.* at 533, 548 *A.2d* 1058 (erroneous submission of c(4)(c) aggravating factor did not prejudice defendant where overwhelming proof existed of escape-apprehension and felony-murder aggravating factors); *see also State v. DiFrisco,* 137 *N.J.* 434, 502, 645 *A.2d* 734 (1994) (*DiFrisco II* ) (no prejudice when aggravating factor erroneously submitted, which jury rejected, because of nature of penalty-phase proceedings), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L.Ed.2d* 873 (1996). The trial court noted in its charge that the jury could not use evidence of depravity when considering the other two aggravating factors and emphasized that the jury could not find both the c(4)(c) factor and the escape-apprehension factor because the two were mutually exclusive. That instruction was reiterated on the verdict sheet, which made clear that if the jury found the c(4)(c) factor, it could not consider the escape-apprehension factor but had to go on to determine whether the murder was committed in the course of a felony. The jury was well aware from the court's instructions and the verdict sheet that the evidence submitted in support of the c(4)(c) factor was irrelevant to the other two aggravating factors, and there is no reason to believe that it ignored those instructions. *State v. Manley,* 54 *N.J.* 259, 270, 255 *A.2d* 193 (1969). We find, therefore, that the submission of the c(4)(c) factor constituted harmless error.

## IX

*Failure to Define "Purposeful Conduct" in Penalty Phase*

During the penalty-phase instruction on the escape-detection aggravating factor, the trial court instructed the jury that, in

order for the jury to find that factor, it had to determine that defendant had the *purpose* of escaping detection at the time that he killed L.G. However, the court never defined "purpose" during its penalty-phase instructions and a definition of "purpose" was never requested.

Defendant, for the first time on appeal, claims that the trial judge's failure to define "purpose" for the jury with respect to the escape-detection aggravating factor, *N.J.S.A.* 2C:11–3c(4)(f), prejudiced him by failing to channel jury discretion, particularly given the weak evidence of a motive to escape detection. Defendant contends that the omission of the definition of "purpose" may have led the jury to find the c(4)(f) aggravating factor based solely on the underlying felonies.

As the State implicitly concedes, the trial court almost certainly erred by failing to reinstruct the jury during the penalty phase on the definition of "purpose," which is an essential element of the escape-detection factor. Defendant correctly argues that the purpose requirement is the primary element that distinguishes the escape-detection factor from the felony-murder factor and that the fact of the felony alone is insufficient to support a finding of the escape-detection factor. *See Martini I, supra,* 131 *N.J.* at 284, 619 *A.*2d 1208; *State v. Hightower,* 120 *N.J.* 378, 422, 577 *A.*2d 99 (1990) (*Hightower I*). Moreover, courts must define terms for the jury even if those terms are commonsensical. *State v. Alexander,* 136 *N.J.* 563, 571–72, 643 *A.*2d 996 (1994). Because of the centrality of "purpose" in any finding of the escape-detection factor, we hold that the trial court erred in failing to define it during the penalty phase.

Here, too, the question becomes whether the omission was plain error—error "clearly capable of producing an unjust result." *R.* 2:10–2. We find that the error was not plain error because the trial court repeatedly defined "purpose" during the guilt phase, and there was no suggestion that the term had a different meaning in the penalty phase. Moreover, defense counsel discussed the concept during his penalty-phase summation. Given

the repeated references to and definitions of the terms, the jury almost certainly knew what "purpose" meant and presumably applied it faithfully during its penalty-phase deliberations.

## X

*Use of Guilt–Phase Evidence at Penalty Phase*

Defendant asserts that the trial court injected inadmissible evidence into jury deliberations when it advised the jury that it could consider all the evidence admitted during the trial, including autopsy photographs, in determining whether the State had proven the existence of an aggravating factor or aggravating factors and in determining whether the aggravating factor(s) outweighed the mitigating factor(s). The issue became important because during penalty deliberations, the jury asked the court whether it was "appropriate for jurors to review the photographs of the victim for the sole purpose of determining whether the aggravating factors outweigh the mitigating factors." The photos to which the question referred included two close-ups of bruises on L.G.'s neck, two photos of her corpse attached to a lifesaving apparatus, a close-up of her hand with fecal matter and/or blood on it, and a photo of her lying on her back with legs spread apart.

Defendant's basic contention is that, by failing to direct the jury's use of the photos, the judge allowed the jury to use them to prove any aggravating factor and to do so arbitrarily. He emphasizes that the only factor to which the photos could have been relevant was the felony-murder factor (to prove that the killing occurred in the course of an aggravated sexual assault).

The State responds that the photos were relevant to all three of the aggravating factors submitted to the jury, and that the court's repeated cautionary instructions that the jury not misuse the photos sufficed to limit the jury's use of them. The State argues that the photos were relevant to show an escape-detection motive because they showed the felonies for which defendant would have attempted to escape detection, as well as the location of the body.

As for depravity, the State contends that the photos were relevant because they showed the helplessness of the victim and the senselessness of the murder. Finally, the State notes that any error vis-a-vis the depravity factor was harmless because the jury unanimously rejected that factor.

This Court consistently has held that evidence admissible at the guilt phase is not necessarily admissible at the penalty phase, because the only issues during the penalty phase are the determination of aggravating and mitigating factors and the balancing of those factors. *State v. Dixon*, 125 *N.J.* 223, 249–50, 593 *A.*2d 266 (1991). Because of the distinction between the guilt and penalty phases, the trial court must instruct the jury which guilt-phase evidence the jury may not consider during its penalty deliberations. In *State v. Erazo*, 126 *N.J.* 112, 594 *A.*2d 232 (1991), the Court stated:

> When the same jury hears both phases of the trial, the court should provide instructions on the extent to which the jury may use guilt-phase evidence on [sic] its penalty-phase deliberations. Even when guilt-phase evidence is not incorporated in the penalty phase, the danger abides that the jury will rely on it during the penalty-phase deliberations. Thus, the court should instruct the jury concerning the evidence that it may use in its penalty deliberations and the purposes for which that evidence may be used.
>
> [*Id.* at 133, 594 *A.*2d 232 (citation omitted).]

Consistent with that rationale, the *Judges Bench Manual for Capital Causes* provides the following instruction:

> However, the guilt and sentencing phases are considered as separate proceedings. The State contends that certain facts established by your verdict in the guilt phase
>
> . . .
>
> also prove the following aggravating factors
>
> . . .
>
> I am instructing you that it is your duty to deliberate again on these facts to determine whether they prove the aggravating factor(s) the State alleges. You have the right to reach a different conclusion about whether these facts prove an aggravating factor than the conclusion you reached as to whether they proved guilt.
>
> [Trial Judges Committee on Capital Causes, *Judges Bench Manual for Capital Causes* J–6 (Nov. 1, 1996).]

The instruction in question informed the jury that "[t]he evidence to be considered by you includes relevant material by both sides and presented at both phases of the trial[,]" and that the jury could "consider everything, all the evidence ... that you heard during the first part of the trial and the second part of the trial in making your determinations as to [the] ... aggravating factors." Defendant, however, wanted the court to limit the use of the photos to the felony-murder aggravating factor.

The real question is whether the photos were relevant to the other two aggravating factors. Under this Court's jurisprudence, the photos are only tenuously relevant to the depravity factor. The State cites several cases for that proposition that the Court has allowed graphic photos to support the factor, but those cases, despite their occasional lack of clarity on the issue, are probably inapposite because they concerned other aspects of the factor when discussing photos. *State v. Moore,* 122 *N.J.* 420, 469, 585 *A.*2d 864 (1991) (photos relevant to show intent to inflict pain or depravity); *McDougald, supra,* 120 *N.J.* at 583, 577 *A.*2d 419 (photos relevant to show intent to cause severe suffering before death or to show depravity); *State v. Pitts,* 116 *N.J.* 580, 638–39, 562 *A.*2d 1320 (1989) (photos potentially relevant to show intent to inflict pain); *State v. Bey,* 112 *N.J.* 123, 183, 548 *A.*2d 887 (1988) (*Bey II* ) ("Photographs may be admissible on torture and aggravated battery as proof of intent to inflict severe pain or on depravity to show mutilation after death."), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995).

Thus, the Court explicitly has approved the use of corpse photos to show mutilation and infliction of pain, but it has not approved of their use to show that the killing was senseless. Photos can be very relevant to prove mutilation and intent to inflict pain. As for intent to inflict pain, a jury could conclude that, given the nature of the wounds, the defendant must have tortured the victim (and, by inference, intended to do so) before killing him or her. However, using photos to prove senselessness is more problematic. Whether a murder is senseless is generally independent of the

nature of the wounds. A gruesome murder could have a purpose (*i.e.*, revenge), while a relatively "civilized" murder could have no purpose at all.

The State notes that the photos could be relevant to show L.G.'s helplessness, which the Court has held to be a factor in determining senselessness. *See Ramseur, supra,* 106 *N.J.* at 209 n. 36, 524 *A.*2d 188. The jury could have determined that, given L.G.'s small size, she was helpless to resist defendant, which could indicate that the killing was senseless. However, the jury was no doubt aware of L.G.'s small size (given her age) relative to defendant. Graphic photos of the wounds were unnecessary to prove that element of the depravity aggravating factor and were necessarily cumulative.

Because the photos did not lend more than the most tenuous support to the State's theory that the killing was depraved in its senselessness and were unnecessary to show L.G.'s helplessness, they were largely irrelevant to that factor.

The photos were also only marginally relevant to the escape-detection factor. The State's argument concerning escape detection is that, because the jury was instructed not to consider defendant's post-murder activities in determining whether his motive was to avoid detection, other evidence of the factor became more important. The State notes that the kidnapping and rape were elements of the escape-detection factor (because the jury had to conclude that defendant had committed the felonies for which he wished to escape detection), thus allowing use of the photos.

That argument fails for two reasons. First, defendant admitted to felony murder, kidnapping, and aggravated sexual assault, and the court instructed the jury that it could consider evidence from the guilt phase during the penalty phase. The photos were thus unnecessary to prove the underlying felonies. *See Bey III, supra,* 129 *N.J.* at 609, 610 *A.*2d 814 (concluding that photos were unnecessary to prove underlying felony for felony-murder factor because other evidence provided sufficient evidence of felony). Second, the State's argument that it needed to introduce the photos because of the dearth of other evidence of a motivation to

escape apprehension appears to assume that proof of the underlying felony is sufficient to prove that defendant killed to escape apprehension. As this Court recently stated, however, "[m]ost persons who commit felonies hope to avoid apprehension. That does not mean that the [escape-detection] factor would automatically be present in every case in which the ... felony murder factor exists." *Loftin, supra,* 146 *N.J.* at 378, 680 *A.*2d 677. So, proof of the underlying felonies through the pictures would not have advanced the State's escape-detection argument measurably. Because the fact of the underlying felonies was neither necessary nor sufficient to prove that defendant killed in order to escape apprehension, the photos' relevance to the escape-detection aggravating factor was less than substantial.

Given that the photos had marginal relevance only to the felony-murder aggravating factor, the question becomes whether the trial court's instruction, which told the jury that it could use the photos in considering any of the aggravating factors, was error. We conclude that it was error because the trial court was obligated to channel the jury's discretion in its balancing of aggravating and mitigating factors. *State v. Williams,* 113 *N.J.* 393, 456–57, 550 *A.*2d 1172 (1988).

Moreover, as defendant maintains, the court also failed to instruct the jury that it could not use the same evidence to support both the escape-detection and depravity factors given their mutual exclusivity. The jury very well may have used the same exact photos to support both factors, thereby undermining this Court's definition of the factors. We conclude that the instructions failed to properly limit the use of the photos.

The next inquiry is whether defendant suffered any prejudice as a result of the erroneous instructions. He clearly did not suffer any prejudice vis-a-vis the depravity factor because the jury rejected that factor. We also are satisfied that defendant suffered little or no prejudice regarding the use of the photos for the escape-detection factor. First, given the minimal relevance of the photos, it is unlikely that the jury gave them much consideration

when deciding the existence of the factor. Second, other evidence existed, most notably defendant's use of a condom and his bringing L.G. to a very secluded place, that pointed to a motive to escape detection. Finally, the trial court instructed the jury on the definition of the escape-detection aggravating factor, thus focusing the jury's inquiry. Those circumstances convince us that the use of the photos did not cause the jury to reach a decision it would not otherwise have reached.

## XI

### Photo Accidentally Submitted to Penalty Jury

Defendant contends that the accidental submission to the jury during the penalty phase of S–158, a graphic photo of the victim lying on her back with her legs spread open during the autopsy, was prejudicial. Defendant objected to its admission during the guilt phase because he already had conceded that he had committed the aggravated sexual assault and because the photograph was especially gruesome. The trial court overruled the objection, reasoning that despite defendant's concession that a sexual assault had occurred, the photo was probative of such an assault, and therefore admissible. The court, however, provided the jury with a general cautionary instruction regarding the photos in general.

During the penalty phase, S–158 was one of the graphic photos that defense counsel and the prosecutor agreed not to submit to the jury. During the jury's deliberations in the penalty phase, the jury submitted a question to the court, which specifically asked "is it appropriate for jurors to review the photographs of the victim for the sole purpose of determining whether the aggravating factors outweigh the mitigating factors?" The judge answered the question in the affirmative, stating "you may use the photographs which you have in the jury room." Approximately fifty minutes after that instruction, the jury returned with a verdict of death. Unfortunately, the photo was accidentally submitted to the jury because it was wedged in between two larger photos. The discov-

ery was made after the jury had returned its verdict. The trial court then stated that it would have admitted that photo during the penalty phase if requested.

Although defendant concedes, as we held, that the photo was at least somewhat relevant to the felony-murder aggravating factor because it showed the victim's genital area, he nonetheless argues that the marginal relevance of the photo was substantially outweighed by its undue prejudicial impact. He maintains that the photo had the capacity to inflame the jury while lacking any relevance to the depravity or escape-detection aggravating factors. He also contends that the accidental submission deprived him of an opportunity to confront that evidence in summation and to request a cautionary instruction regarding the evidence.

The State responds by arguing that the photo was relevant; that it was not unduly prejudicial; that the accidental submission was harmless in that the photo already had been submitted during the guilt phase; and that the jurors took an oath not to be swayed by prejudice or passion. As for relevance, the State argues that the trial court (which has wide discretion to admit photos of the crime scene) correctly found S–158 to be relevant in that the photo corroborated defendant's confession, by showing evidence of the sexual assault, and was relevant to the depravity and felony-murder aggravating factors, because it showed the sexual assault and the brutal injuries that it caused.

Our analysis must begin with the trial court's conclusion that S–158 would have been admissible during the penalty phase had the State chosen to offer it. Admissibility of the photo depends on whether it was relevant, and, if so, whether its relevance was substantially outweighed by its prejudicial impact on defendant. *N.J.R.E.* 403.

One recognized legitimate purpose for the admission of graphic photos into evidence during the penalty phase is to corroborate a defendant's confession. *DiFrisco II, supra,* 137 *N.J.* at 500, 645 *A.*2d 734. In *DiFrisco II,* the Court found that a

photo depicting a bullet in the victim's flesh and a pool of blood, an x-ray film showing three bullets lodged in the victim's skull, and another photo depicting a spent shell cartridge near the victim, were relevant in that they corroborated the defendant's confession that he had fired five shots. *Id.* at 499–500, 645 *A*.2d 734. Such corroboration was relevant to the penalty phase because it supported the hired-killer factor. *Ibid.*

In addition, the Court has held that photos of the crime may be relevant to prove the depravity aggravating factor. *Moore, supra,* 122 *N.J.* at 468–69, 585 *A*.2d 864. However, given the Court's narrowing of the depravity factor in *Ramseur, supra,* 106 *N.J.* at 207–11, 524 *A*.2d 188, a photo that graphically displays the dictionary definition of "depravity" may not be relevant to the legal definition of that term. *Bey II, supra,* 112 *N.J.* at 183, 548 *A*.2d 887. In *Bey II,* the Court held that a photo offered to support the depravity aggravating factor had to show either that defendant intended to cause pain and actually caused such pain or that the killing was senseless. *Ibid.* Thus, if the photo is not relevant to that definition of depravity, it should not be admitted. *See Pitts, supra,* 116 *N.J.* at 638, 562 *A*.2d 1320 (stating that autopsy photo had only limited relevance to depravity factor).

The Court has been much more reluctant to admit graphic photos to prove the felony-murder aggravating factor. In *Bey III, supra,* it held that autopsy photos were not admissible to prove that the murder had occurred in the course of a rape and a robbery because substantial testimony had been introduced to prove that fact and because the defense had never contested the factor. 129 *N.J.* at 609, 610 *A*.2d 814; *see also Moore, supra,* 122 *N.J.* at 469, 585 *A*.2d 864 (holding that photos were not needed to prove felony-murder aggravating factor).

As we have concluded, *supra* at 387–389, 700 *A*.2d at 336–337, S–158 had little or no relevancy to the depravity, felony-murder, or escape-detection aggravating factors. Even if it did, the ultimate question is whether it should have been excluded under *Rule of Evidence* 403 because of its potential prejudicial impact.

In *McDougald, supra,* 120 *N.J.* 523, 577 *A.*2d 419, the trial court had admitted, in both the guilt and penalty phases, photos of the victim, one of which showed a gaping wound on her throat, *id.* at 580, 577 *A.*2d 419, and one of which showed her "lying on her back and stomach with [a] bat protruding from her vagina." *Id.* at 581, 577 *A.*2d 419. This Court held that although the question was "very close," the trial court had been within its discretion in admitting the photos. *Id.* at 583, 577 *A.*2d 419. Similarly, in *Moore, supra,* the Court held that the trial court had been within its discretion. to admit photos depicting multiple wounds to the victim's head. 122 *N.J.* at 467–69, 585 *A.*2d 864. The Court also has allowed graphic photos displaying the victim in a pool of blood. *DiFrisco II, supra,* 137 *N.J.* at 498–500, 645 *A.*2d 734.

Although the question whether S–158 should have been excluded is a close one, we conclude that the trial court's decision that it would have admitted it if the State had requested its admission would not have represented an abuse of discretion. *State v. Nance,* 148 *N.J.* 376, 387–88, 689 *A.*2d 1351 (1997); *State v. Marrero,* 148 *N.J.* 469, 483–84, 691 *A.*2d 293 (1997). Furthermore, S–158 is no more gruesome than the photo of the victims in *DiFrisco II* and *McDougald.*

Although the photo would have been admissible if offered by the State, its accidental admission deprived defendant of an opportunity to confront that evidence. However, because S–158 was admitted during the guilt phase and defense counsel was afforded an opportunity to respond, because the trial court gave cautionary instructions regarding the use of graphic photos, and because the jury rejected the depravity aggravating factor, we conclude that the accidental submission did not prejudice defendant.

## XII

### *Burden of Proof on Mitigating Evidence*

Defendant argues that the trial court failed to properly allocate the burden of proof on the finding of mitigating factors. Specifi-

cally, defendant contends that, although the court correctly informed the jury that defendant bore the burden of producing reliable evidence of mitigating factors, it did not instruct the jury that the State bore the burden of *disproving* such factors once defendant had introduced competent evidence of their existence.

During deliberations, the jury asked the court: "Is it appropriate if some jurors choose not to vote either yes or no on individual mitigating factors due to wording of statements?" Defense counsel urged the court to instruct the jury that the State had the burden of disproving mitigating factors supported by credible evidence, but the court refused to do so, choosing instead to tell the jury that it should examine the substance of the factors, not their exact wording. The court also told the jury that each juror had to vote on each mitigating factor that the defense had submitted.

The Death Penalty Act does not specify a burden of persuasion concerning the establishment of mitigating factors, except to state that the defendant does not bear the burden. *N.J.S.A.* 2C:11–3c(2)(a). The statute, however, does affirmatively impose a burden on the State to prove the existence of any alleged aggravating factor beyond a reasonable doubt. *Ibid.* The statute provides, in pertinent part, that:

> At the [penalty-phase] proceeding, the State shall have the burden of establishing beyond a reasonable doubt the existence of any aggravating factors set forth in paragraph (4) of this subsection. *The defendant shall have the burden of producing evidence of the existence of any mitigating factors set forth in paragraph (5) of this subsection but shall not have a burden with regard to the establishment of a mitigating factor.*
>
> [*Ibid.* (emphasis added).]

The statute also explicitly permits rebuttal evidence:

> The State and the defendant shall be permitted to rebut any evidence presented by the other party at the sentencing proceeding and to present argument as to the adequacy of the evidence to establish the existence of any aggravating or mitigating factor.
>
> [*N.J.S.A.* 2C:11–3c(2)(d).]

In *Zola, supra,* the Court phrased the inquiry as whether "the jury must accept as a mitigating factor any statutory factor on which the defendant has offered competent proof *and that* the

State has failed to disprove." 112 *N.J.* at 438, 548 *A.*2d 1022 (emphasis added). The *Zola* Court recognized that there are two steps to the jury's evaluation of mitigating evidence. First, the jury must find the evidence competent. *Ibid.* The Court rejected defendant's contention that a finding of competent evidence requires the jury to accept that evidence as establishing a mitigating factor. *Ibid.* Second, after finding the evidence competent, the jury must make a qualitative judgment. *Ibid.* In *Rose, supra,* the Court cited *Zola* in holding that "whether or not the State rebuts defendant's proof of a mitigating factor, the jury must still decide if defendant's evidence is sufficient to establish the existence of the mitigating factor." 112 *N.J.* at 539, 548 *A.*2d 1058.

Defendant attempts to distinguish *Zola* and *Rose* by asserting that the "qualitative" judgment about which this Court was concerned, was whether the defense had presented "credible" evidence of a mitigating factor. Defendant maintains that it is in this determination that the jurors must make a qualitative decision, "just as the decisions regarding guilt or innocence, insanity or sanity, self-defense or the absence thereof, and passion/provocation or an absence of passion/provocation are all qualitative judgments made within the confines of a strict burden of proof." Thus, defendant asserts that *Zola* and *Rose* stand for the principle that the State does not have to disprove, beyond a reasonable doubt, incredible or unbelievable evidence of a mitigating factor, stating that "[i]f the jury rejects the credibility of the defense evidence, the state need disprove nothing." Once the jury accepts the evidence as credible, however, the State must bear the burden of disproving the factor beyond a reasonable doubt.

Defendant's limited interpretation of *Zola* and *Rose* is belied by the Court's distinction between the "mechanical" factual determination made at the guilt phase with the "normative [penalty-phase] judgment that death is 'the fitting and appropriate punishment.'" *Bey II, supra,* 112 *N.J.* at 162, 548 *A.*2d 887 (quoting *Ramseur, supra,* 106 *N.J.* at 316 n. 80, 524 *A.*2d 188).

We reject defendant's claim that the State has the burden of disproving mitigating factors after the defendant has come forth

with credible evidence in mitigation. The jury must be given the discretion to accept or to reject a defendant's mitigating evidence regardless of whether the State affirmatively challenges that evidence. That rule is compelled by the broad scope of mitigating evidence and by this Court's consistent pronouncements that virtually no limitations can be placed on mitigating evidence. Requiring the State affirmatively to rebut and to disprove such evidence would place an unwarranted burden on the State. Furthermore, such a burden would be nearly impossible to satisfy, as many of the mitigating factors are quite amorphous and necessarily ill-defined, especially those proffered under the catch-all factor.

Given that the jury can consider any evidence presented throughout both phases of the trial as mitigating evidence, placing the proposed burden on the State would saddle it with the impossible task of disproving all conceivable mitigating evidence, whether or not argued by the defendant. The imposition of such a burden would, in many instances, effectively require the jury to find the existence of the mitigating factors. Because each juror is required to balance every mitigating factor that he or she finds against each aggravating factor that the jury finds, requiring the jury also to determine whether the State has disproved each mitigating factor would be quite expansive. In the end, imposing such a burden on the State would not change the reality of how jurors evaluate mitigating evidence. Jurors attach weight to mitigating factors that they find reasonable and credible. That reality coincides with the common-sense approach that courts now follow of allowing jurors to attach whatever significance they believe appropriate to mitigating factors supported by credible evidence. Defendant offers little reason to change that established practice.

## XIII

### *Instruction that Jury Should Try to Reach Unanimity on Mitigating Factors*

Defendant contends that the trial court committed reversible error by instructing the jury that it should attempt to reach

unanimity on the existence of mitigating factors if reasonably possible. He argues that the instruction effectively told the jury that unanimity was preferable to nonunanimity and, thereby, may have influenced jurors to abandon support for some factors in an effort to achieve unanimity.

During the penalty-phase charging conference, the trial court indicated that it would charge the jury that it did not have to reach a unanimous decision about the existence or absence thereof of each of the eighteen mitigating factors that defendant had submitted, but that it should attempt to reach a unanimous decision. Defense counsel objected to the instruction, arguing that

I don't believe that's the law. I don't think they have to agree one bit and I don't think they have to try to agree. This is an individual weighing process. They are not operating as a jury per se as a whole when they are considering which mitigating.... It seems to imply unanimity is better though.

The court rejected that contention and instructed the jury as follows:

The evidence relating to the mitigating factors should be fully discussed by the jury. To the extent reasonably possible you should attempt to reach agreement on the question of whether a particular mitigating factor does or does not exist. However, unlike aggravating factors, the law does not require unanimity with respect to the finding of mitigating factors. Rather, each juror must individually determine whether or not each mitigating factor exists. In the weighing process each juror must individually decide whether the aggravating factor or factors unanimously found outweigh beyond a reasonable doubt the mitigating factor or factors that that juror has found to be present. If after a full discussion you find that there are not—that you are not unanimous on the existence or nonexistence of a mitigating factor you will record your last vote on the factor on the verdict sheet.... So let's assume it's number 14 it could be whatever kind of numbers six yes and six no.

Later in the charge, the court stated

[i]f any one of you find that there is any credible evidence of any mitigating factor you will check yes next to that fact on the jury verdict sheet.... In the weighing process you will individually weigh all the aggravating factors which all of you have found against the mitigating factors which you individually have found.... It is important to remember that this is an individual weighing process that is unique to each juror. Each of you should determine whether the aggravating factors which all of you have found outweigh the mitigating factors which you as an individual have found. Thus, you will all be considering the same aggravating factors. But

individuals among you may be considering different mitigating factors in varying ways as to that—what that individual finds those factors to be.

In *Loftin, supra,* the trial court instructed the jury during the penalty phase that the "law does not require unanimity with respect to the finding of mitigating factors." 146 *N.J.* at 375, 680 *A.*2d 677. The court also stated, however, that "with respect to mitigating factors, to the extent reasonably possible, you should attempt to reach an agreement regarding whether a particular mitigating factor does or does not exist." *Ibid.*

Although *Loftin* recognized that a trial court may not coerce the jury into achieving unanimity on mitigating factors and that jurors individually must determine the existence or absence of the factors, *ibid.,* the Court concluded that "when the isolated remark [in the charge] is viewed in the context of the charge as a whole, it is clear that there was no error." *Id.* at 376, 680 *A.*2d 677. The Court stressed that the trial court repeatedly had informed the jury that it did not have to be unanimous regarding the mitigating factors and that the jury had returned nonunanimous decisions on nineteen of the thirty-one mitigating factors that the defendant had submitted. *Ibid.*

In the present case, as in *Loftin,* the trial court, while stating that the jury should attempt to achieve unanimity if reasonably possible, repeatedly stated that the jury did not have to be unanimous. Moreover, as in *Loftin,* the jury was nonunanimous on the vast majority of the mitigating factors. Of the eighteen mitigating factors that defendant submitted, the jury reached nonunanimous decisions on fourteen, thereby demonstrating an awareness that nonunanimity was permissible.

We, therefore, reaffirm our holding in *Loftin* and conclude that defendant's claim of error is without merit.

## XIV

### State's Rebuttal of Mitigating Evidence

Defendant argues, for the first time on appeal, that the State's rebuttal of his mitigating evidence and the prosecutor's commen-

tary on that evidence during summation, both mischaracterized the purpose of mitigating evidence and injected a nonstatutory aggravating factor into the proceedings.

Defendant's strategy during the penalty phase was to present a mountain of testimony by defendant's family members about family violence, drug addiction, alcoholism, and general abuse that he had experienced and observed throughout his childhood. He also presented the testimony of numerous experts, some of whom had treated him as a child and some of whom had reviewed his records, who concluded that his background predisposed him to violence and failed to inculcate in him the ability to distinguish right from wrong.

The State offered rebuttal mitigating evidence through Dr. Timothy Michals, a forensic psychiatrist. Dr. Michals testified extensively about antisocial personality disorders, conduct disorders, and psychoses. He opined that, although conduct disorders are generally treatable, antisocial personality disorders are much more difficult, if not impossible, to treat. He also stated that antisocial personality disorders do not necessarily result from poor parenting and lack of stable family relationships, and that bad family environments do not permanently cause an individual to become antisocial.

Specifically regarding defendant, Dr. Michals testified that defendant had benefitted from not being exposed substantially to his mentally ill, criminal father, and from his mother's attempt at rehabilitation. He stated that defendant had the capacity to learn and to know what was right and wrong, and that he had received significant counseling and treatment during his life.

The prosecutor, during her summation, commented on defendant's mitigating evidence and the State's rebuttal testimony. She stressed that certain members of defendant's family had treated him well, and that members of his family may have portrayed his childhood as worse than it was in order to help him to avoid the death penalty. She also emphasized that one's

environment does not necessarily mandate what one becomes in life.

Defendant maintains that several remarks made by the prosecutor stepped over the line of proper comment. First, she stated in reference to defendant's allegedly abusive stay with his uncle after his mother's death:

Now, there is something to think about there. There is something to think about when you're deciding what it is that David Cooper owes his uncle Larry. We kept hearing about what Uncle Larry owed David, but is there anything in us as human beings that cries out and says thank you uncle for giving me a decent place to live. I'll do my best and maybe I'll fail but I'll try, and we have never heard that. It's like how many more times could Larry Cooper fail David.

Second, the prosecutor stated:

Now, [it's] the cousin with all the money's fault. David Cooper had his own money, but it's the cousin with all the money's fault that David Cooper drinks. It's Larry's fault. It's Lucille's fault. Peeing lady's fault. It's his mother's fault. It's his grandmother's fault. It's Shirley Handberry's fault. It's Mrs. Jones' fault. It's Willie Jones' fault, Henry Cooper's fault, James Richardson's.... [At] no point in time even when he's 16 years old when he's 17 year old, at no point in time does David Cooper say I accept responsibility for the consequences of my actions. We have here—I was going to count these for you. These are all help for David Cooper. Defense says it wasn't the right kind of help.... He's got attitude from the time he walks in till the time he walks out. And the bottom line he's going to do what he's going to do and didn't feel like cooperating. Now, he's no kid any more. You can talk about the molding, the force and shaping and the hard times that he had. But he had the same hard times with [various members of his family.] ... He had people walking him through life literally and it continued repeatedly from the day he figured it out on how to manipulate, use and take advantage.

The trial court instructed the jury as follows:

[I]t is important to understand and remember that evidence of the presence of mitigating factors is not offered nor is it meant to justify or excuse a defendant's conduct in committing the crime of murder. Rather, evidence of mitigating factors is intended to present extenuating facts about the defendant's life or character or the circumstances surrounding the murder that would justify a sentence less than death.

Defendant argues that Dr. Michals in his testimony, and the prosecutor in her summation, mischaracterized his mitigating evidence as attempting to excuse or to justify his actions; whereas, the actual purpose of the evidence was to present extenuating circumstances about defendant's character and background in an attempt to justify a life sentence. Defendant also argues that the

prosecutor's summation injected the nonstatutory aggravating factor that defendant was morally reprehensible for attempting to persuade the jury to excuse him of the murder because of his background.

### 1. *Dr. Michals' Testimony*

As described earlier, the crux of Dr. Michals' testimony was that, even with his background, defendant was able to control his conduct and to know the difference between right and wrong. Defendant contends that the testimony implied that he was attempting to excuse his conduct by presenting evidence of his inability to control his conduct. We find that contention to be without merit.

The purpose of mitigating evidence is to "present extenuating facts regarding the defendant's life or character or the circumstances surrounding the murder that would justify a sentence less than death." *Bey II, supra*, 112 *N.J.* at 170, 548 *A.*2d 887. The State's rebuttal evidence is limited to the scope of the mitigating evidence that the defendant has presented. *Rose, supra*, 112 *N.J.* at 503, 548 *A.*2d 1058.

Dr. Michals' testimony was in direct response to defendant's mitigating evidence. Defendant presented evidence that, as a result of his background, he was oriented in such a way that he was aggressive, unable to empathize with others, unable to understand cause and effect, and not inculcated with the values that families normally impart to children. The clear implication of the testimony was that defendant, because of his upbringing, was violent and could not control his conduct as would a well-adjusted person. Defense counsel echoed that implication in summation:

[W]hat happens in your life is what's going to make ya—what's going to influence which way you go. Which choice you make. Which decision you make. It's going to shape your decision-making process just like it shapes you.

Although defendant never explicitly argued that his background excused his conduct, he clearly attempted to persuade the jury that his background *explained* his character and being.

In response to defendant's evidence, the State was entitled to contest defendant's interpretation of the effect of his background and to offer a different explanation for why defendant was what he was. That was done through the testimony of Dr. Michals. He testified that defendant was perfectly capable of controlling his conduct and understanding the difference between right and wrong and that his background was not so awful as to distinguish him from many others who have grown up in problem households. Thus, we find no error in the State's use of Dr. Michals' testimony to rebut defendant's mitigating evidence.

### 2. Prosecutor's Summation

The prosecutor's summation was somewhat problematic. She implied that defendant was attempting to pass blame onto others, thus excusing his own conduct. In *Bey III, supra,* the prosecutor had commented that the defendant's mitigating evidence was "not an excuse." 129 *N.J.* at 620, 610 *A.*2d 814. The Court found that the statement was error. *Ibid.* Here, unlike *Bey III,* the prosecutor never termed the mitigating evidence an "excuse," but the implication was strong and the remarks similar enough to "an excuse" to constitute error. The prosecutor's remarks may have led the jury to conclude that defendant was "morally reprehensible" for having attempted to pass blame to others and for not wanting to accept responsibility. Such an implication constitutes an impermissible nonstatutory aggravating factor.

The plain-error rule applies here because defendant did not raise that claim in the trial court. Here, as in *Bey III,* supra, the prosecutor's comments did not constitute plain error. 129 *N.J.* at 620–21, 610 *A.*2d 814. The trial court's instruction that the purpose of the mitigating evidence was not to excuse the crimes, but rather to explain and to present extenuating facts about defendant's life remedied the prosecutor's error. Thus, the prosecutor's misstatement did not have the capacity to cause an unjust result.

## XV

*Fifty–Five Years of Parole Ineligibility as a Mitigating Factor*

During the penalty phase, defendant requested that the trial court submit, under the catch-all mitigating factor, the fifty-five years of parole ineligibility that would result from a life verdict. The court rejected that request. During the jury instruction, the court informed the jury that defendant would be sentenced to at least fifty-five years in prison without parole and possibly an additional ten years if the jury did not impose a death sentence. The court then stated that "[t]hose decisions are for me to make. The possible sentences for these other convictions should not influence you in your decision regarding the appropriateness of a death penalty on the murder charge."

Defendant argues that, because the trial court gave an ultimate-outcome instruction to the jury during the penalty phase, as was its obligation, the jury should have been allowed to consider the fifty-five years of parole ineligibility under the catch-all mitigating factor for the purpose of deciding whether to impose a sentence of death. The State responds that parole ineligibility cannot possibly be a mitigating factor because it does not relate to a defendant's character or background or to the circumstances of the offense.

We are unpersuaded by defendant's argument. In *Martini I*, *supra*, the Court rejected the same argument advanced by defendant. 131 *N.J.* at 313, 619 *A.*2d 1208. There, the Court concluded that although the trial court should instruct the jury during the penalty phase on potential noncapital sentences, "the court should inform the jury that defendant's possible sentence for the other convictions should not influence its determination regarding the appropriateness of a death sentence on the murder count." *Ibid.* *Martini I*'s holding in this regard is in harmony with the Court's pronouncements in related contexts. *See Bey III, supra*, 129 *N.J.* at 603, 610 *A.*2d 814 (holding that, although court should inform jury about defendant's prior sentences, "the court should instruct the jury that it should not consider prior sentences in its decision

to impose a life or death sentence because they are not statutory aggravating or mitigating factors"). Indeed, it would lead to an incongruous result to permit parole ineligibility to be used as mitigating evidence, because the more crimes a defendant committed, the more mitigating evidence he or she would be able to submit. *Ibid.*

Defendant attempts to distinguish *Martini I* by arguing that in that case, the sentence for the noncapital offenses was uncertain (*i.e.,* the noncapital sentence may or may not have run consecutively to the murder sentence); whereas, in the present case, the period of parole ineligibility was certain because the statute required that the kidnapping sentence run consecutively to the murder sentence based on the victim's age. *N.J.S.A.* 2C:13–1c(2).

The holding of *Martini I,* however, did not rest upon the fact that the consecutive or concurrent nature of the sentence was uncertain. Rather, the Court was concerned that, without sentencing information, a jury might speculate about the sentences that a defendant would face for the noncapital counts and that such speculation would improperly influence the jury's deliberations. To avoid such speculative results, the Court determined that the jury should be informed of the potential sentences the defendant faced for noncapital counts. *See Martini I, supra,* 131 *N.J.* at 313, 619 *A.*2d 1208.

We conclude, therefore, that the trial court properly refused to permit the jury to consider the fifty-five years of parole ineligibility under the catch-all mitigating factor.

## XVI

*Merger of Convictions*

After the conclusion of the penalty phase, the trial court sentenced defendant on the noncapital convictions. The court merged the felony-murder conviction into the purposeful-or-knowing-murder conviction and one aggravated-sexual-assault conviction into the other. It sentenced defendant on the kidnapping

count to fifty-years imprisonment with twenty-five years of parole ineligibility and on the aggravated-sexual-assault count to twenty-years imprisonment with ten years of parole ineligibility, both sentences to be served consecutively to any sentence for purpose-ful-or-knowing murder. Defendant now argues, with the agreement of the State, that the trial court erred in failing to merge the aggravated-sexual-assault conviction into the kidnapping conviction.

We agree that the aggravated-sexual-assault conviction should have merged into the kidnapping conviction. *N.J.S.A.* 2C:13–1c(2) provides that the punishment for kidnapping is twenty-five years of parole ineligibility if the victim was less than sixteen-years-old and if an aggravated sexual assault occurred in the course of the kidnapping. *Ibid.* That statute requires that any aggravated-sexual-assault conviction merge into such a kidnapping conviction. *Ibid.*

The conviction and sentence for aggravated sexual assault are vacated and the matter remanded to the Law Division for the entry of an appropriate amended judgment.

## XVII

*Conclusion*

Except for the aggravated-sexual-assault conviction which must merge with the kidnapping conviction, we affirm defendant's convictions and capital and noncapital sentences. We grant defendant's request that this Court conduct proportionality review of his death sentence and that he be allowed to make full argument at that time.

The State raises the following arguments on cross-appeal: (1) that the trial court improperly limited the State from presenting the results from DNA testing; (2) that the trial court improperly precluded the State from offering rebuttal evidence at the penalty phase regarding defendant's life after the age of seventeen; and (3) that, should the Court order a new penalty phase, the State

must be permitted to elicit victim-impact evidence. Those issues would be relevant only in the event of a new guilt or penalty phase. Because we are affirming defendant's convictions, we need not address those issues. We note, however, that the Court recently held in *State v. Harvey,* 151 *N.J.* 117, 699 *A.*2d 596 (1997) (*Harvey II* ) that certain forms of DNA evidence are scientifically reliable.

Affirmed and remanded.

STEIN, J., concurring.

I concur in the judgment and join the Court's opinion except with respect to section V.C. Although I agree with the Court's determination that the trial court did not commit error in declining to inform the jury during the guilt phase of the potential sentence to be imposed in the event defendant was convicted of felony murder, the basis for my conclusion differs from the primary reasoning advanced by the Court. In my view, the fact that *Mejia* concerned a *"Gerald* mental-state determination" not implicated by the case before us, *see ante* at 375–377, 700 *A.*2d at 330–331, is not dispositive. Rather, to the extent that *State v. Mejia,* 141 *N.J.* 475, 485–86, 662 *A.*2d 308 (1995), and *State v. Brown,* 138 *N.J.* 481, 514–17, 651 *A.*2d 19 (1994), are understood to require that trial courts in capital cases must inform juries during the guilt phase of the specific sentences to which the defendant is subject on any noncapital homicide charges, the Court no longer should adhere to that aspect of *Mejia* and *Brown.*

The prevailing and longstanding rule in federal and state courts is that neither the judge nor counsel should inform the jury of the potential sentencing consequences of a guilty verdict. See Martin A. Kolter, *Reappraising the Jury's Role as Finder of Fact,* 20 *Ga. L.Rev.* 123, 139–41 (1985); Kristen K. Sauer, Note, *Informed Conviction: Instructing the Jury About Mandatory Sentencing Consequences,* 95 *Colum. L.Rev.* 1232, 1242–47 (1995). In *Shannon v. United States,* 512 *U.S.* 573, 114 *S.Ct.* 2419, 129 *L.Ed.*2d 459 (1994), the United States Supreme Court elaborated on the basis

for that general rule in the context of a defendant's request that a trial court inform the jury that the defendant would be involuntarily committed to a mental institution if he were to be acquitted of the charged offense by reason of insanity:

It is well established that when a jury has no sentencing function, it should be admonished to "reach its verdict without regard to what sentence might be imposed." The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

[*Id.* at 579, 114 *S.Ct.* at 2424, 129 *L.Ed.*2d at 466–67 (citations and footnote omitted).]

In *State v. Short,* 131 *N.J.* 47, 618 *A.*2d 316 (1993), this Court endorsed the view that a jury should not be presented with information that would distract jurors from the proper discharge of their function:

The trial court must endeavor to prevent the jury from considering evidence or information that would unduly prejudice either the State or the defense with respect to the central responsibility of the jury: determining criminal culpability. When instructing the jury, the judicial obligation is to ensure "impartial deliberations upon the guilt of a criminal defendant based solely upon the evidence in accordance with proper and adequate instructions."

The core of the jury's duty is to determine criminal culpability, not punishment. Except in capital cases, we do not allow trial courts to inform jurors of the availability or severity of the punishments consequent to the various offenses before them.

[*Id.* at 61, 618 *A.*2d 316 (citations omitted).]

*See also State v. Pereira,* 202 *N.J.Super.* 434, 439, 495 *A.*2d 431 (App.Div.1985) (emphasizing that "the practice of informing a jury during the charge as to the punishment that may be anticipated in the event of conviction is not to be commended. It is the function of the jury to adjudge guilt and for the court to pronounce sentence" (citations omitted)).

Federal courts consistently adhere to the principle that sentencing information should not be communicated to jurors. *See, e.g.,*

*United States v. Stanberry,* 963 *F.*2d 1323, 1326 (10th Cir.1992) ("It is axiomatic that the facts relevant to guilt or innocence are for a jury to decide and that the facts relevant to sentencing are for the sentencing court to decide."); *United States v. Broxton,* 926 *F.*2d 1180, 1183 (D.C.Cir.) (holding that "the jury is not to consider the potential punishment which could result from a conviction."), *cert. denied,* 499 *U.S.* 911, 111 *S.Ct.* 1118, 113 *L.Ed.*2d 226 (1991); *United States v. McDonald,* 935 *F.*2d 1212, 1222 (11th Cir.1991) (noting that it is part of Eleventh Circuit's pattern jury instruction to advise that question of punishment should not be considered by jury in deciding case); *United States v. Patrick,* 494 *F.*2d 1150, 1153 (D.C.Cir.1974) (holding that jury's sole function is to assess guilt or innocence, whereas sentencing decisions are within exclusive province of court); *United States v. Davidson,* 367 *F.*2d 60, 63 (6th Cir.1966) (same); *Pope v. United States,* 298 *F.*2d 507, 508 (5th Cir.1962) (same); *McClanahan v. United States,* 292 *F.*2d 630, 634 (5th Cir.) (declining to find error in jury charge instructing jury not to concern itself with penalty in event that defendant is found guilty), *cert. denied,* 368 *U.S.* 913, 82 *S.Ct.* 193, 7 *L.Ed.*2d 130 (1961).

State courts generally adhere to the same principle. *See, e.g., People v. Holt,* 37 *Cal.*3d 436, 208 *Cal.Rptr.* 547, 559, 690 *P.*2d 1207, 1219 (Cal.1984) ("A defendant's possible punishment is not a proper matter for jury consideration."); *People v. Lake,* 61 *Ill. App.*3d 428, 18 *Ill.Dec.* 900, 903, 378 *N.E.*2d 364, 367 (1978) ("The jury is the trier of fact and has no duty, authority, or responsibility as to the sentence which may, or may not, be imposed."); *Commonwealth v. A Juvenile,* 396 *Mass.* 108, 483 *N.E.*2d 822, 825–26 (1985) (reiterating Massachusetts' longstanding policy that judges may not place issue of punishment before finder of fact); *Commonwealth v. Ferreira,* 373 *Mass.* 116, 364 *N.E.*2d 1264, 1270–71 (1977) (noting that advising juries of sentencing and parole matters invites result-oriented verdicts); *People v. Cipollone,* 106 *A.D.*2d 458, 482 *N.Y.S.2d* 552, 553 (1984) ("It is axiomatic that punishment is within the sole province of the court and may

not be considered by the jury, either out of sympathy for the defendant or for retribution purposes against the defendant.").

Prior to our decisions in *Brown, supra,* and *Mejia, supra,* our capital punishment jurisprudence had emphasized a trial court's responsibility *in the penalty phase* of a capital case to inform the jury of its responsibility in determining the appropriateness of the death penalty, to apprise the jury of the practical effect of a life sentence, and to inform the jury about a defendant's prior sentences in order "to preclude speculation about a defendant's release from distorting a jury's decision to impose life or death." *State v. Bey,* 129 *N.J.* 557, 601–02, 610 *A.*2d 814 (1992) (*Bey III* ), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995). Reflecting federal precedent concerning sentencing information that should be furnished to capital-case jurors in the penalty phase, see *Simmons v. South Carolina,* 512 *U.S.* 154, 161–69, 114 *S.Ct.* 2187, 2192–96, 129 *L.Ed.*2d 133, 141–46 (1994), we concluded in *State v. Martini,* 131 *N.J.* 176, 619 *A.*2d 1208 (1993) (*Martini I* ), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 699, 136 *L.Ed.*2d 621 (1997), that in the penalty phase of a capital case

when defense counsel or the jury requests instructions on the potential sentences a defendant will receive for convictions arising from the same trial as his capital-murder conviction, such information should be provided by the trial court. The jurors should be informed of the sentencing options available to the judge, and that the determination of sentence had not yet been made. In addition, the trial court should explain that the sentence may or may not run consecutively to that for murder, but that the determination is left to the court. Finally, the court should inform the jury that defendant's possible sentence for the other convictions should not influence its determination regarding the appropriateness of a death sentence on the murder count. Such instructions will assist in dispelling confusion on the part of the jury and will help to safeguard against improper sentencing determinations.

[*Id.* at 313, 619 A.2d 1208.]

Although the *Brown* and *Mejia* opinions were the first to raise the issue of providing sentencing information to the jury in the *guilt* phase, that question was not the focus of the *Brown* or *Mejia* appeals. In both *Brown* and *Mejia* the Court considered and resolved the question whether the jury in the guilt phase should have been afforded the option of returning a nonunanimous ver-

dict. In *Brown, supra,* we held that the jury should have been instructed that a nonunanimous verdict was acceptable on the question whether defendant had committed the murders by his own conduct. 138 *N.J.* at 516–18, 651 *A.2d* 19. In *Mejia, supra,* we held that the jury should have been informed in the guilt phase that a nonunanimous verdict was acceptable on the question whether the defendant had committed homicide with the intent to cause death or serious bodily injury that resulted in death. 141 *N.J.* at 486–90, 662 *A.2d* 308. In neither appeal did the defendant brief or argue the question whether the guilt-phase jury had to be instructed on the specific sentences to which the defendant was exposed for the charged noncapital homicides. Hence, my belief is that the Court may not adequately have perceived the significance and the implications of that narrow but consequential issue.

Among the important distinctions between noncapital and capital prosecutions is that juries in capital cases are informed in the guilt phase that a conviction of purposeful-or-knowing murder results in the defendant being eligible for a death sentence. *See State v. Harris,* 141 *N.J.* 525, 536, 662 *A.2d* 333 (1995); *Mejia, supra,* 141 *N.J.* at 485, 662 *A.2d* 308; *Brown, supra,* 138 *N.J.* at 514, 651 *A.2d* 19. A jury so informed legitimately may be concerned about the potential sentence for the noncapital homicide counts of the indictment. In my view, trial courts should address forthrightly the unique concerns of capital-case guilt-phase jurors who are informed that a defendant convicted of purposeful-or-knowing murder is death-eligible, but uninformed about the potential sentences for noncapital homicide charges. I deem it inappropriate for trial courts to provide specific sentencing information in the guilt phase. Even in a capital case, during the guilt phase the jury should not be distracted from its function by specific sentencing information about noncapital homicide charges that could intrude on the jury's deliberative responsibility to return verdicts on the defendant's guilt or innocence of the charged crimes, as well as to determine death-eligibility.

Nevertheless, as the Court's opinion indicates, (*ante* at 378–379, 700 *A*.2d at 331–332), trial courts candidly should inform the guilt-phase jury that those noncapital homicide charges relate to extremely serious offenses, convictions for which result in appropriately severe prison sentences. The jury should be admonished that it should not concern itself with the comparative severity of the sentences for the various charged offenses, and that its responsibility is solely to determine whether the prosecution has met its burden of proving beyond a reasonable doubt the defendant's guilt of the charged offenses. The court also should inform the jury that in the event of the necessity of a penalty-phase proceeding, the jury would be informed during the penalty phase of the prison sentences to which the defendant would be subject in the event the death penalty was not imposed.

Defendant also contends that the prejudice caused by the trial court's failure to inform the jury during the guilt phase of his sentencing exposure for felony murder was exacerbated because the trial court expressly informed the jury that in the event of a conviction of purposeful-or-knowing murder the minimum sentence would be thirty years to life. Because the trial court declined to inform the jury of defendant's sentencing exposure for felony murder, that court obviously should not have informed the jury concerning the minimum sentence for purposeful-or-knowing murder. Nevertheless, I regard the error as harmless. As the majority opinion observes, *ante* at 370, 700 *A*.2d at 327, "defense counsel, as a matter of trial strategy, conceded that defendant was guilty of felony murder." Moreover, during the *voir dire* potential jurors were informed that if defendant were convicted of kidnapping and sexual assault his sentence would include a twenty-five year period of parole ineligibility. In *State v. Marshall*, 123 *N.J.* 1, 586 *A*.2d 85 (1991) (*Marshall I*), *cert. denied*, 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993), we considered the trial court's explanation of mitigating factors during *voir dire* in rejecting defendant's claim that the court's explanation of the nature and function of mitigating factors in the penalty phase was inadequate, and observed that "the prejudicial effect of an omitted instruction

must be evaluated 'in light of the totality of the circumstances—including all the instructions to the jury, [and] the arguments of counsel....'" *Id.* at 145, 586 *A.*2d 85 (quoting *Kentucky v. Whorton,* 441 *U.S.* 786, 789, 99 *S.Ct.* 2088, 2090, 60 *L. Ed.*2d 640, 643 (1979)). On this record, there can be little doubt that the jury deliberating in the guilt phase was aware that if it convicted defendant of felony murder, kidnapping, and sexual assault he would be subject to a prison sentence that was substantial and comparable to the noncapital sentence for purposeful-or-knowing murder.

In view of my conclusion that the Court no longer should adhere to those aspects of *Brown, supra,* and *Mejia, supra,* that suggest the necessity that the guilt-phase jury be informed of a defendant's specific sentencing exposure for charged noncapital homicide offenses, I concur in the judgment of the Court and join the Court's opinion except with respect to section V.C.

POLLOCK, J., concurring and dissenting.

Until today, accurate jury instructions were essential to the jury's determination whether the defendant was subject to the death penalty. Consistent with that principle, the Court has held that trial courts should inform guilt-phase juries of the sentence to which a defendant would be subject if the jury should find the defendant guilty of non-capital homicide. *State v. Mejia,* 141 *N.J.* 475, 485, 662 *A.*2d 308 (1995); *State v. Brown,* 138 *N.J.* 481, 517, 651 *A.*2d 19 (1994). In addition, the Court has held that trial courts should instruct juries to consider non-capital forms of murder simultaneously with capital murder. *Mejia, supra,* 141 *N.J.* at 483–85, 662 *A.*2d 308; *State v. Coyle,* 119 *N.J.* 194, 221–24, 574 *A.*2d 951 (1990). Finally, the Court has held that trial courts should instruct juries that a non-unanimous verdict, in which the jurors cannot agree on the form of murder committed by the defendant, is acceptable. *Mejia, supra,* 141 *N.J.* at 486–87, 662 *A.*2d 308; *Brown, supra,* 138 *N.J.* at 511, 520, 651 *A.*2d 19. Absent such instructions, the Court has not hesitated in the past

to reverse death-penalty convictions. The majority acknowledges that *Mejia* and *Brown*, both of which were rendered in the last three years, would obligate it to overturn defendant's death sentence. Instead of following those precedents, however, the majority overrules them. So abrupt a reversal of precedent is remarkable, all the more so because it leads to an irreversible result, the death penalty.

I continue to believe that accurate instructions are essential for the jury to discharge its duty as the conscience of the community in death-penalty cases. *State v. Bey*, 112 *N.J.* 123, 126, 548 *A.*2d 887 (1988) (*Bey II*) (noting instructions are "crucial in a capital case because of the jury's responsibility to decide whether a defendant shall live or die"); *see also State v. Martin*, 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990) (noting "[a] charge is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations"). Substantially for the reasons set forth in Point I of Justice Handler's dissent, I would reverse the imposition of the death penalty.

O'HERN, J., joins in this opinion.

HANDLER, J., dissenting.

In this case, the Court affirms defendant's capital-murder conviction and death sentence in the face of significant errors that undermined the reliability of the determinations that resulted in that conviction and that sentence. Those errors, in both the guilt and penalty phases, went to the very heart of the truth-seeking function of our criminal-justice system. In sustaining the conviction and death sentence in spite of those errors, the Court tolerates a degree of irrationality and arbitrariness that we have spent the last decade and a half attempting to eradicate from the imposition of the ultimate punishment in New Jersey.

I

During the guilt phase, the State contended that defendant, after kidnapping and raping L.G., intentionally had killed her.

Defendant, by contrast, while admitting that he had kidnapped, raped, and caused the death of L.G., insisted that her death had been accidental. Obviously, then, the critical guilt-phase issue—indeed, the only issue truly before the jury—was whether defendant was guilty of purposeful-or-knowing murder, thereby triggering death-eligibility, or whether he was guilty of felony murder but not purposeful-or-knowing murder, which would preclude death-eligibility.

Despite the clarity of that dispute and despite defendant's presentation of sufficient evidence to allow reasonable jurors to conclude that the death had been accidental, the trial court effectively prevented the jury from fully understanding the consequences of the death-eligibility determination that it was called upon to make. The trial court committed three fundamental errors in that regard: it kept from the jury knowledge of the sentence for felony murder while providing it with full knowledge of the various penalties for purposeful-or-knowing murder; it failed to present the two different forms of murder in a way that would have enabled the jury to consider them in conjunction with one another; and it refused to instruct the jury that it could reach a nonunanimous, non-death-eligible murder verdict split between purposeful-or-knowing murder and felony murder. The trial court's diminution of felony murder, defendant's sole defense to capital murder, in conjunction with its singular presentation of the State's theory, profoundly and irrevocably prejudiced defendant, and requires reversal of his conviction for purposeful-or-knowing murder.

A.

In response to a specific request by defendant, the trial court refused to instruct the jury that, if it found defendant guilty of felony murder (along with kidnapping and aggravated sexual assault) but acquitted him of purposeful-or-knowing murder, he would be sentenced to fifty-five years of parole ineligibility. The court reasoned that it was sufficient to inform the jury that a

conviction of felony murder without a conviction of purposeful-or-knowing murder would not trigger a penalty phase. Defense counsel then requested that the court simply tell the jury that felony murder and purposeful-or-knowing murder carried the same noncapital sentence, namely, life imprisonment with thirty years of parole ineligibility. The court again declined the request. Finally, defense counsel, in a last-ditch effort, asked if he would be permitted to inform the jury during summation of the sentence for felony murder. The court, however, with the active support of the prosecutor, who argued that defendant was attempting to focus too much attention on felony murder, barred any comment by counsel on the issue. Thus, the jury was kept totally in the dark on the sentencing consequences that would flow from accepting the sole defense theory of the case, namely, that defendant was guilty only of felony murder.

In the trial court's actual guilt-phase instruction, it informed the jury that if it convicted defendant of purposeful-or-knowing murder, he would receive either thirty years of parole ineligibility or death. Regarding felony murder, however, it simply stated that a felony-murder conviction without a conviction of purposeful-or-knowing murder would not lead to a penalty phase.

Thus, during its guilt-phase deliberations, the jury was fully aware that a conviction of purposeful-or-knowing murder—the State's theory of the case—would result in either death or, at a minimum, a very long sentence of thirty years of parole ineligibility. It had no such assurance, however, that felony murder—the defense theory—would result in the exact same sentence as a noncapital purposeful-or-knowing-murder conviction, or that it even would lead to a substantial sentence that would adequately punish defendant. Indeed, the jury very well may have believed, given the court's emphasis of the long sentence for purposeful-or-knowing murder and its failure to say *anything* about the sentence for felony murder, that felony murder carried a much lesser sentence. That one-sided presentation greatly weakened the defense theory of the case; it very well may have dissuaded the jury,

or a potential holdout juror who entertained a reasonable doubt about defendant's intent to kill, from giving serious consideration to a result that would have appeared speculative and uncertain, in that it left open the possibility that it not only would not result in a death sentence but that it would not even assure defendant's imprisonment for a substantial period of time.

The trial court's handling of that issue was totally at odds with the established standards that govern the prosecution of capital cases. It is firmly established as a matter of fundamental due process in our capital jurisprudence that juries must understand the "legal effect" of their decisions. It is also firmly settled that felony murder is a non-death-eligible alternative form of homicide to which juries must be allowed to give full consideration.

We consistently have required trial courts to inform capital juries of the legal consequences of their decisions so that they have a complete understanding of the full range of sentencing consequences, thus assuring that their decisions will be rational and informed. In *State v. Ramseur*, 106 *N.J.* 123, 311, 524 *A*.2d 188 (1987), we held that penalty-phase juries, when deciding between life and death, must be instructed about the noncapital sentence for purposeful-or-knowing murder. We stated that

[t]o hide from the jury the full range of its sentencing options, thus permitting its decision to be based on uninformed and possibly inaccurate speculation, is to mock the goals of rationality and consistency required by modern death penalty jurisprudence.

[*Ibid.*]

*Cf. State v. Loftin*, 146 *N.J.* 295, 370, 680 *A*.2d 677 (1996) ("A capital sentencing jury must be fully informed of its responsibility in determining the appropriateness of the death penalty.").

Since *Ramseur*, we have explained that the mandate to inform juries of the legal effect of their decisions includes presentation to the penalty-phase jury of sentences that the defendant currently is serving, *State v. Bey*, 129 *N.J.* 557, 603, 610 *A*.2d 814 (1992) (*Bey III*), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995), of the sentences that the court likely will impose on the defendant for any nonmurder convictions in the present case,

*State v. Martini,* 131 *N.J.* 176, 313, 619 *A.*2d 1208 (*Martini I* ), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 203, 133 *L. Ed.*2d 137 (1995), and of the "realistic likelihood" that the trial court will, in the present case, impose any noncapital sentences consecutively to the prior sentences, *Loftin, supra,* 146 *N.J.* at 372, 680 *A.*2d 677. Those holdings express the principle that, because the jury must determine the justness of the sentence in light of the defendant's culpability, the penalty-phase jury must appreciate the consequences of its sentencing decision in order to assure a determination that is rational and not motivated by the apprehension that a nondeath sentence will constitute insufficient punishment. *See Loftin, supra,* 146 *N.J.* at 426–27, 680 *A.*2d 677 (Handler, J., dissenting) (describing juror confusion about the length of time normally served during life sentence).

We have not limited to the penalty phase our repeated holdings that capital juries must understand the legal effect of their decisions, including the sentences attendant to the homicide offenses with which capital defendants are charged. Our capital jurisprudence recognizes that a capital-murder trial, though bifurcated into distinct guilt and penalty phases, is, in actuality, a continuum in which guilt-phase decisions directly impact the imposition of the death penalty. For example, several forms of murder are non-death-eligible, including serious-bodily-injury murder (pre-constitutional amendment), felony murder, and accomplice-liability murder. Recognizing the consequences that the jury's guilt-phase decisions have on the ultimate penalty determination, we have required trial courts to inform capital juries, during the guilt phase, of those consequences, including sentencing consequences.

In *State v. Brown,* 138 *N.J.* 481, 651 *A.*2d 19 (1994), we held that guilt-phase juries must be instructed that a failure to agree unanimously that a capital defendant committed murder "by his own conduct," *N.J.S.A.* 2C:11–3c, would result in a noncapital sentence of between thirty years and life in prison with thirty years of parole ineligibility. In so holding, we stressed the

relevance of the own-conduct determination to the ultimate penalty decision:

> The jury's final verdict in the penalty phase results either in the imposition of a life sentence with a thirty-year minimum term or a sentence of death. Similarly, when a jury in a capital case decides whether a defendant committed the homicide "by his own conduct," its determination establishes whether that defendant will be eligible for the death penalty. Although the consequences of the own-conduct determination and the penalty-phase verdict are not identical, the analogy is compelling.... [A] capital-murder defendant may focus his or her efforts in the guilt phase on raising a reasonable doubt about issues that trigger the penalty phase, rather than vigorously contesting guilt or innocence on the murder charge.... *We are convinced that, consistent with their statutory obligation in the penalty phase, the jurors should have been "fully informed of the consequences of their votes and the penalties which could result in each eventuality."*
>
> [*Id.* at 517, 651 *A*.2d 19 (quotations omitted and emphasis added) (quoting *Ramseur, supra,* 106 *N.J.* at 309, 524 *A*.2d 188).]

In *State v. Mejia,* 141 *N.J.* 475, 485–86, 662 *A*.2d 308 (1995), we reiterated our belief, first expressed in *Brown,* that guilt-phase capital juries must understand the legal effect of their death-eligibility determinations and, accordingly, must be informed of the sentences that defendants would receive upon a conviction of non-death-eligible murder. We stated that "[t]he failure to inform the jury of the difference [in sentences], which could have diluted the jury's responsibility for the imposition of the death penalty, ... constitutes reversible error." *Ibid.* (citations and quotations omitted).

The purpose and logic of our holdings in *Brown* and *Mejia* apply fully to felony murder. Like accomplice-liability murder and serious-bodily-injury murder, felony murder is a noncapital form of murder that does not subject a defendant to a penalty-phase trial even though the jury has convicted the defendant of murder. We recognized as much in *State v. Purnell,* 126 *N.J.* 518, 530–34, 601 *A*.2d 175 (1992), in which we held that, where the evidence provides a rational basis for the jury to convict of felony murder, felony murder must be charged to provide the jury with the opportunity to convict of that noncapital alternative form of murder. *See also* John M. Cannel, *New Jersey Criminal Code, Annotated,* comment 13 to *N.J.S.A.* 2C:1–8(e) ·(1994) ("[I]n a

capital case, where there is support in the evidence for a non-capital murder conviction, the jury must be given every opportunity to convict of the charge not carrying the death penalty."). We stated that "[t]o deprive a capital defendant of a lesser-included alternative murder charge, which arguably would have affected the deliberation of a death sentence, is not constitutionally permissible." *Purnell, supra,* 126 *N.J.* at 532, 601 *A.*2d 175. We also concluded that "when the separate offense encompassed by [a charged] aggravating factor is, in itself, a basis for an alternative form of murder that is non-capital, a defendant is constitutionally entitled to have that alternative offered for jury deliberation in the guilt phase." *Id.* at 534, 601 *A.*2d 175.

The status of felony murder as an alternative non-death-eligible form of murder, in combination with this Court's repeated insistence that guilt-phase juries be fully informed of the legal effect of their decisions, including the sentences for noncapital alternative forms of homicide, requires that the jury understand the sentencing consequences of a conviction of felony murder. The failure of the trial court here either to inform the jury of the sentence for felony murder or to allow counsel to do the same constituted clear error. The trial court effectively "hid[ ] from the jury the full range of its sentencing options, thus permitting its decision to be based on uninformed and possibly inaccurate speculation . . . [and] mock[ing] the goals of rationality and consistency required by modern death penalty jurisprudence." *Ramseur, supra,* 106 *N.J.* at 311, 524 *A.*2d 188.

While implicitly recognizing that the trial court's actions could not have been harmless because of the significance of felony murder to the accident defense in this case, the Court nevertheless attempts to validate the deliberate withholding of critical information from the jury. It does so, first, by unconvincingly arguing that the 1992 constitutional amendment that overruled our decision in *State v. Gerald,* 113 *N.J.* 40, 69–92, 549 *A.*2d 792 (1988), and that validated application of the death penalty to serious-bodily-injury murder "mooted the *Gerald* issue that formed the

basis for the *Mejia* ultimate-outcome instruction." *Ante* at 377, 700 *A*.2d at 331. The Court thus implies that the reasoning that supports the *Mejia* holding has been impugned and that *Mejia* is no longer authoritative. However, the rationale for the *Mejia* ultimate-outcome instruction—namely, that capital guilt-phase juries must be made aware of the legal effect of their decisions— does not depend on its particular application in that case. The doctrine is both fundamental and unique to capital prosecutions; it is essential because of the nature of the decision to sentence a defendant to death, a decision like no other in the criminal law. We have applied the doctrine in various contexts, including but not limited to serious-bodily-injury murder. *E.g., Brown, supra*, 138 *N.J.* at 517, 651 *A*.2d 19 (accomplice-liability murder). The vitality of the doctrine did not derive solely from the constitutionality of subjecting to the death penalty those who intended only to cause serious bodily injury. Indeed, *Mejia* was decided several years after the constitutional amendment, and its failure to limit its rationale to pre-constitutional-amendment cases is a convincing indication that the Court did not perceive that the broad ultimate-outcome principle was limited to that restricted context. The Court's limitation of this aspect of *Mejia* seriously misperceives and greatly undermines a critical component of our capital jurisprudence.

Apparently recognizing that its logic about the "moot[ing]" of *Mejia* is insupportable, especially because of *Brown*'s application of the exact same principle of informing the jury of the legal effect of its guilt-phase decisions, the Court resorts to the only action that it can take to salvage this defective conviction and death sentence, namely, to refuse to apply the inconvenient (albeit well-reasoned) precedents that stand in the way. After dispatching *Mejia*, the Court converts *Brown*'s holding that guilt-phase juries must be informed of the noncapital sentence for accomplice-liability murder into "dicta," which it then overrules. *Ante* at 377, 700 *A*.2d at 331.

The Court attempts to justify its shift away from informing juries of the legal effect of their guilt-phase decision by asserting

that "[g]enerally, juries in criminal cases are not informed of the consequences of returning guilty verdicts." *Ante* at ——. The concurrence further elaborates on the Court's new-found equation of capital and noncapital criminal proceedings, stating that

[e]ven in a capital case, during the guilt phase the jury should not be distracted from its function by specific sentencing information about noncapital homicide charges that could intrude on the jury's deliberative responsibility to return verdicts on the defendant's guilt or innocence of the charged crimes, as well as to determine death-eligibility.

[*Ante* at 411–412, 700 A.2d at 349 (Stein, J., concurring).]

What both the Court and the concurrence utterly fail to grasp is that a capital jury's guilt determinations—unlike a noncapital jury's guilt determinations—are inherently linked to its sentencing decisions, thus making information about the relevance of guilt-phase decisions to the ultimate punishment anything but "distract[ions]."

In relying on our noncapital rule that juries should not be told about the sentencing consequences of their guilt determinations, in order to justify the same rule in the capital context, the Court ignores the fact that both the Legislature and this Court repeatedly have determined that the taking of human life by the State is so different from other forms of punishment that procedures unique to capital trials and unheard of in noncapital trials are appropriate. The Legislature, for example, has vested exclusive and mandatory appellate jurisdiction in this Court, *N.J.S.A.* 2C:11–3e; has determined that juries, not judges, generally should impose sentence, *N.J.S.A.* 2C:11–3c(1); has provided incredible leeway to defendants in the presentation of mitigating evidence, *N.J.S.A.* 2C:11–3c(5)(h); and has provided for nonunanimous penalty verdicts that redound to defendants' benefit, *N.J.S.A.* 2C:11–3c(3)(c). None of those extraordinary procedures exist in the noncapital criminal context.

This Court, as well, has treated capital cases differently from noncapital cases. *E.g., Loftin, supra,* 146 *N.J.* at 339, 680 A.2d 677 ("While an *in banc voir dire* is ordinarily deemed adequate to ensure an impartial jury, we insist on an individualized *voir dire*

for capital cases because of the range of discretion entrusted to a jury in a capital sentencing hearing. . . . Because juries have so much more discretion, there is a greater need to screen out those jurors who cannot be impartial.") (quotations and citations omitted); *State v. Biegenwald,* 106 *N.J.* 13, 30, 524 *A.*2d 130 (1987) (*Biegenwald II*) ("[W]e note that in capital cases trial courts should be especially sensitive to permitting attorneys to conduct some *voir dire.*"); *Ramseur, supra,* 106 *N.J.* at 324, 524 *A.*2d 188 ("Because death is a uniquely harsh sanction, this Court of necessity will more readily find prejudice resulting from prosecutorial misconduct in a capital case than in other criminal matters. . . ."). The Court's determination today that, because noncapital juries are not told the full legal effect of their decisions, capital juries should be deprived of that information makes no sense in light of the fundamental premise undergirding modern capital jurisprudence, namely, that death is different.

Yet, however misguided the Court's holding, it is not fatal to capital defendants who seek death-eligibility determinations by juries that understand the import of their guilt-phase death-eligibility determinations. Fortunately, the Court preserves, for future cases,[1] all aspects of full jury knowledge of the legal effect of guilt-phase decisions except for the exact number of years that non-death-eligible forms of murder carry. For example, trial courts *must* tell juries which forms of homicide do and do not lead to a penalty phase and that all of the homicide offenses are "extremely serious" and carry "severe prison sentences." *Ante* at

---

[1] The Court must make its newly minted version of the ultimate-outcome instruction purely prospective because, even under the Court's new, limited ultimate-outcome rule, the trial court in this case erred badly. As noted, after the trial court refused to instruct the jury about the exact sentence for felony murder, it refused to tell the jury *anything* about the sentence for felony murder, including the fact that it carried a substantial sentence that was equivalent to the noncapital sentence for purposeful-or-knowing murder. That refusal was wholly inconsistent with the Court's holding today that juries must receive at least a fair degree of information about the sentencing results of their guilt-phase determinations. *Ante* at 378–379, 700 *A.*2d at 331–332.

378–379, 700 A.2d at 331–332. Implicit in the Court's holding is a requirement that trial courts also inform juries that the noncapital sentences for certain forms of non-death-eligible and death-eligible murder are equivalent (accompanied, of course, by an instruction not to consider the comparative lengths of the sentences in determining guilt or lack thereof).

Obviously, just as trial courts must not tell juries the numerical sentence for noncapital forms of homicide, nor are they permitted to inform juries of the noncapital sentence for death-eligible purposeful-or-knowing murder (i.e., thirty years to life). In other words, a jury determining guilt must not be informed of the sentence for purposeful-or-knowing murder that would result from a penalty-phase determination that death is not the appropriate sentence. If the guilt-phase jury were to know the noncapital sentence for death-eligible murder without knowing the sentence for non-death-eligible homicide, an obvious inequity would result because the jury could be induced to convict of death-eligible murder, which would be a known quantity, in order to assure a long sentence. As the Court today recognizes, juries should not be left to speculate about the results of their guilt-phase determinations. *Ante* at 378, 700 A.2d at 332. Not informing juries about the exact length of sentences for either death-eligible or non-death-eligible murder while telling them that, whatever the form of murder of which they convict, the sentence will be severe (and, in the case of purposeful-or-knowing murder and felony murder, the noncapital sentences will be equivalent) will allow the jury to fulfill its function without being misled by knowing the sentence for some forms of homicide but not others.

\* \* \*

Despite the limits that the Court places on its overruling of our well-reasoned precedent, its refusal to apply the ultimate-outcome rule in this case constitutes a sharp departure from our firm tradition and consistent practice of placing primary emphasis on the procedurally and substantively fair application of the death penalty. The Court effectively holds that a rule going directly to

the heart of the truth-seeking process should not be applied to this case, despite the essentiality of the rule to the defense theory and despite defense counsel's repeated invocation of the rule.

The real issue, I submit, is not about the continued vitality of *Mejia* or whether the ultimate-outcome issue was briefed in *Brown* and *Mejia, ante* at 411, 700 *A.*2d at 349 (Stein, J., concurring). Instead, it is about a capital defendant's right to present his defense and not to have the jury kept ignorant and clueless about the consequences of accepting that defense, especially when the jury has been fully apprised of the consequences of accepting the State's theory. *Cf. State v. Martin,* 119 *N.J.* 2, 16–17, 573 *A.*2d 1359 (1990) (reversing conviction based on trial court's failure to mold instruction to fit defense theory of case despite its tailoring of instructions to track State's theory). If our long-standing insistence that capital juries understand the "legal effect" of their decisions means anything, it means that this defendant cannot be executed based on the verdict of a jury left entirely in the dark about a crucial aspect of the case.

## B.

The Court also deflates the doctrine of noncapital alternative murder offenses, a doctrine that is fundamental to the fair and constitutional administration of our system of capital punishment. Based on the competing theories of intent and accident, defendant requested that the trial court instruct the jury that it should evaluate purposeful-or-knowing murder and felony murder simultaneously and in tandem with one another. The purpose of that request was to enable the jury to consider both forms of murder without initially tilting in favor of one over the other. The trial court, however, refused the request, instead instructing the jury that it should consider felony murder only after deliberating about the State's theory of purposeful-or-knowing murder. It may be the case that, under all the circumstances, the trial court's sequential presentation of the two forms of murder was harmless error because the court clearly informed the jury that it could convict of

felony murder while acquitting of purposeful-or-knowing murder and that such a result would avoid a penalty phase. Nevertheless, I strongly disagree with the Court's (mis)treatment of the vital due-process doctrine of non-death-eligible alternative murder offenses.

Although we traditionally have required juries to consider lesser-included offenses only after they acquit of the greater offense, *e.g.*, *State v. Harris*, 141 *N.J.* 525, 552–53, 662 *A.*2d 333 (1995), we have been much more skeptical of the sequential presentation of offenses where the "lesser" offense is actually an alternative form of homicide that avoids a penalty phase. Our skepticism about sequential presentation of noncapital alternative offenses has stemmed from the risk that juries may give undue attention to the first offense and may not consider the second offense until their minds are made up and they already have determined to convict of the first, death-eligible, offense. We have noted that "[o]ne problem with a sequential charge is that it may cause a jury that believes a defendant guilty of something to convict on the first and most serious charge." *Mejia, supra,* 141 *N.J.* at 484, 662 *A.*2d 308. In the context of the death penalty, that risk is simply unacceptable because of the high stakes involved.

Thus, in *State v. Coyle,* 119 *N.J.* 194, 221–24, 574 *A.*2d 951 (1990), we held that, where a rational basis exists for the jury to convict a capital defendant of passion/provocation manslaughter, which is not death-eligible, instead of death-eligible purposeful-or-knowing murder, the two must be presented simultaneously so that the jury does not consider whether the defendant had an intent to kill without also considering whether passion or provocation actually caused the killing. We noted that sequential presentation

had the potential to foreclose jury consideration of whether passion/provocation should reduce an otherwise purposeful killing from murder to manslaughter. Thus, despite the evidence of passion/provocation in the record, the jury may have convicted defendant of murder simply by finding that "it [was] his conscious object to cause death or serious bodily injury," without having considered the possibility of a manslaughter verdict.

[*Id.* at 222–23, 574 *A.*2d 951.]

In *Mejia, supra,* 141 *N.J.* at 483–85, 662 *A.*2d 308, we made clear that *Coyle* 's condemnation of sequential charges in the capital context was not limited to passion/provocation manslaughter. We noted that, like passion/provocation manslaughter,

> serious-bodily-injury murder is an alternative form of homicide, not a lesser-included offense of "intent to kill" murder.... Under *N.J.S.A.* 2C:11–3a, murder is defined as a criminal homicide committed by an actor who knowingly or purposely intends to cause death or serious bodily injury resulting in death. Thus, one who kills with either intent is a murderer.
>
> [*Id.* at 484, 662 *A.*2d 308.]

*Mejia* and *Coyle* stand for the proposition that where a rational basis exists for the jury to convict a capital defendant of a non-death-eligible alternative form of homicide, not only must the trial court charge that offense, *State v. Koedatich,* 112 *N.J.* 225, 340, 548 *A.*2d 939 (1988) (*Koedatich I* ) (accomplice-liability murder), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L. Ed.*2d 803 (1989); *State v. Harvey,* 121 *N.J.* 407, 413, 581 *A.*2d 483 (1990) (*Harvey I* ) (serious-bodily-injury murder), *cert. denied,* 499 *U.S.* 931, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991); *State v. Grunow,* 102 *N.J.* 133, 145, 506 *A.*2d 708 (1986) (passion/provocation manslaughter), but it must charge it in such a way that the jury will consider it simultaneously with its consideration of death-eligible purposeful-or-knowing murder. Because, under New Jersey law, felony murder is also a non-death-eligible alternative form of homicide, *Purnell, supra,* 126 *N.J.* at 530–34, 601 *A.*2d 175, it also must be presented to the jury simultaneously so that the jury will give it due consideration.

Despite the clarity of our precedents, the Court concludes that felony murder is no more than a traditional lesser-included offense of purposeful-or-knowing murder and thus holds that it may be charged sequentially, regardless of its significance in a particular case. *Ante* at 363–370, 700 *A.*2d at 324–327. That conclusion cannot be sustained. In *Purnell, supra,* in explaining the standard under which trial courts should determine whether to charge felony murder in the first place, we referred to lesser-included

offenses by analogy. 126 *N.J.* at 531, 601 *A.*2d 175. We made it very clear, however, that the significance of felony murder went beyond that of a traditional lesser-included offense. We stated that "when the separate offense encompassed by the aggravating factor is, in itself, a basis for an alternative form of murder that is non-capital, a defendant is constitutionally entitled to have that alternative offered for jury deliberation in the guilt phase." *Id.* at 534, 601 *A.*2d 175. Thus, in *Purnell,* we specifically pointed to the non-death-eligible status of felony murder as the significant factor in our requirement that it be charged if a rational basis exists for the jury to convict of it. Given that the *only* difference, in terms of penal consequences, between purposeful-or-knowing murder and felony murder is that one carries the potential for a death sentence whereas the other does not (they both carry noncapital sentences of thirty years to life, *N.J.S.A.* 2C:11-3b), *Purnell*'s holding that felony murder must be presented to the jury would be superfluous and unnecessary if felony murder were viewed only as a traditional lesser-included offense and not as a means for the jury to convict of a noncapital offense.[2] The Court misperceives that essential basis of *Purnell.*

Felony murder's status as a true alternative form of murder is confirmed by the structure of the murder statute, which defines "murder" as killing accompanied by purpose to cause death or serious bodily injury, knowledge that death or serious bodily injury will occur, or the intent to engage in an enumerated predicate felony. *N.J.S.A.* 2C:11-3a. Felony murder is thus a

---

[2] The facts of *Purnell* further undermine the Court's conclusion that felony murder, regardless of the specific facts of a case, is simply a traditional lesser-included offense of purposeful-or-knowing murder and not an alternative offense. In *Purnell, supra,* the defendant stabbed the victim fifteen times in the neck, chest, and abdomen. 126 *N.J.* at 528, 601 *A.*2d 175. Without more, that factual scenario does not appear to provide a rational basis *both* for conviction of felony murder *and* acquittal of purposeful-or-knowing murder, which is exactly what would be required as a rational basis to charge a traditional lesser-included offense. The Court, however, required that felony murder be presented precisely because of its non-death-eligible status.

coequal form of murder that should be charged as such and not relegated to the status of a lesser offense.

The Court, referring to the *Coyle* decision, asserts that simultaneous charging of purposeful-or-knowing murder and passion/provocation manslaughter is necessary because the mental states of the two are "interrelated" and "shade[ ] from one into the other." *Ante* at 369, 700 *A.*2d at 327. By contrast, says the Court, "there is no connection between the required mental state for purposeful-or-knowing murder and that for felony murder, the latter being a strict-liability offense." *Ibid.* Yet, as the facts here demonstrate, the mental states underlying purposeful-or-knowing murder and felony murder can be quite "interrelated."

In this case, defendant killed either intentionally or unintentionally. Just as the jury in *Coyle* could not convict of purposeful-or-knowing murder without finding a lack of passion/provocation and just as the jury in *Mejia* could not find the existence of a specific intent to kill without concluding that the defendant did not simply possess an intent to cause serious bodily injury, the jury in this case could not conclude that defendant had intended to kill L.G. without finding an absence of accident. As in *Coyle* and *Mejia,* the mental state for the non-death-eligible alternative offense in this case was inextricably bound up with the mental state for purposeful-or-knowing murder and should have been presented as such.

Indeed, the analogy between a passion/provocation defense and an accident/felony-murder defense is compelling. In the passion/provocation context, the defendant admits that he caused the death of the victim but attributes the killing to passion or provocation; thus, the dispute between the prosecution and the defense boils down to whether the defendant killed the victim in a premeditated, deliberate manner or whether he did so only after being provoked in some way. Likewise, in the accident/felony-murder context, the defendant admits that he caused the death of the victim but attributes the killing to an accident; thus, the dispute between the prosecution and the defense boils down to whether

the defendant killed the victim in a premeditated, deliberate manner or whether he did so accidentally. In both contexts, the jury is confronted with a choice of premeditation or lack thereof, and, in both contexts, the consequences of the jury's choice is enormous, namely, whether a penalty phase will be triggered. How the Court can dismiss that similarity is puzzling.

Obviously felony murder and other murder offenses need not be presented as coequal alternatives to purposeful-or-knowing murder in *all* cases, regardless of the evidence. A rational basis must exist in order for the jury to consider felony murder as a viable option. Trial courts should evaluate the facts and circumstances of the evidence and defenses presented in determining whether alternative homicide offenses should be presented simultaneously to death-eligible murder. In this case, such a rational basis existed.

The trial court nevertheless ignored that requirement and instructed the jury that it should not deliberate on felony murder without first deliberating on—and, implicitly, acquitting or convicting of—purposeful-or-knowing murder. That presentation could have exerted a coercive influence on the jury by inducing it to consider purposeful-or-knowing murder without giving equal consideration to defendant's sole defense, namely, that the killing had been accidental and that he consequently was guilty only of felony murder. The error, however, may have been harmless because the trial court clearly informed the jury that it could convict of felony murder while acquitting of purposeful-or-knowing murder and that such a result would avoid a penalty phrase.

Yet, the harmlessness of the error does not justify the Court's disposition of this claim. Jurors must be provided "every opportunity to convict of the charge not carrying the death penalty." Cannel, *supra*. Moreover, jurors must possess a clear understanding of the "legal effect" of their guilt-phase determinations, including their effect on death-eligibility. *Mejia, supra,* 141 *N.J.* at 485, 662 *A.*2d 308; *Brown, supra,* 138 *N.J.* at 517, 651 *A.*2d 19. Although the Court wisely reaffirms *Purnell* and the essentiality

of charging non-death-eligible alternative homicide offenses, *ante* at 358–365, 369, 700 *A.2d* at 321–325, 329, by fashioning a per se rule that felony murder is nothing more than a traditional lesser-included offense of purposeful-or-knowing murder that can be given secondary status regardless of the facts of the case, the Court does great disservice to those aspects of our capital jurisprudence that are designed to promote sound and informed decisions.

### C.

The Court also rejects the possibility of a nonunanimous murder verdict in which jurors are divided between purposeful-or-knowing murder and felony murder. Under that nonunanimity theory, if some jurors believe that a defendant intended to kill while other jurors believe that he killed accidentally in the course of a felony and, hence, is guilty of felony murder but not purposeful-or-knowing murder, then the result is a non-death-eligible murder conviction. The Court's conclusion is inconsistent with our requirement that juries have "every opportunity to convict of the charge not carrying the death penalty." Cannel, *supra.*

New Jersey's murder statute has a distinctive structure in that it initially was drafted without capital punishment in mind. When the Legislature later adopted the death penalty in 1982, it simply engrafted death-eligibility onto the already-existing definition of murder. *See Gerald, supra,* 113 *N.J.* at 89–90, 549 *A.2d* 792 (noting discrepancies between statements by key legislators in enactment of death penalty and actual structure of statute once death-eligibility provisions were incorporated); John J. Farmer, Jr., *The Evolution of Death–Eligibility in New Jersey,* 26 *Seton Hall L.Rev.* 1548, 1564–72 (1996). The statute defines "murder" as death resulting from one of five mental states: intent to cause death; intent to cause serious bodily injury; knowledge that death will occur; knowledge that serious bodily injury will occur; or the mental state necessary to support a predicate felony giving rise to felony murder. *N.J.S.A.* 2C:11–3a. Those five forms of "murder" are not distinguished by degree, and they all carry the same

noncapital sentence, namely, between thirty years and life imprisonment with thirty years of parole ineligibility. *N.J.S.A.* 2C:11–3b.

After comprehensively defining "murder" without distinguishing among the five mental states that may give rise to it, the statute defines death-eligibility. *N.J.S.A.* 2C:11–3c. It does so by simultaneously exempting felony murder and most forms of accomplice-liability murder. *Ibid.* This Court added a class of cases to that exemption when it invalidated the application of the death penalty to murderers who did not specifically intend to kill their victims or have knowledge that death would occur. *Gerald, supra,* 113 *N.J.* at 69–92, 549 *A.*2d 792. Although that decision was superseded by constitutional amendment and legislation, *L.* 1993, *c.* 111, § 1 (codified at *N.J.S.A.* 2C:11–3i), *Gerald* still exempts from death-eligibility any murder unaccompanied by a specific intent to kill that occurred before December 3, 1992. *Loftin, supra,* 146 *N.J.* at 349, 680 *A.*2d 677.

With the superimposition of death-eligibility onto the murder statute, the Court was faced with the question of how to distinguish between death-eligible and non-death-eligible murder. After all, while the murder statute equated a number of mental states as various forms of the general crime of "murder," the death-eligibility provision of the statute distinguished among those mental states and made even further distinctions (e.g., principal versus accomplice).

The Court responded by emphatically relying on the original definition of "murder," without distinguishing among the differing mental states, and by viewing the death-eligibility provision as a simple penalty-phase triggering mechanism, without relevance to the underlying substantive definition of "murder." As we stated in *Mejia, supra:*

> Like the "by your own conduct" requirement, the "intent to kill" requirement "is not an element of the offense of murder [but is] merely a triggering device for the death-penalty phase of the trial."
>
> [141 *N.J.* at 486, 662 *A.*2d 308 (quoting *Gerald, supra,* 113 *N.J.* at 99, 549 *A.*2d 792) (citations and quotations omitted).]

*See also Brown, supra,* 138 *N.J.* at 520, 651 *A.*2d 19 ("Although murder indictments must specify whether the murder is alleged to have been committed by the defendant's own conduct, ... the purpose of that requirement is only to indicate whether the alleged crime is one punishable by death."). Consequently, we have not required jury unanimity with respect to the particular *theory* or factual basis underlying a murder conviction because the murder statute makes no such distinction in its definition of "murder" and because more than one theory or factual basis can constitute "murder." Instead, we simply have required that all jurors agree that the defendant is guilty of some form of murder, that is, murder in one of its prescribed forms, as defined by *N.J.S.A.* 2C:11–3a. *E.g., Mejia, supra,* 141 *N.J.* at 486, 662 *A.*2d 308 ("A jury need not agree unanimously on a defendant's mental state when a finding on one of several alternative mental states will satisfy the relevant statutory requirement."); *Brown, supra,* 138 *N.J.* at 520, 651 *A.*2d 19 ("[T]he accepted view is that to return a criminal conviction, a jury need not be unanimous on the theory of criminal-conduct responsibility if the alternative theories apply to commission of the same criminal act and each of them supports conviction of the same offense...."); *Bey III, supra,* 129 *N.J.* at 582, 610 *A.*2d 814 ("That a jury agree unanimously that the defendant's state of mind was either purposeful or knowing is sufficient to find a defendant guilty of capital murder.").

It is only in the context of a capital prosecution when the jury has agreed unanimously that the defendant is guilty of "murder" under *N.J.S.A.* 2C:11–3a that the jury's agreement or lack thereof about the particular theory underlying the murder conviction becomes relevant in determining whether a penalty phase will be triggered pursuant to *N.J.S.A.* 2C:11–3c. If the jury unanimously agrees on a death-eligible theory (e.g., intent to kill by one's own conduct) or is split among more than one death-eligible theory (e.g., intent to kill by one's own conduct and knowledge that death will result from one's own conduct), then the verdict triggers a penalty phase. If fewer than all of the jurors agree on a death-eligible theory, however, then a penalty phase does not occur. *See*

*Brown, supra,* 138 *N.J.* at 511, 651 *A.*2d 19 ("[T]he inability of the jury to reach a unanimous decision on the own-conduct determination constitutes a final verdict that results in the imposition of a sentence of imprisonment of at least a thirty-year mandatory term....").

Given that established decisional background, the question in this case is whether felony murder should be arbitrarily excluded from our nonunanimity jurisprudence despite the inclusion of every other form of "murder" as defined in *N.J.S.A.* 2C:11–3a. The Court concludes that it should be excluded because of a perceived legislative intent underlying the murder statute and because of the "chaos" that would occur if felony murder were included.

The Court's reliance on legislative intent is misplaced. It states that

[t]he fact that the Legislature has established the identical sentence for noncapital purposeful-or-knowing murder as it has for felony murder should not be determinative of whether to require a unified-murder charge. It is the culpable mental state plus the aggravating circumstances that determine death-eligibility and that also distinguish capital murder from felony murder.

[*Ante* at 360, 700 *A.*2d at 322.]

After noting that "felony murder is an absolute liability crime because a defendant need not have contemplated or *intended* the victim's death," *ibid.,* the Court concludes that "the Legislature intended that death-eligibility be viewed as the touchstone of moral equivalence" [3] in determining which forms of murder can be

---

[3] "Moral equivalence" is the standard that both the United States Supreme Court and this Court have adopted for determining whether two *mens reas* are similar enough in terms of traditional notions of blameworthiness for the government to base a conviction for a single crime on the two *mens reas* without having to specify which one. *See Schad v. Arizona,* 501 *U.S.* 624, 643, 111 *S.Ct.* 2491, 2503, 115 *L. Ed.*2d 555, 573 (1991) (plurality opinion) ("If, then, two mental states are supposed to be equivalent means to satisfy the mens rea element of a single offense, they must reasonably reflect notions of equivalent blameworthiness or culpability, whereas a difference in their perceived degrees of culpability would be a reason to conclude that they identified different

combined to form a nonunanimous murder verdict. *Ante* at 361, 700 *A*.2d at 322.

The Court bases its holding—that a non-death-eligible theory of murder cannot combine with a death-eligible theory to form a general murder conviction—on the conclusion that death-eligible and non-death-eligible theories are not moral equivalents. The support for that conclusion, however, is simply that death-eligibility is the touchstone of moral equivalence, a proposition that serves as both the Court's premise and its conclusion. The Court thus begs the key question of *why* death-eligibility, as opposed to other aspects of the murder statute's structure, is the "touchstone" of moral equivalence.

The Court's assertion finds equivocal support in the statute's language and history and no support in this Court's jurisprudence. The murder statute, as noted, groups all five states of mind together in the category "murder" and provides that all are punishable by the same term of imprisonment. It then exempts felony murder and most forms of accomplice-liability murder from death-eligibility. That structure, standing alone, does not lead to the inevitable conclusion that death-eligibility is the "touchstone" of moral equivalence. If anything, the fact that the Legislature, in enacting the death penalty, maintained the unified definition of murder in *N.J.S.A.* 2C:11–3a, instead of dividing that definition of murder into "capital" and "noncapital" murder, suggests that it intended for the various forms of murder to remain morally equivalent.

Concededly, the murder statute is ambiguous about whether the Legislature intended for death-eligible and non-death-eligible forms of murder to be moral equivalents. On the one hand, the Legislature grouped all forms of murder together in the definition of "murder" and imposed the same noncapital punishment for them, *N.J.S.A.* 2C:11–3a & b; on the other hand, it distinguished among them in terms of death-eligibility, *N.J.S.A.* 2C:11–3c.

offenses altogether."); *Bey III, supra,* 129 *N.J.* at 581–82, 610 *A.*2d 814 (applying *Schad* standard).

Thus, it is plausible to look to either section of the statute to discern a legislative intent regarding moral equivalence.

The ambiguity in the statute, however, is fully clarified by this Court's repeated rejection of death-eligibility as the sole determinant or "touchstone" of moral equivalence. In *Brown, supra,* we held that the jury could reach a nonunanimous verdict about whether the defendant was a (death-eligible) principal or (non-death-eligible) accomplice in the murder. 138 *N.J.* at 511–18, 651 *A.*2d 19. Likewise, in *Mejia, supra,* we validated nonunanimous murder verdicts split between (non-death-eligible) serious-bodily-injury murder and (death-eligible) intent-to-kill murder. 141 *N.J.* at 486–87, 662 *A.*2d 308. In *Mejia,* we based our holding on the irrelevance of the defendant's specific state of mind to the actual "murder" conviction, instead stressing that as long as all jurors agreed that one of the requisite states of mind for murder was present, a murder conviction resulted; state of mind came into play only to determine whether the jury unanimously had agreed on a death-eligible state of mind, thereby triggering a penalty phase. *Id.* at 486, 662 *A.*2d 308; *see also Brown, supra,* 138 *N.J.* at 520, 651 *A.*2d 19; *Gerald, supra,* 113 *N.J.* at 99, 549 *A.*2d 792.

Given our explicit holdings and reasoning in *Brown* and *Mejia,* the Court's conclusion that death-eligibility is the sole "touchstone" of moral equivalence and that felony murder is thus "different" from other forms of murder is totally unconvincing. *See Brown, supra,* 138 *N.J.* at 521, 651 *A.*2d 19 (citing to case that permitted mixing of premeditated and felony murder). Even if the Court were incorrectly to conclude that *Brown* is distinguishable in that the "own-conduct" determination is independent of the statute's definition of "murder," it cannot make that claim about the jury's intent-to-kill determination, which is clearly part of the definition of "murder" in *N.J.S.A.* 2C:11–3a. The Court cannot avoid the fact that we already have concluded that the Legislature's definition of "murder" in *N.J.S.A.* 2C:11–3a is the touchstone of moral equivalence. Nor can it avoid our repeated holdings that the murder statute defines "murder" as encompassing a

number of different states of mind and that the jury need not agree on one particular state of mind to support a murder conviction, as opposed to death-eligibility.

In order to avoid that conclusion, however, the Court chooses to rely on assertion to support its claim, stating that

[b]ecause the Legislature has decreed that felony murder is not a death-eligible offense and our capital jurisprudence, stressing the importance of providing a jury with every opportunity to spare a defendant's life, has been limited to purposeful-or-knowing-murder cases in which the jury had to resolve a factual dispute determinative of whether that murder was death-eligible, we decline to extend that jurisprudence to noncapital murder. Those cases have been restricted to capital murder as defined in *N.J.S.A.* 2C:11–3c for which notice of aggravating factors has been given. *N.J.S.A.* 2C:11–3c(2)(e).

[*Ante* at 361–362, 700 *A.*2d at 323.]

Again, the question here is *why* "our capital jurisprudence, stressing the importance of providing a jury with every opportunity to spare a defendant's life, has been limited to purposeful-or-knowing-murder cases in which the jury had to resolve a factual dispute determinative of whether the murder was death-eligible...." And, again, the Court provides no satisfactory response, instead simply falling back on its arbitrary and unsupported assertion that felony murder is different from non-death-eligible forms of purposeful-or-knowing murder.

The Court comes closest to attempting to justify its excision of felony murder from its unambiguously coequal place in the statute's definition of murder by relying on felony murder's "different" *mens rea*, namely, its status as an "absolute liability crime." *Ante* at 360, 700 *A.*2d at 322. That reliance is undermined, however, by our inclusion of serious-bodily-injury murder in our nonunanimity jurisprudence. Serious-bodily-injury murder is, in reality, a form of "absolute liability" felony murder, with aggravated assault as the underlying felony. *See Gerald, supra,* 113 *N.J.* at 88, 549 *A.*2d 792 ("In that respect [i.e., felony murder only requires an intent to commit the underlying felony as opposed to an intent to kill] felony-murder is strikingly similar to the crime at issue here, the purposeful or knowing infliction of serious bodily injury resulting in death."). The Court, however, has not excluded

that "absolute liability" form of murder from its nonunanimity jurisprudence, thus casting doubt on the Court's new-found distinction between absolute-liability and non-absolute-liability forms of murder.

Moreover, felony murder's requisite *mens rea* is not necessarily less culpable than other *mens reas*. All of the predicate felonies to felony murder (robbery, sexual assault, arson, burglary, kidnapping, and criminal escape) involve either violence or high risk of violence against others; indeed, for a felony murder to occur, the felony must result in the ultimate form of violence, namely, death. Our requirement that, for causation to exist in the felony-murder context, death must have been the "probable consequence of the defendant's conduct," *Martin, supra,* 119 *N.J.* at 33, 573 *A.2d* 1359, is further evidence of the high level of indifference to the value of human life that we require to sustain a felony-murder conviction. The distinction between a violent rape or robbery resulting in death and a violent assault that results in death is unclear at best.

As in the case of the Court's emphasis on death-eligibility as the "touchstone" of moral equivalence, its reliance on *mens rea* as an indicator of moral culpability is a sharp break from the past and not dictated by the structure of the murder statute. We long have allowed nonunanimous murder verdicts split between and among various mental states (e.g., purpose/knowledge, intent to kill/intent to cause serious bodily injury). Moreover, the statute's definition of murder in *N.J.S.A.* 2C:11–3a equates all of the violent mental states as "murder," thereby undermining the putative legislative intent that the Court reads into the statute. Consequently, the impression is unmistakable that the Court is engaging in jurisprudential and statutory revisionism in order to sustain this death sentence.

The Court also points to the "nearly-universal hallmark[ ] of . . . the requirement of a unanimous verdict in criminal cases" and asserts that "the intermingling of death-eligible murder with non-death-eligible murder would create utter chaos when instructing a jury." *Ante* at 361, 700 *A.2d* at 323 (quotations and citation

omitted). The Court then insinuates that a murder conviction split between felony murder and purposeful-or-knowing murder would fail to lead to a guilty verdict for murder, stressing "[t]he public's right to see that a criminal prosecution proceeds to a verdict either of acquittal or conviction" and that a nonunanimity instruction "would lead a jury down the wrong path ... to a verdict not permitted under our law." *Ibid.*

In concluding that the felony-murder nonunanimity instruction would be "chao[tic]" and somehow unconstitutional, the Court, again, completely ignores our nonunanimity jurisprudence, the nonunanimity practice of other states, and the United States Supreme Court's explicit validation of such verdicts. In *Brown, supra,* 138 *N.J.* at 511–18, 651 *A.*2d 19, and *Mejia, supra,* 141 *N.J.* at 486–87, 662 *A.*2d 308, we explicitly *required* "the intermingling of death-eligible murder with non-death-eligible murder," *ante* at 361, 700 *A.*2d at 323, and, to my knowledge, neither "utter chaos," *ibid.,* nor unconstitutional verdicts have occurred. In fact, in *Mejia, supra,* we *specifically* rejected the argument that nonunanimity in that context would violate the "bedrock principle of jury unanimity...." 141 *N.J.* at 486, 662 *A.*2d 308 (quotations omitted); *see also Brown, supra,* 138 *N.J.* at 518, 651 *A.*2d 19 (noting that, as in the penalty phase, a nonunanimous guilt-phase verdict regarding death-eligibility does not result in a hung jury or mistrial, instead resulting in a "valid murder conviction").

Moreover, as the Court notes, numerous other states allow nonunanimous murder verdicts split between premeditated and felony murder, *ante* at 359, 700 *A.*2d at 322; *see Schad, supra,* 501 *U.S.* at 641–42, 111 *S.Ct.* at 2502, 115 *L. Ed.*2d at 571–72 (canvassing states that allow such nonunanimous verdicts), including Washington and Kansas, where felony murder is not death-eligible, *ante* at 359 n. 1, 700 *A.*2d at 322 n 1. As one court has stated:

[P]remeditated murder and felony murder are not separate or different offenses. The statute merely provides alternative methods of proving the deliberation and premeditation required for a conviction of first degree murder.... A prosecution under the felony murder rule merely changes the type of proof necessary to establish a violation of the statute. Proof that a homicide was committed in the

perpetration of a felony is tantamount to premeditation and deliberation which otherwise would be necessary to constitute murder in the first degree.

[*State v. McCowan*, 226 *Kan.* 752, 602 *P.*2d 1363, 1370–71 (1979), *cert. denied,* 449 *U.S.* 844, 101 *S.Ct.* 127, 66 *L.Ed.*2d 53 (1980).]

Finally, the United States Supreme Court has approved of murder verdicts split between premeditated and felony murder, *Schad, supra,* 501 *U.S.* at 630–45, 111 *S.Ct.* at 2496–2504, 115 *L. Ed.*2d at 564–74 (plurality opinion); *id.* at 648–52, 111 *S.Ct.* at 2505–07, 115 *L.Ed.*2d at 576–78 (Scalia, J., concurring in part and in judgment), which should assuage the Court's fear that such verdicts are "not permitted under our law." *Ante* at 363, 700 *A.*2d at 324 (quotations and citation omitted).

Regarding the "utter chaos" that a felony-murder nonunanimity instruction allegedly would cause, resulting in the "reversal of *any* murder or felony-murder conviction," *ante* at 363, 700 *A.*2d at 324, the Court's fears are greatly exaggerated. As noted, numerous states permit nonunanimous verdicts split between felony murder and premeditated murder and have done so for many years. *See Schad, supra,* 501 *U.S.* at 651, 111 *S.Ct.* at 2507, 115 *L.Ed.*2d at 577–78 (Scalia, J., concurring in part and in judgment) ("Submitting killing in the course of a robbery and premeditated killing to the jury under a single charge ... was the norm when this country was founded ... and remains the norm today.... [It is] a practice as old as the common law and still in existence in the vast majority of States...."). One imagines that if "utter chaos" had resulted, many states would have abandoned the practice.

The Court's chaos argument is further undermined by the proposed verdict sheet that defendant submitted in this case, which is quite clear and comprehensible. Slightly modified, it states:

MURDER

We the jury unanimously find the defendant

 not guilty of murder _____

 guilty of murder _____

 (defendant caused the death of L.G. purposely or knowingly, or he caused the death of L.G. during the commission of or attempted commission of, or flight

after committing or attempting to commit the crime of kidnapping and/or sexual assault)

If your answer is not guilty, go to AGGRAVATED MANSLAUGHTER on the next page.

If your answer is guilty answer the following questions:

SELECT ONE OF THE FOLLOWING:

1. We find unanimously that the defendant purposely or knowingly committed the murder. _____

2. We find unanimously that the defendant caused the death of L.G. during the commission of or attempted commission of or flight after committing or attempting to commit the crime of kidnapping and/or sexual assault.

_____

3. We unanimously find both 1 and 2. _____

4. We are unable to agree unanimously on either 1, 2, or 3, but all 12 of us find 1, 2, or 3 and at least 1 of us finds 2 but not 1 or 3. _____

That verdict sheet is entirely understandable and provides the jury with a clear framework within which to work. It allows the jury, once it has reached a unanimous determination that the defendant is guilty of "murder," to decide whether the murder was (1) purposeful-or-knowing murder but not felony murder, (2) felony murder but not purposeful-or-knowing murder, (3) both purposeful-or-knowing murder and felony murder, or (4) one or the other, but not both. Thus, the jury can implement our consistent description of the murder statute as defining the general crime of "murder" followed by a triggering mechanism (i.e., *mens rea* ) to determine death-eligibility.

Moreover, the fact that a jury can convict of *both* purposeful-or-knowing murder and felony murder because they are not mutually exclusive is of no moment. Although accomplice-liability murder and principal-liability murder may be mutually exclusive, neither intent-to-kill murder and serious-bodily-injury murder nor purposeful murder and knowing murder are mutually exclusive. If one intends to kill, then she also intends to cause serious bodily injury, and if one has the purpose of killing, then she also possesses the knowledge that death will result if she completes her purpose. That two forms of murder may overlap has not been dispositive in our nonunanimity jurisprudence. Instead, we have focused on the difference in the "legal effect" (i.e., death-eligibility

or lack thereof) of the different theories in determining whether a nonunanimity instruction is required.

Despite the ability of trial courts to inform and to guide juries about the possibility of reaching a nonunanimous verdict regarding death-eligibility, the Court determines that juries must reach unanimity on each theory of murder in order to produce a valid murder conviction. When combined with the Court's erroneous holding that it is permissible to require juries to convict or acquit of purposeful-or-knowing murder prior to considering felony murder, *ante* at 363–370, 700 *A.*2d at 324–327, the unanimity requirement may cause holdout jurors, who believe that a defendant is guilty of some sort of murder but not necessarily purposeful-or-knowing murder, to cave in to majority pressure and to convict of purposeful-or-knowing murder rather than risk not convicting of any form of murder.

The Court's rejection of the nonunanimity instruction is inconsistent with the murder statute, our capital jurisprudence, principles of fairness and due process, and the practice of many other states. Similar to the Court's treatment of the ultimate-outcome instruction and simultaneous presentation of the two forms of murder, its analysis and dismissal of this claim have no support in either logic or precedent.

## II

Although defendant's guilt-phase death-eligibility process was fundamentally flawed, death-eligibility, by itself, does not determine whether a capital defendant will be sentenced to death. A defendant who is denied a fair determination of death-eligibility still has the opportunity to persuade the penalty-phase jury that his life should be spared. In this case, however, an egregious error by the trial court in submitting mutually exclusive aggravating factors to the jury, prosecutorial misconduct in encouraging and compounding that error, and the accidental submission of a gruesome autopsy photograph to the jury, combined to inject a degree of arbitrariness and irrationality into the penalty phase

that no court should tolerate. Paralleling its treatment of the guilt-phase issues in this case, however, the Court, after conceding that errors occurred, employs an analysis that falls far short of supporting its conclusion that those errors were harmless. I believe that the errors were not harmless beyond a reasonable doubt and that, individually and cumulatively, they require that defendant's death sentence be vacated.

### A.

The submission of both the depravity and escape-detection aggravating factors (in addition to the felony-murder factor, whose existence defendant essentially conceded) to the jury was one of the most contentious issues in this capital prosecution. As the Court notes, *ante* at 381, 700 *A.*2d at 333, on numerous occasions, defendant moved to dismiss the depravity factor because the finding of lack of motive required to support it was inconsistent with the definite motive required to find the escape-detection factor. Defendant's motions created confusion on the part of the trial court and induced the prosecutor to make a number of telling statements that demonstrated her knowledge of the impermissibility of the submission of both factors.

The trial court's position was consistent throughout the proceedings, namely, that the jury could find motive (i.e., to escape detection) or lack thereof (i.e., depravity) but could not find both. The court based its belief that the two factors could be submitted to the jury, despite their mutual exclusivity, on a misreading of the precise wording of our holding in *State v. Moore,* 122 *N.J.* 420, 471, 585 *A.*2d 864 (1991), in which we noted the "logical contradiction" in submitting the two factors.

Although the trial court's unfortunate error stemmed from a misreading of our precedents, the prosecutor's "errors" were not so benign. She initially expressed agreement with the trial court that the two factors were mutually exclusive, but she subsequently changed her position, stating that "I'm not sure I haven't proven both. There is no reason for the killing of this child, none. That's

the depravity. He did it because he wanted to. And he didn't want to get caught. I think they are both here." After trial, the prosecutor clarified her rationale for charging both aggravating factors:

Now, *Samuel Moore* says that those are mutually exclusive aggravating factors. But I would submit to you that this is the exception to the rule. I would submit to you that even though the Supreme Court gives us that direction, that in this case they have to give us the opportunity, because this is the rare case where it was fun and part of the fun was to get away with it.

After the trial court, with the encouragement of the prosecutor, submitted both factors, in complete contravention of "the Supreme Court['s] . . . direction," the court instructed the jury that it could not find both factors, because they were mutually exclusive. The court never instructed the jury that it could *reject* both factors. The prosecutor, after commenting on the mutual exclusivity, told the jury in summation:

He either did it because it involved depravity [of] the mind, . . . which really talks about from society's point of view, a totally meaningless, senseless, from the point of view of society, killed her. And in the alternative, . . . to keep from getting caught. . . . And you will be able to decide and it's not hard, I think, between the two. They are an alternative. One is basically an absence of motive and the other is motive.

She also stated: "The question remaining is which of the other two aggravating factors [i.e., other than the felony-murder factor] is here," and "so you have to pick one [i.e., either escape-detection or depravity]." Again, neither the court nor the prosecutor qualified those statements by telling the jury that it had a third alternative, namely, rejection of *both* factors.

After its penalty-phase deliberations, the jury unanimously rejected the depravity factor and unanimously found the existence of the felony-murder and escape-detection factors. In weighing the aggravating factors against the mitigating evidence, the jury explicitly found that the two factors, when combined, outweighed the mitigating evidence but that, individually, they did not.[4] Thus,

---

[4] The verdict sheet's explicit question about how many of the aggravating factors that the jury found were necessary to outweigh the mitigating factors is a

only with both aggravating factors did the State obtain a death sentence.

The Court correctly holds that the trial court committed a blatant and serious error when it submitted both the depravity and escape-detection factors to the jury. *Ante* at 383, 700 *A.*2d at 334. We have held on numerous occasions that the lack-of-motive component of the depravity factor may not be submitted along with a factor that requires a finding of motive. *Coyle, supra,* 119 *N.J.* at 233–35, 574 *A.*2d 951; *State v. Rose,* 112 *N.J.* 454, 529–33, 548 *A.*2d 1058 (1988). Moreover, as the Court notes, we specifically have applied that principle to the depravity/escape-detection context. *S. Moore, supra,* 122 *N.J.* at 471, 585 *A.*2d 864. Trial courts that preside over capital cases must be knowledgeable about our capital jurisprudence, given that a defendant's life hangs in the balance.

Despite the Court's correct holding that the trial court committed error, it nevertheless classifies the error as harmless, glossing over the error's factual context, omitting much of the prosecutor's outrageous conduct, and ignoring several important cases that point toward a finding of prejudice.

In *State v. Christener,* 71 *N.J.* 55, 362 *A.*2d 1153 (1976), the trial court submitted both murder and manslaughter to the jury, even though insufficient evidence existed to support the murder charge. The jury acquitted the defendant of murder and convicted him of manslaughter. After recognizing that submission of the murder charge was error, we confronted the error's potential harmless-

---

practice that does not appear to be widespread in New Jersey, but it is one that trial courts should employ, whether or not the parties request it. Requiring juries to make that specification yields two benefits. First, it forces the jury to engage in deeper analysis of and reflection on the balancing process, particularly the precise weight to be assigned to each factor. Second, it allows for more effective and efficient appellate review by this Court in that we can assess more accurately the prejudicial impact of errors relating to aggravating factors. For example, if a jury determines that each aggravating factor individually outweighs the mitigating evidence, then the erroneous submission of an aggravating factor is more likely to be harmless.

ness resulting from the jury's rejection of the erroneously submitted offense. We held that the error was prejudicial because "the possibility that the jury, in the absence of sufficient evidence to sustain a first degree murder charge, may have reached a compromise verdict suggests that [defendant] may have suffered prejudice by that instruction in spite of his manslaughter conviction." *Id.* at 69–70, 362 *A.*2d 1153.

> In *State v. Thomas,* we clarified *Christener* by stating that
>
> [o]ur holding in *Christener* does not stand for the proposition that reversal is mandated every time a judge charges a jury about a crime for which there may be insufficient evidence to support a conviction. The entire discussion of *Christener* centered on the prejudicial effect of "overcharging," or instructing the jury on a crime more serious than is warranted by the evidence. In this case, the mistaken charge was not an overcharge. Rather, it related to alternate theories of establishing the same offense....
>
> [76 *N.J.* 344, 365, 387 *A.*2d 1187 (1978).]

We concluded in *Thomas* that, to show prejudice, a defendant would have to show that the mistaken charge led to jury confusion. *Ibid.*

Since *Christener* and its clarification in *Thomas,* we have applied *Christener* analysis in the context of overcharging of aggravating factors. In *State v. DiFrisco,* 137 *N.J.* 434, 502, 645 *A.*2d 734 (1994) (*DiFrisco II* ), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L. Ed.*2d 873 (1996), we held that the erroneous submission of the escape-detection factor was harmless because the jury had rejected the factor and had found that the other factor alone outweighed the mitigating evidence. We distinguished *Christener* by reasoning that the prejudice to the defendant in that case had grown out of the mutually exclusive nature of murder and manslaughter. *Ibid.* In other words, because the *Christener* jury had to consider the mutually exclusive murder and manslaughter charges in conjunction with one another, it was more likely to reach a compromise verdict of manslaughter where it might otherwise have acquitted of all charges. On the other hand, we reasoned that, when the jury is confronted with two non-mutually-exclusive aggravating factors, it must consider each one independently of the other. We concluded that it would be speculative to

assume that the jury's consideration of one independent aggravating factor affected (via compromise) its consideration of the other independent factor. *Ibid.*

In *Rose, supra,* we previously had noted the distinction between independent and mutually exclusive aggravating factors in the *Christener* context:

> Unlike the mutually exclusive choices between first-degree murder and manslaughter ... the jury's function in the penalty phase of a capital case is first to assess, independently of each other, the sufficiency of proof of the aggravating and mitigating factors. *Its rejection of one such factor neither compels nor inhibits its determination that another factor exists.*
>
> [112 *N.J.* at 533, 548 *A.*2d 1058 (emphasis added).]

Thus, the essence of *Christener* prejudice is that when the jury is overcharged, be it with an unsupported greater offense or aggravating factor, the inquiry must focus on the potential for jury confusion and compromise, focusing on the interdependence of the properly and improperly charged offenses or factors. Mutual exclusivity, as evidenced in *Rose,* is an important consideration in evaluating the possibility of jury confusion and compromise because, where the jury is told that it cannot choose both options and that accepting one option automatically means rejection of the other option, the jury may feel constrained to choose one of the options, thus overlooking the choice of rejecting all of the options.

In the context of aggravating factors, an evaluation of *Christener* prejudice entails consideration of which factors were submitted and the potential for confusion. For example, if the felony-murder factor is properly submitted but the murder-for-hire factor is improperly submitted, the jury can be expected to consider each without reference to the other. The same cannot be said, however, of aggravating factors that are inextricably linked to one another, as both *DiFrisco II* and *Rose* recognized.

In this case, the depravity and escape-detection factors *were* mutually exclusive, thereby triggering *Christener* concerns. The jury had to consider the two factors jointly, and its deliberations on one necessarily affected its deliberations on the other; if it found that one existed, it had to reject the other. The jury easily

could have been confused about the relationship between the two and may have believed that it had to choose one or may have compromised by choosing one.

That rather abstract vision of prejudice was translated into reality by the actions of the trial court and especially the prosecutor. Both stressed to the jury that it could not pick both factors, but they never explicitly informed it that it could reject both. The jury thus may have believed, consciously or subconsciously, that it needed to pick one of the two. The danger of jury compromise was quite real. The prosecutor's inaccurate statements strengthened the subtle, but clear, message that the jury "ha[d] to pick one." *Supra* at 372, 700 *A.*2d at 328. ("He either did it because it involved depravity [of] the mind, ... [a]nd in the alternative, ... to keep from getting caught....."). The jury easily could have interpreted those remarks, which went uncorrected and unclarified by the trial court, as instructions to pick one or the other; after all, either defendant had a motive, or he did not have a motive.

Nor does the jury's uncontroversial acceptance of the felony-murder factor obviate a finding of prejudice. As noted, the jury explicitly found that the two aggravating factors (felony-murder and escape-detection) outweighed the mitigating evidence only when combined and that, individually, they did not. Thus, had the jury found only the felony-murder factor, it would not have imposed death.

Defendant was further prejudiced by the erroneous submission because of his resulting inability to argue against one of the mutually exclusive factors without implicitly arguing in favor of the other. For example, to argue that depravity was not present necessarily implied that defendant had a motive, which the jury reasonably could have interpreted as a concession of the existence of the escape-detection factor. Conversely, an argument that defendant's motive was not to escape detection, while failing to present another motive, could have been viewed as a concession of lack of motive, *i.e.,* depravity. The erroneous submission of the

depravity factor thus effectively placed defendant in a catch–22 in his efforts to confront either of the two factors.

Defense counsel's penalty-phase summation reflected that dilemma by urging the jury to reject both factors because it was unclear whether or not defendant had a motive. Jurors, however, reasonably could have discerned from that subtle argument the implication that, although it was unclear *which* of the two factors was present, one of the two *had* to be present because defendant killed either for a reason or for no reason—there could be no in-between. By precluding counsel from strenuously arguing against either of the factors, the erroneous submission placed him in the untenable position of implying to the jury that one of the two had to be present. The State should not be able to abuse its discretion in charging aggravating factors by placing defense counsel in such a precarious and untenable posture.

We thus are faced with a situation in which the trial court, over defendant's strenuous and repeated objections, erroneously submitted an aggravating factor to the jury. That error, by itself, could support a finding of prejudice because of the mutually exclusive nature of the depravity and escape-detection factors. The error then was greatly exacerbated when the prosecutor inaccurately told the jury that it had to pick one or the other and when defense counsel was precluded from effectively advocating against either one. The jury's explicit statement on the verdict sheet that it would not have sentenced defendant to death had it rejected both factors is proof of the prejudice that defendant may have suffered as a result. That course of events constitutes reversible error.

In classifying the error as harmless the Court engages in the most cursory analysis, reasoning that because the "rejection by the jury of one aggravating ... factor does not compel or inhibit its determination that another factor existed," it would be "highly speculative" to conclude that defendant was prejudiced. *Ante* at 384, 700 *A*.2d at 334. The Court then undermines its own argument by stressing the trial court's instruction to the jury that

if it found one factor, it had to reject the other. *Ante* at 384, 700 A.2d at 335. What the Court appears to miss, however, is that the instruction to the jury that the two factors were mutually exclusive certainly "inhibit[ed] its determination that another factor existed," *ante* at 384, 700 A.2d at 385, and, given the prosecutor's repeated, inaccurate remarks, may have "compel[led] . . . its determination that another factor existed," *ibid.* One need not "speculat[e]," *ibid.*, to draw that inference.

Nowhere does the Court confront the heart of this claim, namely, that the overcharging and its attendant circumstances created a reasonable possibility that the jury believed, either consciously or subconsciously, that, while it could not choose both factors, it "ha[d] to choose one," given that defendant either had a motive or did not have a motive. Nor does it so much as pay lip service to the potential that the circumstances of this claim, from the prosecutor's improper remarks to counsel's paradoxical penalty-phase summation to the jury's explicit findings, had to prejudice defendant.

I do not assert that the circumstances here make it certain or even likely that the jury was induced by the cumulative errors to find the escape-detection factor. That, however, is not the standard. Instead, the measure is whether a reasonable possibility existed that, absent the multiple errors, *one juror* would not have found the factor. By that measure, one must conclude that the error generated a fatally prejudicial result.

## B.

Eight hours into the penalty deliberations, the jury sent a note to the trial court, asking if jurors could use the photo exhibits of L.G. for the "sole purpose of determining whether the aggravating factors outweigh the mitigating factors." Evident from the note was that the jury already had evaluated the existence of the aggravating and mitigating factors and that it wanted to view the photos during the subjective balancing portion of the penalty phase. The trial court, after giving a cautionary instruction, allowed the jury to use the photos during its balancing process.

Fifty minutes later, after defense counsel claims to have heard "raised voices" coming from the jury room, the jury returned a death sentence. After the verdict, Exhibit S–158, or "the crotch picture," as the prosecutor so eloquently termed it, was discovered in the jury room; that photo was so graphic that, prior to the penalty phase, the State had agreed to exclude it, as it had agreed to exclude all of the highly graphic photos.

I concur in the Court's holding that the accidental submission was error because it "deprived defendant of an opportunity to confront that evidence," *ante* at 394, 700 *A.*2d at 340, but I strongly disagree with its two-sentence analysis of the alleged harmlessness of the deprivation. The Court bases its finding of harmlessness on S–158's admission during the guilt phase, defendant's resulting opportunity to confront the photo during the guilt phase, the trial court's cautionary instruction about the use of the photos, and the rejection of the depravity factor. *Ibid.* Yet, although those considerations may have reduced to a degree the prejudice that defendant suffered, they did not render the error harmless beyond a reasonable doubt.

It is important to consider the *context* of the accidental submission in order to assess its prejudicial impact. The use of the photos during the guilt phase was very different from their use during the penalty-phase balancing process. In the guilt phase, the jury viewed the photos solely to determine the factual issues relating to defendant's guilt or innocence. Its guilt-phase viewing of the photos, moreover, had occurred substantially prior to its penalty deliberations. In the penalty-phase balancing process, by contrast, the jury was in the final stages of a highly sensitive and subjective determination of blameworthiness that clearly could be influenced and easily swayed by such a gruesome photo.

We know that the jury's penalty determination was a close one. First, as I have noted, the jury determined that only the combined aggravating factors outweighed defendant's mitigating evidence and that, individually, they did not. *Supra* at 371–372, 700 *A.*2d at 328–329. Second, we know from the post-trial hearing examining

452

the propriety of Juror Maria Hollenback's employment at the Monmouth County Prosecutors Office, that one of the juror's had been reluctant to agree to a death sentence.

Given what we know about the jury's use of the photo, we can readily envision a plausible situation in which defendant was prejudiced by its accidental submission. The jury already had deliberated for eight hours before viewing the photo, and, from the jury's note, we know that it already had determined which aggravating and mitigating factors existed. When it began to use the photos, therefore, it was already in the critical, subjective balancing process. Given Hollenback's statement that one juror had been reluctant about sentencing defendant to death, the eleven pro-death jurors may have desired to use graphic photos (including the inadvertently submitted S–158) to convince the holdout that defendant deserved to die. After the trial court responded affirmatively to the jury's question about whether it could "review the photographs of the victim for the sole purpose of determining whether the aggravating factors outweigh the mitigating factors," the pro-death jurors may have used S–158 to convince the holdout that he or she should switch. The jury's determination that the individual aggravating factors did not outweigh the mitigating evidence may reflect that tentative verdict.

That set of possible circumstances is sufficiently plausible, considering the unusual amount of information that we have about the jury's balancing process, to preclude a finding that the accidental submission was harmless beyond a reasonable doubt. Had the photo not been submitted, the jury would have been left with a number of autopsy photos that were not particularly graphic (as per the parties' stipulation). Without the exhibit, therefore, the pro-death jurors may not have been able to persuade the potential holdout juror to switch, thus resulting in a life sentence. The exhibit was highly inflammatory; with its graphic display of L.G.'s spread legs and bloody genitalia, it may have been just enough to provide that late push toward a death sentence. That possibility

is sufficient to cast a reasonable doubt on the harmlessness of the error.

The Court's reliance on defendant's opportunity to confront the photo does not rescue this death sentence. That counsel did not confront the photos during the guilt phase is irrelevant because of the difference between the guilt and penalty phases and because defendant did not contest anything except for intent during the guilt phase. Regarding the penalty phase, given the stipulation that no graphic photos would go to the jury, defense counsel may have made a deliberate choice not to confront them. Although it could be argued that counsel's failure to confront them during the penalty phase is dispositive because of the trial court's erroneous failure to limit the jury's consideration of guilt-phase evidence during the penalty phase (i.e., counsel should have known that the jury could rely on its recollection of the photos regardless of their physical submission during the penalty phase), counsel may have made the reasonable determination that, given the time interval between the jury's use of the photos during the guilt phase and the penalty deliberations, it would be unwise to remind jurors of the graphic photos. Had counsel been aware that S–158 would be submitted to the jury, however, he very well may have determined that it would be advisable to defuse its prejudicial impact during his penalty-phase summation.

In any event, we should not be so presumptuous as to guess what defense counsel's strategy would have been had he known that the inflammatory exhibit would be in the jury room. The fact remains that he did not know and thereby was denied any opportunity to confront it in the context of the penalty phase.

We repeatedly have recognized the differences between the guilt and penalty phases in terms of the greater care that trial courts must take during the latter in ensuring that highly prejudicial evidence does not infect the jury's sensitive penalty determination. *State v. Dixon*, 125 *N.J.* 223, 249, 593 *A.*2d 266 (1991); *State v. Johnson*, 120 *N.J.* 263, 299, 576 *A.*2d 834 (1990); *State v. Pitts*, 116 *N.J.* 580, 638–39, 562 *A.*2d 1320 (1989). In this case, we

know that the gruesome and emotionally-charged photo was viewed during the most subjective and sensitive portion of the penalty phase, namely, the balancing process. Moreover, we know that the penalty determination was a close one. As one court has stated:

> Modern day trials are factually presented in open court before the iron curtain descends upon the jury room. We cannot tolerate prejudicial factual intrusion into that sanctum lest our courts return to darker days of our jurisprudential history. The dagger of hidden evidence must not be taken from its scabbard for the first time in the jury room to wound the defendant; and unless its piercing effect is only skin deep and without prejudice to the anatomy of the trial, we must apply a constitutional salve.
>
> [*United States v. Howard*, 506 F.2d 865, 866 (5th Cir.1975).]

This revolting and powerful piece of evidence was not "factually presented in open court," instead having been "taken from its scabbard for the first time in the jury room." Because it had the reasonable potential to affect the precarious balance in which defendant's life hung, I would "apply a constitutional salve" and vacate defendant's death sentence.

## III

This case is a prime example of the severe constitutional infirmities that plague the administration of capital punishment in this State. Through the trial court's errors, the prosecutor's misconduct, and this Court's refusal to view the trial for what it was—a proceeding profoundly lacking in fairness and due process—defendant has been condemned to die.

If we are to subject individuals to the ultimate violence, namely, the deliberate taking of life in the name of the people, then, at the very least, we should require that adequate safeguards be in place to ensure that that violence is not inflicted in an arbitrary manner. In this case, however, the Court dismisses and even legitimates substantial arbitrariness in both phases of the trial. Ranking with the Court's failure to right the injustice of defendant's death sentence is the grave harm that it inflicts on the progress that we have made over the last fifteen years in rooting out arbitrariness in the administration of capital punishment in New Jersey.

The arbitrariness of this death sentence becomes apparent when the errors infecting defendant's conviction and sentence are viewed in their entirety. Defendant was found death-eligible by a jury that was unaware of the consequences of accepting his non-death-eligible theory of the case and that was encouraged to reach unanimity on the State's death-eligible theory of the case before even thinking about defendant's theory. Once found death-eligible, defendant's penalty jury was told, both implicitly and explicitly, that it *had* to choose one of two alternative aggravating factors. After it potentially was induced into choosing more aggravating factors than it would have chosen with a proper presentation of aggravating factors, the jury's balancing process, including a probable holdout juror, was infected by the unconfronted submission of a highly inflammatory photo.

At every stage of this capital prosecution—the determination of death-eligibility, the evaluation of aggravating factors, and the balancing of aggravating and mitigating factors—the questions were close. Yet, at every stage, something occurred to ensure that defendant would proceed to the next stage. However ugly the facts of this case are and however much the victim suffered at defendant's hands, defendant was constitutionally entitled to a fair trial. That he did not receive.

I dissent.

POLLOCK, J., joins in Part I of this opinion.

O'HERN, J., joins in Parts I and II.A. of this opinion.

STEIN, J., concurring in result.

*For affirmance*—Chief Justice PORITZ, and Justices GARIBALDI, STEIN and COLEMAN—4.

*For reversal*—Justices HANDLER, POLLOCK and O'HERN—3.